Peter A. Brandt, CA Bar No. 241287
pbrandt@hsus.org
Jonathan R. Lovvorn, CA Bar No. 187393
jlovvorn@hsus.org
2100 L St., N.W.
Washington, DC 20037
(202) 955-3669 (phone)
(202) 778-6132 (fax)

*Counsel for Plaintiff Californians for Humane Farms*

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

**CALIFORNIANS FOR HUMANE FARMS**
1545A Powell Street
San Francisco, CA 94133

        Plaintiff,

    v.

**ED SCHAFER**, Secretary
United States Department of Agriculture
1400 Independence Avenue, S.W.
Washington, DC 20250,

**AMERICAN EGG BOARD**
1460 Renaissance Drive
Park Ridge, IL 60068,

        Defendants.

Civ. No. 08-03843 (MHP)

Administrative Procedure Act Case

**Motion for Temporary Restraining Order and/or Preliminary Injunction**

**Hearing: _____**

## MOTION FOR TEMPORARY RESTRAINING ORDER
## AND PRELIMINARY INJUNCTION, AND REQUEST FOR HEARING

    Plaintiff hereby moves for a temporary restraining order and/or for a preliminary injunction to prevent federal officials from illegally disbursing as much as $3 million in federal funds to help campaign against the enactment of California

Proposition 2 – a citizen initiative concerning the protection of farm animals pending on the November 2008 state ballot.

As explained in the attached memorandum, the AEB – a federal commodity promotion or "check off" program under the supervision of USDA – "unanimously passed a motion at its recent fall meeting in California that $3 million be held in reserve to assist the state if necessary in the industry's current battle with animal activists [concerning] a referendum on the November 2008 ballot that would eliminate [battery] cage [egg] production in California." *AEB Supports California Egg Battle*, Egg Industry 6 (Dec. 2007). On August 8, 2008, USDA notified Plaintiff that USDA and AEB have either begun, or will soon begin, releasing AEB funds to the opponents of California Proposition 2 so they can begin airing advertisements that reinforce the opposition's campaign messages.

However, the plain language of the Egg Research and Consumer Information Act, P.L. 93-428, 7 U.S.C. § 2701, *et seq.*, prohibits the AEB from expending any funds *"for the purpose of influencing governmental policy or action." Id.* at § 2707(h). Because the USDA is required by federal law to approve all AEB expenditures, *id.* at § 2707(d), and because the expenditure of federal funds for the express purpose of interfering with a state legislative process is a clear violation of federal law, plaintiffs are likely to prevail on their claim that USDA's actions are "not in accordance with law" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706.

Temporary injunctive relief is necessary to maintain the *status quo* because once federal money is released by AEB, the proponents of Proposition 2 will be irreparably harmed by a massive and overwhelming influx of illegal cash to the opposition campaign, and there will be nothing plaintiffs or the Court can do under the Administrative Procedure Act to retrieve those funds and restore the *status quo*. At the same time, a temporary delay in the release of such funds while Plaintiff's claim can be considered by the Court will have no negative impact on

defendants or any third party, since the election is almost three months away, and the funds can always be disbursed at a later date if the Court finds the expenditures to be lawful. Accordingly, Plaintiff respectfully requests a hearing and a decision at the Court's earliest convenience.

Plaintiff previously informed the office of the United States Attorney for the Northern District of California of its intention to file this motion today, August 18, 2008. Further, Plaintiff will forward a copy of this motion and the attached memorandum and exhibits to the United States Attorney and the American Egg Board immediately upon the filing of this motion as required under Civil L.R. 65-1(b).

Defendants have represented that advertisements funded by the challenged government expenditure could begin as early as Thursday of this week. Accordingly, unless the parties can reach an agreement to delay such expenditures pending the resolution of a motion for a preliminary injunction, Plaintiff respectfully requests a hearing on this motion at the Court's earliest convenience. [1]

Respectfully submitted,

*/s/ Peter A. Brandt*

_____

Peter A. Brandt (CA Bar No. 241287)
Jonathan R. Lovvorn (CA Bar No. 187393)
2100 L Street, N.W.
Washington, D.C. 20037
(202) 955-3669 (phone)
(202) 778-6132 (fax)

August 18, 2008

*Counsel for Plaintiff Californians for Humane Farms*

_____

[1] Plaintiff is proposing to the United States Attorney's office and the American Egg Board that this matter be resolved as a request for preliminary injunction, rather than as a temporary restraining order. Plaintiff will advise the Court immediately if such an agreement is forthcomming.

PETER A. BRANDT, CA Bar No. 241287
pbrandt@hsus.org
JONATHAN R. LOVVORN, CA Bar No. 187393
jlovvorn@hsus.org
2100 L St., N.W.
Washington, DC 20037
(202) 955-3669 (phone)
(202) 778-6132 (fax)

*Counsel for Plaintiff Californians for Humane Farms*

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| **CALIFORNIANS FOR HUMANE FARMS**<br>1545A Powell Street<br>San Francisco, CA 94133<br><br>          Plaintiff,<br><br>     v.<br><br>**ED SCHAFER**, Secretary<br>United States Department of Agriculture<br>1400 Independence Avenue, S.W.<br>Washington, DC 20250,<br><br>**AMERICAN EGG BOARD**<br>1460 Renaissance Drive<br>Park Ridge, IL 60068,<br><br>          Defendants. | Civ. No. 08-03843 (MHP)<br><br>Administrative Procedure Act Case<br><br><br><br>**Memorandum in Support of Motion<br>for TRO and Preliminary Injunction**<br><br>**Hearing:** _____ |

## <u>MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>

Peter A. Brandt (CA Bar No. 241287)
Jonathan R. Lovvorn (CA Bar No. 187393)
2100 L Street, N.W.
Washington, D.C. 20037
(202) 676-2324 (phone)
(202) 778-6132 (fax)

# TABLE OF CONTENTS

Table of Authorities ...................................................................................iii

Introduction ................................................................................................1

Background ..................................................................................................2

    I.     The Statutory and Regulatory Scheme...................................................2

          A.  The Administrative Procedure Act ....................................................2

          B.  The Egg Research and Consumer Information Act..........................3

          C.  The Commodity Promotion, Research and Information Act............4

          D.  Egg Research and Promotion Order Regulations and Guidelines
              for Research and Promotion Boards .................................................5

    II.    Relevant Facts .....................................................................................5

          A.  California Proposition 2....................................................................5

          B.  The AEB's Decision to Fund Efforts to Defeat Proposition 2 ..........6

          C.  Plaintiff's Efforts to Convince USDA and AEB Not to Interfere
              with the California Electoral Process.................................................7

Argument ...................................................................................................10

    I.     Plaintiff is Likely to Succeed on the Merits .........................................11

          A.  The AEB's Purpose in Expending $3 Million in Federal
              Checkoff Funds Violates the Plain Meaning of the ERCIA
              and CPRIA...................................................................................11

          B. The Secretary's Decision Does Not Comport with a Reasonable
             Construction of the ERCIA and CPRIA, and Conflicts with the
             USDA's Existing Regulations and Guidance Documents...............16

    II.    The Balance of Equities and the Public Interest also Favor
           Injunctive Relief .................................................................................17

A. Plaintiff will Suffer Irreparable Harm Absent Issuance of an Injunction ................................................................................ 17

B. Defendants Will Not Suffer Irreparable Harm if the Court Issues a Preliminary Injunction ................................................. 19

C. Injunctive Relief is in the Public Interest ...................................... 20

Conclusion ............................................................................................... 21

## <u>TABLE OF AUTHORITIES</u>

### CASES

<u>Akhtar v. Burzynski</u>,
384 F.3d 1193 (9th Cir. 2004) ........................................................... 12

<u>Barnhart v. Thomas</u>,
540 U.S. 20, 124 S.Ct. 376 (2003) ..................................................... 16

<u>Bennett v. Spears</u>,
520 U.S. 154, 117 S. Ct. 1154 (1997) ................................................ 11

<u>Bernhardt v. Los Angeles County</u>,
339 F.3d 920 (9th Cir. 2003) .............................................................. 11

<u>Bonnichsen v. United States</u>,
217 F. Supp. 2d 1116 (D.Or. 2002) .................................................... 16

<u>Chaplaincy of Full Gospel Churches v. England</u>,
454 F.3d 290 (D.C. Cir. 2006) ........................................................... 19

<u>Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>,
467 U.S. 837, 104 S.Ct. 2778 (1984) ...................................... 11, 12, 16

<u>City of South Pasadena v. Slater</u>,
56 F. Supp. 2d 1106 (C.D. Cal. 1999) ................................................ 20

<u>Cole v. Oroville Union High School District</u>,
228 F.3d 1092 (9th Cir. 2000) ............................................................ 19

<u>Earth Island Inst. v. U.S. Forest Serv.</u>,
351 F.3d 1291 (9th Cir. 2003) ................................................ 11, 17, 18

<u>High Sierra Hikers Ass'n v. Powell</u>,
No. C-00-01239-EDL, 2002 WL 240067 (N.D. Cal., Jan. 9, 2002) ................ 20

<u>Household Credit Services, Inc. v. Pfennig</u>,
541 U.S. 232, 124 S.Ct. 1741 (2004) ................................................. 16

<u>Johanns v. Livestock Marketing Association</u>,
544 U.S. 550, 125 S. Ct. 2055 (2005) ................................................ 21

<u>Keller v. State Bar of Cal.</u>,
496 U.S. 1, 110 S. Ct. 2228 (1990) .................................................... 21

Kootenai Tribe of Idaho v. Veneman,
    313 F.3d 1094, 1124 (9th Cir. 2004) ................................................................ 17

Lynch v. Donnelly,
    465 U.S. 668, 104 S. Ct. 1355 (1984) ............................................................... 19

Miller v. French,
    530 U.S. 327, 120 S.Ct. 2246 (2000) ............................................................... 15

Nat'l Black Police Ass'n v. D.C. Board of Elections and Ethics,
    858 F. Supp. 251 (D.D.C. 1994) ..................................................................... 18

Nat'l Senior Citizens Law Ctr. v. Legal Services Corp.,
    581 F. Supp. 1362 (D.D.C. 1984) ................................................................... 20

Natural Resources Defense Council v. U.S. E.P.A.,
    526 F.3d 591 (9th Cir. 2008) ......................................................................... 12

Northern Cal. Power Agency v. FERC,
    37 F.3d 1517 (9th Cir. 1994) ......................................................................... 17

Public Citizen v. Heckler,
    653 F. Supp. 1229 (D.D.C. 1987) ................................................................... 17

The Wilderness Society v. U.S. Fish and Wildlife Serv.,
    353 F.3d 1051 (9th Cir. 2003) ....................................................................... 12

United States v. United Foods, Inc.,
    533 U.S. 405, 121 S. Ct. 2334 (2001) .............................................................. 21

Wash. Capitols Basketball Club, Inc. v. Barry,
    419 F.2d 472 (9th Cir. 1969) ......................................................................... 20

Western States Petroleum Association v. U.S. E.P.A.,
    87 F.3d 280 (9th Cir. 1996) ........................................................................... 17

## STATUTES

Administrative Procedure Act, 5 U.S.C. § 551, *et seq* .................................................. 2

5. U.S.C. § 702 ............................................................................................................. 2

5 U.S.C. § 706 ............................................................................................................. 3

iv

Commodity Promotion, Research and Information Act, 7 U.S.C. § 7411, *et seq*... 4, 12

7 U.S.C. § 7414.................................................................................... 4, 5, 12

Egg Research and Consumer Information Act, 7 U.S.C. § 2701, *et seq*........... 2, 12, 14

7 U.S.C. § 2701 ..................................................................................... 14

7 U.S.C. § 2706 ..................................................................................... 3

7 U.S.C. § 2707 ................................................................... 2, 3, 4, 12, 13, 15, 20

7 U.S.C. § 2709 ..................................................................................... 4

Federal Agricultural Improvement and Reform Act, Pub. L. No. 104-127, 110
    Stat. 1032 (1996) ........................................................................... 4

## REGULATIONS

7 C.F.R. § 1250.346.............................................................................. 5, 16

7 C.F.R. § 1250.351 .............................................................................. 5

## MISCELLANEOUS

H. Rep. No. 93-1032, 93rd Cong., 2d Sess. At 5 (1974) ......................... 3, 14

S. Rep. 93-1109, 93rd Cong., 2d Sess. (Aug. 20, 1974) ........................... 15

USDA, Agricultural Marketing Service, Guidelines for Research and
    Promotion Boards............................................................................ 5, 16

# INTRODUCTION

Plaintiff hereby moves for a temporary restraining order and/or for a preliminary injunction to prevent federal officials from illegally disbursing as much as $3 million in federal checkoff program funds to help campaign against the enactment of California Proposition 2 – a citizen initiative concerning protection of farm animals pending on the Fall 2008 state ballot.

The expenditure at issue is contained in the revised 2008 annual budget of the American Egg Board ("AEB"), a commodity promotion program created by Congress. The revised budget was submitted to the United States Department of Agriculture ("USDA") for approval of the transfer of $3 million – approximately ten percent of the program's entire annual budget – from AEB reserve holdings in order to fund a special project described in the budget as a "consumer animal welfare ed. campaign." Exh 7.

However, according to several agency documents obtained under the Freedom of Information Act, the true purpose of this proposed expenditure was, and remains, to provide financial support for efforts by the egg industry to defeat a ballot initiative, the Prevention of Farm Animal Cruelty Act, or Proposition 2, certified for consideration by the citizens of California in the November 2008 state election. Federal Defendants were aware of this purpose at the time that they approved the AEB's revised annual budget, and have recently informed Plaintiff that they have either begun, or will soon begin, releasing AEB funds for the purpose of airing advertisements that reinforce the campaign being waged by the opponents of California Proposition 2.

As explained further below, the expenditure of federal checkoff program funds to influence the outcome of a state election is plainly unlawful, and Plaintiff is entitled to emergency injunctive relief. Plaintiff is almost certain to prevail on its claim that the Secretary's approval of the withdrawal of $3 million from AEB reserve funds contravenes an express prohibition on political spending by the AEB

set forth in the Egg Research and Consumer Information Act of 1974 ("ERCIA"), P.L. 93-428, 7 U.S.C. § 2701, *et seq.*, which unequivocally forbids the use of any funds collected by the AEB pursuant to a federal legislative checkoff program "for the purpose of influencing governmental policy or action." *Id.* at § 2707(h).

Further, the balance of equities and the public interest also support the relief sought by Plaintiff. Plaintiff's ability to enact Proposition 2 will be damaged beyond recovery if the chief industry opposition groups' campaign is illegally aided by *several million dollars* in federal checkoff program funds. And once these funds are expended by AEB, there will be nothing Plaintiff or the Court can do under the law to retrieve those funds and restore the *status quo.* At the same time, a temporary delay in the release of such funds will have no negative impact on Defendants or any third party, since the election is almost three months away, and the funds can always be disbursed at a later date if the Court finds the expenditures to be lawful. Indeed, the only way Defendants could possibly claim any harm from the issuance of the requested injunction is by admitting that the expenditures at issue *are* for the purpose of influencing the election, and therefore need to be used for advertising in the next two months to have their desired effect.

Accordingly, and to prevent an unprecedented and unlawful attempt by the federal government to interfere with state election processes, Plaintiff respectfully requests that a temporary injunction be issued to maintain the *status quo.*

**BACKGROUND**

# I. THE STATUTORY AND REGULATORY SCHEME

### A. The Administrative Procedure Act

The Administrative Procedure Act ("APA"), 5 U.S.C. § 551, *et seq.*, provides that any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." *Id.* § 702. Under the APA, final agency actions, findings, or conclusions must be declared unlawful and set aside if they are

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). Agency action that expressly violates federal law, or that fails to consider all relevant facts or an important aspect of the problem before it, is thus prohibited. The APA also requires that agency action be set aside if the agency has failed to "observ[e] . . . procedure required by law." *Id.* § 706(2)(D).

## B. The Egg Research and Consumer Information Act

The ERCIA, enacted on October 1, 1974, established the AEB as the primary commodity promotion program for egg production in the United States. 7 U.S.C. § 2707(a). Unlike a private industry trade group, the AEB is funded by a federal checkoff program by which egg producers with more than 75,000 egg laying hens must pay a mandatory assessment on the eggs they produce by volume. The USDA is charged with oversight of the AEB's activities and expenditures, and the program's board members are approved by the Secretary of Agriculture. *Id.* § 2707(b).

Under the ERCIA, the activities of the AEB are strictly limited. The Secretary issues egg research and promotion orders, in the form of regulations, and the AEB's powers and duties "shall include *only*" the authority to administer the orders, make rules for its constituent members to effectuate the terms of the orders, investigate and report to the Secretary any violations of the orders, and recommend to the Secretary appropriate amendments to the orders. *Id.* § 2707(a) (emphasis added). Congress limited the terms and conditions of the Secretary's orders to advertising, sales promotion, and consumer education plans or projects; research, marketing, and development projects and studies; recordkeeping and reporting requirements; other incidental and necessary terms; and "*no others.*" *Id.* § 2706 (emphasis added).

The ERCIA requires that "[a]ll expenditures of the Egg Board must be approved by the Secretary." H. Rep. No. 93-1032, 93rd Cong., 2d Sess., 5 (1974); *see also* 7 U.S.C. § 2707(d). Moreover, the Act requires that all "plans or projects"

funded by the AEB "must be approved by the Secretary before becoming effective." 7 U.S.C. § 2707(c).

In addition to, and separate from, the limitation on the types of activities that may be undertaken by the AEB, Congress included a provision in the ERCIA prohibiting use of federal checkoff funds for political purposes. *Id*. § 2707(h). Specifically, "*no funds collected by the Egg Board under the order shall in any manner be used for the purpose of influencing governmental policy or action*," except for recommendations to the Secretary as to amendments to the order. *Id*. This prohibition on influencing governmental policy or action is a required term of any order issued by the Secretary. *Id*. § 2707. The Secretary is required to terminate or suspend operation of any part of an existing order if activities permitted thereby do not operate consistently with the provisions of the ERCIA. *Id*. § 2709(a).

### C. The Commodity Promotion, Research and Information Act

The Commodity Promotion, Research and Information Act ("CPRIA"), 7 U.S.C. § 7411, *et seq*., was enacted on April 4, 1996 as part of the Federal Agricultural Improvement and Reform Act, Pub. L. No. 104-127, 110 Stat. 1032 (1996). Similar to the ERCIA, the CPRIA is designed to maintain and expand markets and uses of agricultural commodities. The CPRIA applies to commodity promotion boards for which the Secretary of Agriculture issues national research and promotion orders.

Like the ERCIA, the CPRIA requires that all commodity promotion boards "submit to the Secretary for approval plans and projects for promotion, research, or information relating to the agricultural commodity covered by the order," and "a budget of its anticipated annual expenses and disbursements to be paid to administer the order." 7 U.S.C. § 7414(e).

The CPRIA sets forth certain terms that are required to be a part of all research and promotion orders issued by the Secretary, including a prohibition on political spending. *See Id*. § 7414. Specifically, the CPRIA prohibits commodity

promotion boards from "using funds collected by the board under the order" to engage in "any action undertaken for the purpose of influencing any legislation or governmental action or policy other than recommending to the Secretary amendments to the order." *Id.* § 7414(d)(2).

### D. Egg Research and Promotion Order Regulations and Guidelines for Research and Promotion Boards

The national egg research and promotion orders required to be issued by the USDA pursuant to the ERCIA and CPRIA are published as regulations in Title 7 of the Code of Federal Regulations. Under these regulations, the AEB is only permitted to incur such expenses "as the Secretary finds are reasonable," and as necessary "to enable it to exercise its powers and perform its duties" in accordance with the law. 7 C.F.R. § 1250.346.

The egg research and promotion order regulations include an express prohibition on influencing governmental action, stating that "[n]o funds collected by the Board under this subpart shall in any manner be used for the purpose of influencing governmental policy or action except to recommend to the Secretary amendments to this subpart." *Id.* § 1250.351.

The USDA has also developed Guidelines for Research and Promotion Boards that specifically define "influencing governmental policy or action" as including actions intended to affect the outcome of proposed policy or regulation, and "influencing legislation" as including "any attempt to affect the opinions of the general public or any segment thereof concerning legislation." *See* Exh. 22.

## II. RELEVANT FACTS

### A. California Proposition 2

Proposition 2, the Prevention of Farm Animal Cruelty Act, was submitted by Plaintiff to the Initiative Coordinator's Office of the Attorney General of California on August 9, 2007. Exh. 2. The purpose of Proposition 2 is to prohibit cruel confinement practices associated with certain industrialized farming operations,

including the tethering or confinement of pregnant pigs, veal calves, and egg-laying hens in a manner that prevents such animals from lying down, standing up, fully extending their limbs, or turning around freely. Nearly 800,000 citizens of California signed the petition to have Proposition 2 placed on the November 2008 ballot. *See* Declaration of Jennifer Fearing ("Fearing Decl."), Exh. 1, ¶ 4.  On April 9, 2008, the California Secretary of State certified the ballot measure for the November 2008 election. Exh. 3.

**B. The AEB's Decision to Fund Efforts to Defeat Proposition 2**

On or about November 1, 2007, the AEB held an Executive Committee meeting in California in which it unanimously passed a motion to set aside $3 million for the purpose of providing financial assistance to the groups opposing Proposition 2.  According to the minutes of this meeting, officials of the USDA's Agricultural Marketing Service ("AMS") were present. Exh. 4. The motion was reported in the December 1, 2007 issue of the trade publication Egg Industry, in an article entitled "AEB Supports California Egg Battle." The article states:

> The American Egg Board unanimously passed a motion at its recent fall meeting in California that $3 million be held in reserve to assist the state if necessary in the industry's current battle with animal activists.  Animal welfare groups are attempting to place a referendum on the November 2008 ballot that would eliminate cage production in California.

Exh. 5. The article also indicates that multiple board members spoke at the November meeting to indicate that "a great deal of work needs to be done on this challenge as it is estimated that if the referendum vote were held today it would pass." *Id.*

News of the motion was also circulated within the USDA.  In his November 5, 2007 Weekly Activity Report to the Administrator of the AMS, Rex Barnes, the Deputy Administrator of Poultry Programs stated that the purpose of the funds set aside by the Executive Committee motion was to "supplement" an ongoing

1

2

"campaign to defeat the measure" – referring specifically to Proposition 2 – through the funding of various "public relations and other projects." Exh. 6.

3

4

5

6

7

8

9

10

Sometime after passing the motion, the AEB submitted a revised 2008 annual budget to the USDA for approval. The revised budget contains an increase of nearly $2.9 million in revenue, all drawn from the AEB's reserve accounts. Exh. 7. The revised budget contains an equivalent increase in expenses. *Id.* The AEB's initial 2008 annual budget did not contain any provision for the expenditure of funds for special projects related to animal welfare. Exh. 8. In fact, the AEB's initial 2008 annual budget contained the same funding for special projects ($1.52 million) as did the AEB's 2007 budget approved by the USDA. *Compare* Exh. 7, 8.

11

12

13

14

15

16

17

Except for a reduction in intended expenditures of $120,000 that had  been allocated to a dietary cholesterol symposium, the change in expenses between the AEB's initial 2008 annual budget and its revised 2008 annual budget is entirely due to the allocation of $3 million for a "special project" related to Proposition 2. *Id.* The AEB's revised 2008 annual budget, including the $3 million draw down on AEB reserves for use in opposing the animal welfare initiative, was approved by the Secretary of Agriculture on or before January 15, 2008. Exh. 7.

18

19

## C.  Plaintiff's Efforts to Convince USDA and AEB Not to Interfere with the California Electoral Process

20

21

22

23

24

25

26

27

On March 6, 2008, Plaintiff wrote to both the AEB and the USDA's Agricultural Marketing Service to indicate that the planned expenditure of federal checkoff funds to support a political campaign in opposition to the California ballot initiative violates the ERCIA, CPRIA, and USDA regulations. Exh. 9. Plaintiff requested that the USDA withdraw its approval of the AEB's $3 million budgetary allowance, and that AEB rescind the motion it passed at its November 2007 Executive Committee meeting and refrain from spending any federal checkoff funds for the purpose of influencing voter opinion on the ballot initiative. *Id.*

28

The USDA and the AEB sent response letters to Plaintiff on March 14 and March 17, 2008, respectively. Exh. 10, 11. Both the USDA and the AEB stated in these response letters that the motion passed by the Board in November 2007 simply reserved funds for use in general educational and promotional programs concerning agricultural practices associated with egg production, that the funds could be used in any state, and that the funds were not planned for use to influence voting on the California ballot initiative. *Id*.

However, in March and April 2008, Plaintiff received documents from the USDA in response to a February 2008 Freedom of Information Act ("FOIA") request concerning AEB spending practices. These documents included minutes from the AEB Executive Committee meeting in November 2007, Exh. 4, as well as emails between AEB officials and USDA staff in which the $3 million set aside pursuant to the November motion is specifically referred to as a "draw down" to be used in opposition to "the CA animal welfare ballot campaign." Exh. 12. Other documents received in response to the FOIA request, written by USDA officials, characterized the AEB expenditure as intended "to defeat the measure."  Exh. 13. Thus, the claimed purpose of the $3 million withdrawal from AEB reserve funds stated in the Defendants March 14 and 17 letters to Plaintiff were entirely fallacious, and simply *post-hoc* attempts at contriving a purportedly legitimate purpose for an unprecedented and illegal expenditure.

In addition, the email correspondence between the AEB and USDA officials indicated that the AEB intended to give some of its federal checkoff funds to the private industry trade group United Egg Producers ("UEP") and its president, Gary West, for use in producing billboards to combat the animal welfare ballot initiative. Exh. 12. It is not clear how much of the $3 million in federal check-off funds the AEB has or intends to forward directly to the industry opponents of Proposition 2.

Given this new information about the true purpose behind the November 2007 motion and use of the $3 million approved to be transferred out of AEB

reserve holdings, Plaintiff sent follow-up letters to both the USDA and the AEB on May 15, 2008, citing and attaching the documents received in response to the FOIA request. Exh. 14. Because these documents clearly indicate that the purpose of the $3 million "special project" is to sway public opinion concerning, and ultimately to defeat, the California animal welfare ballot initiative, Plaintiff renewed its request that the USDA withdraw its approval of the AEB's revised budget and that the AEB rescind its November 2007 motion.

The USDA and the AEB responded to Plaintiff on May 28 and 29, 2008, respectively. Exh. 15, 16. Both indicated that none of the funds had been spent at that point, but neither agreed to simply rescind their prior decisions concerning the $3 million expenditure.

On June 24, 2008, representatives of one of the Plaintiff's sponsors, the Humane Society of the United States (HSUS), met with Secretary Schafer in Washington, D.C. The parties discussed the USDA's decision to approve the AEB's revised 2008 annual budget and the expenditure of the $3 million from AEB reserve accounts. *See* Fearing Decl., Exh. 1, ¶ 13. Secretary Schafer assured that he would be able to prevent the Egg Board from spending checkoff funds in an attempt to influence voter opinion on the ballot initiative by specifically reviewing every disbursement of funds from the $3 million set aside by the AEB. *Id.*

At the same time, other parties began expressing concern over this matter, which has been reported in various news outlets. *See*, *e.g.*, Exh.17. On June 17, 2008, John R. Baker, owner and operator of an egg-production facility in Newton, Pennsylvania, wrote to the AEB to express his concerns with AEB use of producer assessment funds to influence the upcoming election. Exh. 18. Mr. Baker's company, Giving Nature Foods, produces eggs from hens kept in a cage-free environment, and is subject to the federal checkoff program. Mr. Baker's letter, a copy of which was sent to the HSUS, describes his unfortunate circumstance:

> Basically, the Board is taking money that Giving Nature Foods was required to pay to the Board under federal law for the promotion of egg

production in general, and using it to influence the public to take a position that is contrary to Giving Nature Foods' production philosophy and may cause financial harm to our company.

*Id.*

Likewise, on July 23, 2008, Congressman Earl Blumenauer (D-Or.) sent a letter to Secretary Schafer, expressing his concern that a Congressionally-chartered commodity promotion board would attempt to use federal checkoff program funds to influence the outcome of proposed legislation. Exh. 19. Rep. Blumenauer expressed concern with the apparent "collusion" between the AEB and the private sector, stating that "[n]o federal checkoff funds . . . are permitted to be used for the purpose of . . . affecting citizen votes on state-approved ballot initiatives, whether used directly by the commodity promotion program itself or by third-party industry groups." *Id.*

Despite these warnings, on August 8, 2008, Secretary Schafer informed Wayne Pacelle, CEO of the HSUS, a chief sponsor of Plaintiff CHF, that USDA had begun approving the disputed expenditures. Exh. 20. Secretary Schafer also stated that Plaintiff's objection to use of the $3 million for an advertising campaign in California would be viewed as "unfair [for] not allowing those who think differently to express their opinions too," Exh. 20, thus admitting USDA's knowledge that the AEB's approved expenditures are for the purpose of influencing the outcome of the November state election.

Finally, lest there be any doubt about the purpose of AEB's funding, one the chief industry opponents of Proposition 2 – the UEP – sent fundraising letters to its egg industry members within the last few weeks describing the AEB as one of several "associates" whose contribution checks are already "in the bank." Exh. 21.

## ARGUMENT

Ordinarily, emergency injunctive relief is appropriate where plaintiffs demonstrate that: (1) there is a likelihood of success on the merits; (2) the possibility they will suffer irreparable injury absent the relief sought; (3) a balance of hardships among the parties weighs in their favor; and (3) injunctive relief is in

the public interest. *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1297-98 (9th Cir. 2003). Under a traditional equitable analysis, these factors are interrelated on a sliding scale, and relief should be granted where a plaintiff "demonstrates *either* a combination of probable success on the merits and the possibility of irreparable injury *or* that serious questions are raised and the balance of hardships tips sharply in his favor." *Id.* at 1298 (internal quotation omitted) (emphasis in original); *see also Bernhardt v. Los Angeles County*, 339 F.3d 920, 929-31 (9th Cir. 2003) (injunction required where "serious questions going to the merits of the case" are raised and the hardships analysis is focused on the effects of an injunction "narrowly drawn" to the specific economic interests of the parties in case). Here, as discussed below, Plaintiffs easily satisfy the requisite standard.

# I. PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS

## A. The AEB's Purpose in Expending $3 Million in Federal Checkoff Funds Violates the Plain Meaning of the ERCIA and CPRIA

Plaintiff is likely to prevail on its claim that the expenditure decision at issue violates the plain language of the ERCIA and the CPRIA. In determining whether the Secretary's approval of the AEB's revised 2008 annual budget violates federal law,[1] the familiar two-part Chevron test applies. *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778 (1984). Under the first step of *Chevron*, the Court asks "whether Congress has directly spoken to the precise question at issue." *Id.* at 842-43. If "the intent of Congress is clear, that is

---

[1] The Secretary's approval of the AEB's budget is a reviewable "final agency action," because it is not "of a merely tentative or interlocutory nature" – there is no further statutorily mandated agency review or decision required before AEB may spend funds allocated according to the terms of the budget. *Bennett v. Spears*, 520 U.S. 154, 178, 117 S.Ct. 1154, 1168 (1997). The approved revised budget "mark[s] the consummation of the agency's decisionmaking process," and is a formal action by which "rights or obligations have been determined or from which legal consequences will flow." *Id.* at 177-78 (internal citation omitted).

the end of the matter . . . the Court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.*; *see also The Wilderness Soc'y v. U.S. Fish and Wildlife Serv.*, 353 F.3d 1051, 1059 (9th Cir. 2003) (en banc) (Congress' intent "must be given effect as law").

Only "if a statute is 'silent or ambiguous with respect to a specific issue,' does the court move on to step two where 'the question for the court is whether the agency's answer is based on a permissible construction of the statute.'" *Natural Res. Def. Council v. U.S. E.P.A.*, 526 F.3d 591, 602 (9th Cir. 2008) (quoting *Chevron*, 467 U.S. at 843). Here, the Court need proceed no further than the first step of *Chevron*, because when the statute's "language, structure, subject matter, context, and history" are considered, *Akhtar v. Burzynski*, 384 F.3d 1193, 1199 (9th Cir. 2004), it is plain that "Congress has directly spoken to the precise question at issue," and that the "the intent of Congress" to prohibit any use of federal check-off fund *for the purpose of* influencing voter opinion "is clear." *Id.* at 1198 (quoting *Chevron*, 467 U.S. at 843).

The plain language of the Egg Research and Consumer Information Act of 1974 ("ERCIA"), P.L. 93-428; 7 U.S.C. § 2701, *et seq.*, by which the AEB was formed, expressly prohibits the use of any funds collected by the AEB pursuant to a federal legislative checkoff program "for the purpose of influencing governmental policy or action." *Id.* at § 2707(h). Over twenty years later, Congress reaffirmed this prohibition in enacting the Commodity Promotion, Research, and Information Act of 1996 ("CPRIA"), P.L. 104-127; 7 U.S.C. § 7411, *et seq.*, which applies to all commodity promotion programs, including the AEB, and requires that such programs shall not use their checkoff funds "for the purpose of influencing any legislation or governmental action or policy. . . ." *Id.* at § 7414(d). The Secretary's approval of the AEB's revised annual budget, and specifically the withdrawal of $3 million from AEB reserve funds for the purpose of influencing voter opinion on

Proposition 2, contravenes the prohibitions on political spending by the AEB clearly set forth in the ERCIA and the CPRIA.

The AEB's November 2007 motion to reserve $3 million for use in 2008 for a targeted state campaign to address "an animal welfare situation," Exh. 4, was clearly passed for the purpose of defeating the citizen initiative sponsored by Plaintiffs – regardless of how hard USDA or AEB may try to re-characterize the decision after-the-fact. Emails between USDA and AEB officials, discovered as a result of a FOIA request to the USDA, discuss "use of the $3 million" to fund billboards that a private industry group opponent of Proposition 2 is planning to run "regarding the CA animal welfare ballot campaign."[2] Exh. 12. Other emails between USDA officials within the AMS' Poultry Programs division that oversees AEB activities describe the November 2007 motion as part of a "campaign" by "California egg producers . . . to defeat the [ballot] measure." Exh 13. The emails specifically state that the AEB "voted . . . to set aside $3 million" "to support these efforts." *Id.*

Based on these and other documents, it cannot be reasonably argued that the AEB passed the November 2007 board motion – which remains a part of the AEB's revised 2008 annual budget approved by the USDA – for any purpose other than swaying public opinion on Proposition 2, which violates the plain language of the ERCIA and CPRIA.

Furthermore, the AEB's purpose in expending the $3 million in federal checkoff funds *continues* to defy the statutory prohibition on political spending under the ERCIA and CPRIA. Recent fundraising letters from the industry trade group UEP continue to list the AEB as a financial sponsor of the campaign opposing Proposition 2 whose contribution is "in the bank." Exh. 21.  In addition,

---

[2] The AEB may only allow third-party use of federal checkoff funds if all such contracts or agreements are also first subject to the approval of the USDA to ensure their compliance with law. *See* 7 U.S.C. § 2707(g).

Secretary Schafer's most recent correspondence specifically states that USDA gave final approval to advertisements planned to be released by the AEB because they are "generic," even though the content of these ads supports a primary campaign message of the industry opponents of Proposition 2, and will allow "those opposing [the] initiative . . . to express their opinions too" – *i.e.,* to help the opponents of Proposition 2 "influence government policy or action." Exh. 20.

In addition to violating the plain meaning of the text of the statutes, the AEB's expenditure of $3 million in federal checkoff funds to influence voter opinion in the upcoming election also violates the structure and purpose of the statutes. In its legislative findings and declaration of policy for the ERCIA, Congress stated that it chose to create the AEB because:

> [t]he production and marketing of [egg and spent fowl] products by numerous individual egg producers have prevented the development and carrying out of adequate and coordinated programs of research and promotion necessary for the maintenance of markets and the development of new products of, and markets for, eggs, egg products, spent fowl, and products of spent fowl.

7 U.S.C. § 2701. Thus, the AEB was not formed to provide a vehicle for egg producers to use the imprimatur of a quasi-governmental entity to promote or oppose particular laws and policies relating to eggs and egg production, but rather to maintain and develop new markets for and products of eggs within existing regulatory frameworks.

Notably, the Federal Trade Commission opposed the enactment of the ERCIA out of concern that the AEB's advertising and promotional activities intended to build a demand for eggs that would be inherently "false or misleading." The Commission was concerned that Congressional chartering of the AEB "would clothe such advertisement with the stamp of Congressional approval, and moreover, would place such promotion under the aegis of the Secretary of Agriculture." *See* H. Rep. 93-1032, 93rd Cong., 2d Sess., 7 (May 10, 1974). In response to this and similar concerns, Congress sought to ensure that the relationship between the AEB

and the USDA was not collaborative, but that the latter was clearly charged with oversight of the activities and expenditures of the former.

In response to these concerns, when enacting the ERCIA and forming the AEB, Congress explicitly added as a mandatory term of the Egg Research and Promotion Orders issued by the USDA that no checkoff funds "shall in any manner" be used to influence governmental activity. 7 U.S.C. § 2707(h). The term "shall," as used in the ERCIA and CPRIA in prohibiting spending for the purpose of influencing policymaking "creates an obligation impervious to judicial discretion." *Miller v. French*, 530 U.S. 327, 337, 120 S.Ct. 2246, 2253 (2000) (internal quotation omitted). So broad and absolute is this prohibition that Congress created a single, specific exemption to ensure that the AEB would be able to make recommendations to the Secretary of Agriculture concerning the terms of the Egg Research and Production Orders without being deemed in violation of the prohibition on "influencing governmental policy or action." 7 U.S.C. § 2707(h) (*citing Id.* § 2707(a)(4)).

The Senate Report accompanying the bill eventually enacted as the ERCIA (H.R. 12000) specifically notes that the AEB must act within the terms of a national order ("order") issued by the Secretary of Agriculture, and the order may be "terminated or suspended by the Secretary if he found that it obstructs or does not tend to effectuate the purposes of the bill." S. Rep. 93-1109, 93rd Cong., 2d Sess. (Aug. 20, 1974). The Senate Report also noted the "greater accountability" associated with a board appointed by the Secretary, the "research and information program [of which] will be subject to the Secretary's review and approval." *Id.*

Thus, it is clear that the statute was designed to ensure that the USDA act to provide independent scrutiny of AEB activities and expenditures, including the program's advertising and promotional activities. When an agency decision appears contrary to the particular statutory language at issue, but also clearly contravenes the "design of the statute as a whole," the decision should be set aside.

*See Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 239, 124 S.Ct. 1741, 1747 (2004) (internal citation omitted).

**B. The Secretary's Decision Does Not Comport with a Reasonable Construction of the ERCIA and CPRIA, and Conflicts with the USDA's Existing Regulations and Guidance Documents**

Even if the Court somehow found Congress's intent to be "ambiguous," *Chevron*, 467 U.S. at 843, the Secretary's decision to approve the AEB's revised annual budget is certainly not a "*reasonable* construction of the text" and legislative intent, as it must be to pass muster under the second step of *Chevron*. *Barnhart v. Thomas*, 540 U.S. 20, 26, 124 S.Ct. 376, 380 (2003) (emphasis added). Under *Chevron* "step two," the Court may "defer only to an agency's 'permissible' and 'reasonable' statutory interpretations." *Bonnichsen v. United States*, 217 F.Supp.2d 1116, 1137 n.38 (D.Or. 2002). Any construction of the ERCIA and CPRIA that would allow the AEB to use federal checkoff funds for advertising and promotional activities targeted at California citizens and designed to support the "No on Prop. 2" ballot committee's messaging campaign, would be patently unreasonable.

The USDA's own Egg Research and Promotion Order regulations contain a prohibition on political spending that is nearly identical to the statutory prohibitions. *See* 7 C.F.R. § 1250.346. Moreover, the agency has developed Guidelines for Research and Promotion Boards that specifically define "influencing governmental policy or action" as including actions intended to affect the outcome of proposed policy or regulation, and "influencing legislation" as including "any attempt to affect the opinions of the general public or any segment thereof concerning legislation." Exh. 22.

Agency officials have further stated that, pursuant to these Guidelines, any materials produced by commodity promotion programs "cannot be *perceived* as attempting to sway public opinion." Exh. 23 (emphasis added). Accordingly, the agency cannot rewrite both the statute and its own rules for this one-time $3

million dollar expenditure – no matter how much the current Administration may dislike the political message contained in California Proposition 2.  *See*, *e.g.*, *Western States Petroleum Ass'n v. U.S. E.P.A.*, 87 F.3d 280, 284 (9th Cir. 1996) (agency "may not depart, *sub silentio*, from its usual rules of decision to reach a different, unexplained result in a single case"); *Northern Cal. Power Agency v. FERC*, 37 F.3d 1517, 1522 (9th Cir. 1994) ("[a]n agency acts arbitrarily when it departs from its precedent without giving any good reason"); *Pub. Citizen v. Heckler*, 653 F. Supp. 1229, 1237 (D.D.C. 1987) ("For an agency to say one thing . . . and do another . . . is the essence of arbitrary action.").

## II. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST ALSO FAVOR INJUNCTIVE RELIEF

### A. Plaintiffs Will Suffer Irreparable Harm Absent Issuance of an Injunction

Because Plaintiff has demonstrated a particularly strong likelihood of success on the merits, Plaintiff needs "only to make a minimal showing of harm to justify the preliminary injunction." *Earth Island*, 351 F.3d at 1300 (*citing Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1124 (9th Cir. 2004)).  "A preliminary injunction only requires plaintiffs to show *probable* success on the merits and the *possibility* of irreparable harm." *Id.* at 1298 (reversing denial of a preliminary injunction for failure to apply the proper legal standard).

In this case, plaintiffs can show far more than just the "possibility" of irreparable harm. Once federal money is expended by AEB, the proponents of Proposition 2 will be irreparably harmed by a massive and overwhelming influx of illegal cash to the opposition campaign, and there will be nothing Plaintiff or the Court can do under the law to retrieve those funds and restore the *status quo* in existence prior to the expenditure of federal checkoff funds for this unlawful political purpose.

Plaintiff CHF is the official ballot committee in support of Proposition 2.  *See* Fearing Decl. at ¶ 2. Plaintiff, its employees, and thousands of California voter-

volunteers have spent extraordinary amounts of time, money, and other organizational resources in gathering support for Proposition 2 and reaching out to voters to inform them of the value and benefits of enacting the initiative. *See* Fearing Decl. at ¶ 4.

To date, the "No on Prop. 2" campaign has raised just over $2 million in support of its efforts, with 47 monetary contributions reported by the Secretary of State's office and an average contribution amount in excess of $45,000. *Id.* at ¶ 11. Thus, the $3 million approved for expenditure by the AEB would *more than double* the funds currently available to the "No on Prop. 2" campaign, and bring the total funds available to the egg industry entities opposing the initiative to an amount that *far exceeds* the funds currently available to Plaintiff's campaign. *Id.* at ¶ 15.

As described in the attached declaration of CHF's campaign manager, Jennifer Fearing, because of the competition to reach voters through a limited amount of available television and radio advertising, "[u]nless the Yes on Prop. 2 campaign can match or exceed the dollar amount that the opposition to Prop. 2 spends on advertising the Yes on Prop. 2 campaign will be operating at an enormous disadvantage and will face a very real and significant threat of simply not being able to carry our message to enough voters in advance of this November's election to carry our campaign to victory." *Id.* at ¶ 9. Use of up to $3 million for additional advertisements and activities designed to influence voters to reject Proposition 2 in the upcoming election will reduce Plaintiff's opportunities to reach the same voters, and clearly do substantial and non-compensable damage to the "Yes on Prop. 2" campaign. *Id.* at ¶ 16, 18-19.

Courts have previously recognized financial injuries to election campaigns in deciding whether to issue preliminary injunctive relief – presumably because there is nothing the Court can do to compensate such injuries once the election is completed. *See Nat'l Black Police Ass'n v. D.C. Bd. of Elections and Ethics*, 858 F.Supp. 251 (D.D.C. 1994) (holding potential harm to third party candidates

already abiding by campaign contribution limitations supported denial of injunction against campaign finance law). Similarly here, Plaintiff's ongoing campaign in support of Proposition 2 would be irreparably injured by the AEB's illegal expenditure of federal checkoff funds for the purpose of swaying voter opinion against the initiative.

Moreover, an injunction may be appropriate where governmental endorsement of particular "members of the political community," sends an impermissible message "of official preference." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 302 (D.C. Cir. 2006) (quoting *Lynch v. Donnelly,* 465 U.S. 668, 688, 104 S.Ct. 1355 (1984) (O'Connor, J., concurring)); *see also Cole v. Oroville Union High School Dist.*, 228 F.3d. 1092, 1103 (9th Cir. 2000) (prohibiting proselytizing valedictory speech was necessary to prevent "objective observer[s] from . . . perceiv[ing] that the speech carried the District's seal of approval"). Thus, in addition to facing the sudden influx of massive and illegal campaign contributions from the federal Defendants, Plaintiff also faces the daunting proposition of an electorate that may view AEB advertisements and other activities as a sort of government endorsement of the opposition to Proposition 2.

## B. Defendants Will Not Suffer Irreparable Harm if the Court Issues a Preliminary Injunction

In contrast to the significant irreparable harm to Plaintiff's interests that will result if the *status quo* is not temporarily maintained, a temporary delay in the release of federal funds while Plaintiff's claim can be considered by the Court will have no negative impact on Defendants or any third party. The election is almost three months away, and while campaign advertisements will begin to appear very shortly, those funds that have been lawfully raised by the "No on Prop. 2" campaign may be spent at this time, and the disputed funds can always be disbursed at a later date if the Court finds the AEB's expenditures to be lawful.

Further, the stay sought by Plaintiff would in no way inhibit Defendants from conducting any and all activities authorized by Congress under the ERCIA and CPRIA – *i.e.*, the AEB could still engage in marketing, research and promotional activities, subject to USDA oversight, that are not intended to influence voter opinion on proposed legislation or other governmental action or policy. *See* 7 U.S.C. § 2707. Indeed, the only way a brief delay in running AEB-funded advertisements could possibly harm Defendants is if they do in fact intend them to influence the election. Otherwise, these funds can be spent after November 4th with no harm to any legitimate purpose they may have.

Moreover, since this $3 million expenditure did not originally appear in the AEB's 2008 budget, and since this appears to be the first time any such advertising campaign has been launched by AEB in California in many years, if ever, the requested "preliminary relief will require the defendants to maintain a course of conduct that they have pursued for many years" and therefore "order maintaining the status quo will cause [defendants] little, if any harm." *Nat'l Senior Citizens Law Ctr. v. Legal Services Corp.*, 581 F. Supp. 1362, 1373 (D.D.C. 1984). Thus, the burden of the requested injunctive relief is minimal; *see also Wash. Capitols Basketball Club, Inc. v. Barry*, 419 F.2d 472, 476 (9th Cir. 1969) (upholding grant of preliminary injunction "to maintain the status quo," which "is the last, uncontested status preceding the commencement of the controversy.").

## C. Injunctive Relief Is In the Public Interest

The public interest is plainly served by making absolutely sure that federal officials do not illegally interfere with the state legislative process in California. A government agency's "failure to comply with a statute . . . invokes a public interest of the highest order." *High Sierra Hikers Ass'n v. Powell*, No. C-00-01239-EDL, 2002 WL 240067, *3 (N.D. Cal., Jan. 9, 2002) (internal quotation omitted) (granting preliminary injunction against Forest Service for failure to abide by requirements of National Environmental Policy Act); *see also City of South Pasadena v. Slater*, 56

F. Supp. 2d 1106, 1144 (C.D. Cal. 1999) ("the interest in having government officials act in accordance with the law" is "a public interest of the highest order"). Thus, it is clearly in the public's interest to ensure that federal program funds are not used to improperly influence the outcome of a state election.

The requested stay will also ensure that the rights of individual AEB members are not infringed by USDA and the AEB's governing board. The Supreme Court has held that the First Amendment "may prevent the government . . . from compelling certain individuals to pay subsidies for speech to which they object." *United States v. United Foods, Inc.*, 533 U.S. 405, 410, 121 S.Ct. 2334, 2338 (2001). The Court has drawn a distinction between programs expending compulsory member assessments on generic promotional campaigns developed under official government supervision from programs that use these assessments to fund activities "having political or ideological coloration which are not reasonably related" to "the regulation of the [entire industry or field]." *Keller v. State Bar of Cal.*, 496 U.S. 1, 15, 110 S.Ct 2228, 2237 (1990); *cf. Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 562, 125 S.Ct. 2055, 2063 (2005). Thus, the AEB's use of producer assessment funds to support specific political and ideological viewpoints raises serious First Amendment concerns, as indicated by the letter sent by Giving Nature Foods' owner John R. Baker to the AEB in June. *See* Exh. 18.

If the Court grants Plaintiff's request, the $3 million in federal checkoff funds set aside for the unlawful purpose of defeating Proposition 2 would presumably be redirected to lawful AEB programs of benefit to Defendant AEB's entire constituency, while individual producers would then be able choose whether to make individual political contributions to the ballot committees advocating for or against enactment of the initiative.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully submits that the circumstances of this case warrant the issuance of an order temporarily preserving

the *status quo*.  Accordingly, Defendants should be ordered to halt any further spending of AEB funds in California, and take all possible steps to ensure that any funds already released be returned to the AEB's reserve holdings immediately while the Court considers the merits of Plaintiff's claim for relief.

Respectfully submitted,

*/s/ Peter A. Brandt*

_____

Peter A. Brandt (CA Bar No. 241287)
Jonathan R. Lovvorn (CA Bar No. 187393)
2100 L Street, N.W.
Washington, D.C. 20037
(202) 955-3669 (phone)
(202) 778-6132 (fax)

August 14, 2008                    *Counsel for Plaintiff Californians for Humane Farms*

1

PETER A. BRANDT (CA Bar No. 241287)
pbrandt@hsus.org

2

JONATHAN R. LOVVORN, CA Bar No. 187393
jlovvorn@hsus.org

3

2100 L St., N.W.
Washington, DC 20037

4

(202) 955-3669 (phone)

5

(202) 778-6132 (fax)

6

*Counsel for Plaintiff Californians for Humane Farms*

7

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

8

9

10

11

**CALIFORNIANS FOR HUMANE FARMS**

12

1545A Powell Street
San Francisco, CA 94133

13

14

Plaintiff,

15

v.

16

**ED SCHAFER**, Secretary

17

United States Department of Agriculture
1400 Independence Avenue, S.W.

18

Washington, DC 20250,

19

**AMERICAN EGG BOARD**

20

1460 Renaissance Drive
Park Ridge, IL 60068,

21

22

Defendants.

Civ. No. 08-03843 (MHP)

**Certificate of Service**

23

24

## CERTIFICATE OF SERVICE

25

Pursuant to Local Rule 5-6(a)(2), I hereby certify that on this 18th day of

26

August 2008, I caused a true copy of the foregoing Plaintiffs' Motion for Temporary

27

Injunction and/or Preliminary Injunction and accompanying materials to be served:

28

(1) Electronically by means of the Court's ECF system to Defendant Schafer's counsel to the following electronic address:

Julie.Arbuckle@usdoj.gov.

(2) By facsimile and first-class certified mail, postage prepaid, to Defendant American Egg Board at the following address:

American Egg Board
1460 Renaissance Drive
Park Ridge, Illinois 60068
Facsimile: (847) 296-7007

Respectfully submitted,

*/s/ Peter A. Brandt*

_____

August 18, 2008                    Peter A. Brandt (CA Bar No. 241287)

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

**CALIFORNIANS FOR HUMANE FARMS**
1545A Powell Street
San Francisco, CA 94133

    Plaintiff,

   v.

**ED SCHAFER**, Secretary
United States Department of Agriculture
1400 Independence Avenue, S.W.
Washington, DC 20250,

**AMERICAN EGG BOARD**
1460 Renaissance Drive
Park Ridge, IL 60068,

    Defendants.

Civ. No. 08-03843 (MHP)

## PROPOSED TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE

Upon consideration of Plaintiff's Motion for Temporary Restraining Order, it is hereby ordered that, pending hearing on Plaintiff's Request for Preliminary Injunction, Defendants Ed Schafer, Secretary, United States Department of Agriculture, and the American Egg Board **are temporarily restrained and enjoined from**:

(1) Any expenditure or disbursement of funds approved in Defendant American Egg Board's revised 2008 annual budget to support activities targeted specifically to California prior to the forthcoming election, whether undertaken by the Egg Board or another entity;

(2) Any expenditure or disbursement of funds approved in Defendant American Egg Board's revised 2008 annual budget to support any other activity the purpose of which is to affect voter opinion on, or the ultimate disposition of, California Proposition 2,

(3) Any further approval by Defendant Schafer of the use of the Egg Board's federal checkoff funds on projects targeted specifically to California prior to the forthcoming election, or to support any other activity the purpose of which is to affect voter opinion on, or the ultimate disposition of California Proposition 2;

It is further ordered that Defendants must appear on _____, 2008, at _____, to show cause why a preliminary injunction should not issue upon the Plaintiff's motion for the same; and

It is further ordered that this Temporary Restraining Order and all supporting pleadings and papers must be served on Defendants no later than _____, 2008, and proof of service shall be filed no later than one court day prior to the hearing on the preliminary injunction.

**SO ORDERED**.

_____

United States District Judge

Date: _____

# Exhibit 1

## DECLARATION OF JENNIFER L. FEARING

I, Jennifer L. Fearing, declare as follows:

1.      I am the campaign manager for the Yes on Prop 2 -- Californians for Humane Farms campaign ("Yes on Prop. 2"), and am an employee of The Humane Society of The United States.

2.      Yes on Prop. 2 is the official ballot committee in support of Proposition 2.

3.      Proposition 2, if approved by California voters, will mandate that by January 1, 2015, egg laying hens, breeding pigs, and calves raised for veal all be given sufficient room to stand up, lie down, turn around and extend their limbs or wings. Currently in California, as in the rest of the country, the industry standard is to so intensively confine these animals that they do not have space to engage in these most basic behaviors.

4.      Contributors to the Yes on Prop. 2 campaign, including The Humane Society of the United States, have already expended tremendous monetary and non-monetary resources to qualify Prop. 2 for the November ballot, to educate voters about the benefits of Prop.2's passage, to engage endorsers for the measure, and to campaign for its passage. As of June 30, 2008, the most recent reporting deadline, the Yes on Prop. 2 campaign had already spent $839,867.32. In addition, major supporters of Prop. 2 had contributed $181,314.17 in in-kind labor, materials, and other resources. Finally, nearly 4,000 Californians volunteered thousands of hours

of their collective time between October 2007 and February 2008 to help collect the nearly 800,000 voter signatures that put Prop. 2 on the ballot.

5.    In my capacity as campaign manager I oversee all aspects of the Yes on Prop. 2 campaign, including the campaign's purchase of television commercials designed to sway California voters to vote yes on Prop. 2. This advertising is by far the single greatest outlay of campaign funds. In the 2006 election, initiative campaigns spent more than half of their funds on television broadcast advertising. (http://www.cgs.org/images/publications/cgs_dbi_chapter_8.pdf , p. 297) The Yes on Prop. 2 campaign plans to spend in excess of 80% of contributed funds on television advertising.

6.    This massive expenditure is necessary in order to reach California's massive electorate because the 23 million voters will be bombarded by advertising both for and against 11 other statewide ballot initiatives, in addition to advertising supporting candidates for president and candidates for local, state and national offices.

7.    According to a May 2008 report entitled, "Democracy by Ballot Initiative," released by the Center for Governmental Studies,

> Television is by far the most expensive—but cost-effective—weapon of ballot measure campaigns. 'Every election, it has become almost axiomatic to say that airing political ads is more expensive than ever before.' The cost of reaching a statewide audience via television ads skyrocketed to over $4 million per week in the November 2005 special election. A single 30-second spot on a popular television show in a large market like Los Angeles cost up to $110,000 during the 2005 election. Campaigns spent nearly $165 million on radio and television ads in that election. Broadcast advertising is particularly effective when a party is trying to defeat a particular ballot

2

measure. (http://www.cgs.org/images/publications/cgs_dbi_chapter_8.pdf, p. 297)

8.    . Thus the goal of the campaign is to raise as much money as possible and then spend virtually all of it on television advertising.

9.    Unless the Yes on Prop. 2 campaign can match or exceed the dollar amount that the opposition to Prop. 2 spends on advertising the Yes on Prop. 2 campaign will be operating at an enormous disadvantage and will face a very real and significant threat of simply not being able to carry our message to enough voters in advance of this November's election to carry our campaign to victory.

10.    The No on Prop. 2 campaign faces the very same financial and political realities described in the paragraphs above.  The outcome will be determined largely by which campaign convinces individuals and other entities that their message merits funding.

11.    To date, the No on Prop. 2 campaign has raised $2.1 million dollars, and all but $650 of that amount was contributed by large egg producing and distributing companies and industry trade groups. A total of 47 monetary contributions have been reported by the Secretary of State's office with an average contribution amount in excess of $45,000.

12.    To date, the Yes on Prop. 2 Campaign has collected just over $4.4 million in donations from animal protection charities and more than 7,000 private citizens, primarily California residents. The average contribution is $558, which takes into account two large contributions of The Humane Society of the United

States, the measure's primary sponsor. Not including those contributions, the average donation is just $151.

13.    I am aware that Secretary Schafer, of the United States Department of Agriculture ("USDA") met with Wayne Pacelle and other employees of the Humane Society of the United States ("HSUS"), in Washington, D.C. on June 24, 2008. At that meeting, I'm told that Secretary Schafer and The HSUS representatives discussed the USDA's decision to approve the decision by the American Egg Board ("AEB") to expend the $3 million in AEB funds, and that the Secretary assured that he would be able to prevent the AEB from spending any of this money on attempts to influence voter opinion regarding Proposition 2. Secretary Schafer stated that he would do so by reviewing every disbursement of funds from the $3 million set aside by the AEB.

14.    Despite the agreement reached this past June, I have been informed that the Secretary of the USDA recently approved the AEB expenditure of $3 million in check-off funds collected under the mandate of federal law from egg producers nationwide. USDA is allowing the AEB to funnel every penny of this money into advertising solely in California which, given the timing, is transparently an effort to influence the results of this November's ballot initiative contest. In fact, I am aware that Secretary Schafer has advised that he and other USDA staff have already approved several advertisements which will imminently be released in California.

4

15.    As a direct result of USDA improperly allowing the AEB to expend money on advertising designed to defeat Proposition 2, the No on Prop. 2 campaign's funds will effectively more than double (from $2.1 million to $5.1 million) as this federal money unlawfully flows in to influence a California state political contest.

16.    The pool of available television advertising airtime is finite, and the more advantageous airtime—during high viewership programming in major California cities—is even more limited. In addition, the field of political advertising is overcrowded with 11 other propositions along with presidential candidates and others all vying for air time in the weeks before November.  Because of this finite nature of air time and because there are so many other campaigns endeavoring to buy as much airtime as possible the addition of  $3 million dollars in AEB money into the 'election marketplace' will inevitably reduce our campaign's advertising opportunities.

17.    Thus, USDA, a federal agency, is wading into a state's political process and providing several million dollars in advertising to the agribusiness opponents of Prop. 2. In doing so at this point in the campaign—just two to three weeks before advertising buys must be made—they may well ensure the defeat of a popularly supported ballot measure that would otherwise pass.

18.    It is impossible to precisely ascertain the value of the damage that would be done to the Yes on Prop 2 campaign if the AEB is permitted to fund additional advertising for the No on Prop. 2 Campaign. Nevertheless, this improper

doubling of our opponents funds will greatly injure our prospects of success at the ballot box in November—and that injury may occur as early as this week.

19.    If the No on Prop. 2 campaign is allowed the use of such an enormous amount of advertising money it will without any doubt adversely and irreparably harm the Yes on Prop. 2 campaign. Indeed if this influx of improperly allocated federal money is allowed to stand it will skew this contest so far in our opponents' favor that our campaign's prospects for success this November may be completely eliminated.    Once this money is expended, and the damage is done to the Proposition 2 campaign, there is no form of money damages or other relief that can compensate the supporters of Prop 2 after-the-fact.    The damage will be done and irreversible.

20.    Pursuant to 28 U.S.C. § 1746, I declare, under the penalty of perjury, that the foregoing statements are true and correct to the best of my knowledge.

Jennifer L. Fearing

Dated: August 14, 2008

# Exhibit 2

August 6, 2007

Ms. Toni Melton
Initiative Coordinator
Office of the Attorney General
P.O. Box 944255
Sacramento, CA 94244-2550



AUG - 9 2007

INITIATIVE COORDINATOR
ATTORNEY GENERAL'S OFFICE

Re:  Request for Title and Summary for Proposed Initiative

Dear Ms. Melton:

Pursuant to California Elections Code, Section 9002, I respectfully request the Attorney
General prepare a title and summary of the chief purpose and points of *The California
Prevention of Farm Animal Cruelty Act*.

Also enclosed, as required by California Elections Code, Section 18650, is the filing fee
of two-hundred dollars ($200); and the proponent declaration, as required by California
Elections Code, Section 9608.

Please direct any correspondence regarding this initiative to my resident address, below.

Thank you for your assistance.

Sincerely,

Joe Ramsey

## INITIATIVE MEASURE TO BE SUBMITTED DIRECTLY TO THE VOTERS

The Attorney General of California has prepared the following title and summary of the chief purpose and points of the proposed measure:

(Here set forth the title and summary prepared by the Attorney General. This title and summary must also be printed across the top of each page of the petition whereon signatures are to appear).

## TO THE HONORABLE SECRETARY OF STATE OF CALIFORNIA

We, the undersigned, registered, qualified voters of California, residents of _____ County (or City and County), hereby propose amendments to the Health and Safety Code, relating to farm animals, and petition the Secretary of State to submit the same to voters of California for their adoption or rejection at the next succeeding primary or general election, or at any special statewide election held prior to that primary or general election, or as otherwise provided by law. The proposed statutory amendments (full title and text of measure) read as follows.

### SECTION 1. SHORT TITLE

This Act shall be known and may be cited as the Prevention of Farm Animal Cruelty Act.

### SECTION 2. PURPOSE

The purpose of this Act is to prohibit the cruel confinement of farm animals in a manner that does not allow them to turn around freely, lie down, stand up, and fully extend their limbs.

### SECTION 3. FARM ANIMAL CRUELTY PROVISIONS

Chapter 13.8 (commencing with Section 25990) is added to Division 20 of the Health and Safety Code, to read:

CHAPTER 13.8: FARM ANIMAL CRUELTY

**25990. PROHIBITIONS.**— In addition to other applicable provisions of law, a person shall not tether or confine any covered animal, on a farm, for all or the majority of any day, in a manner that prevents such animal from:

(a)     Lying down, standing up, and fully extending his or her limbs; and

(b)     Turning around freely.

**25991. DEFINITIONS.**— For the purposes of this chapter, the following terms have the following meanings:

(a)   "Calf raised for veal" means any calf of the bovine species kept for the purpose of producing the food product described as veal.

(b)   "Covered animal" means any pig during pregnancy, calf raised for veal, or egg-laying hen who is kept on a farm.

(c)   "Egg-laying hen" means any female domesticated chicken, turkey, duck, goose, or guinea fowl kept for the purpose of egg production.

(d)   "Enclosure" means any cage, crate, or other structure (including what is commonly described as a "gestation crate" for pigs; a "veal crate" for calves; or a "battery cage" for egg-laying hens) used to confine a covered animal.

(e)   "Farm" means the land, building, support facilities, and other equipment that are wholly or partially used for the commercial production of animals or animal products used for food or fiber; and does not include live animal markets.

(b)   "Fully extending his or her limbs" means fully extending all limbs without touching the side of an enclosure, including, in the case of egg-laying hens, fully spreading both wings without touching the side of an enclosure or other egg-laying hens.

(f)   "Person" means any individual, firm, partnership, joint venture, association, limited liability company, corporation, estate, trust, receiver, or syndicate.

(g)   "Pig during pregnancy" means any pregnant pig of the porcine species kept for the primary purpose of breeding.

(h)   "Turning around freely" means turning in a complete circle without any impediment, including a tether, and without touching the side of an enclosure.

**25992. EXCEPTIONS.**— This chapter shall not apply:

(a)   During scientific or agricultural research.

(b)   During examination, testing, individual treatment or operation for veterinary purposes.

(c)   During transportation.

(d)   During rodeo exhibitions, state or county fair exhibitions, 4-H programs, and similar exhibitions.

(e)   During the slaughter of a covered animal in accordance with the provisions of chapter 6 (commencing with Section 19501) of Division 9 of the Food and Agricultural Code, relating to humane methods of slaughter, and other applicable law and regulations.

(f)   To a pig during the seven-day period prior to the pig's expected date of giving birth.

**25993. ENFORCEMENT.**— Any person who violates any of the provisions of this chapter is guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine not to exceed one thousand dollars ($1,000) or by imprisonment in the county jail for a period not to exceed 180 days or by both such fine and imprisonment.

**25994.  CONSTRUCTION OF CHAPTER.—** The provisions of this chapter are in addition to, and not in lieu of, any other laws protecting animal welfare, including the California Penal Code. This chapter shall not be construed to limit any state law or regulations protecting the welfare of animals, nor shall anything in this chapter prevent a local governing body from adopting and enforcing its own animal welfare laws and regulations.

## SECTION 4. SEVERABILITY

If any provision of this Act, or the application thereof to any person or circumstances, is held invalid or unconstitutional, that invalidity or unconstitutionality shall not affect other provisions or applications of this Act that can be given effect without the invalid or unconstitutional provision or application, and to this end the provisions of this Act are severable.

## SECTION 5. EFFECTIVE DATES

The provisions of sections 25990, 25991, 25992, 25993, and 25994 shall become operative on January 1, 2015.

# Exhibit 3



**DEBRA BOWEN** | SECRETARY OF STATE
STATE OF CALIFORNIA | ELECTIONS
1500 11th Street, 5th Floor | Sacramento, CA 95814 | Tel (916) 657-2166 | Fax (916) 653-3214 | www.sos.ca.gov

April 9, 2008

Joe Ramsey
7737 Greenridge Way
Fair Oaks, CA  95628

Dear Mr. Ramsey:

Pursuant to Section 9033 of the Elections Code, the Secretary of State has certified that
the certificates received from County Clerks or Registrars of Voters by the Secretary of
State established that the TREATMENT OF FARM ANIMALS. STATUTE. (#1274) has
been signed by the requisite number of qualified electors needed to declare the petition
sufficient.  The TREATMENT OF FARM ANIMALS. STATUTE. (#1274) is, therefore,
qualified for the next statewide election.

Sincerely,

Joanna Southard, Program Manager
Ballot Pamphlet and Initiatives

Enclosure



# State of California

## SECRETARY OF STATE

April 9, 2008

TO:  ALL COUNTY CLERKS/REGISTRARS OF VOTERS (CCROV 08135)

Pursuant to Section 9033 of the Elections Code, I hereby certify that on April 9, 2008, the certificates received from the County Clerks or Registrars of Voters by the Secretary of State established that the TREATMENT OF FARM ANIMALS. STATUTE. (#1274), has been signed by the requisite number of qualified electors needed to declare the petition sufficient.  TREATMENT OF FARM ANIMALS. STATUTE. (#1274), is, therefore, qualified for the next statewide election.

TREATMENT OF FARM ANIMALS. STATUTE. Requires that an enclosure or tether confining specified farm animals allow the animals for the majority of every day to fully extend their limbs or wings, lie down, stand up, and turn around.  Specified animals include calves raised for veal, egg-laying hens, and pregnant pigs.  Exceptions made for transportation, rodeos, fairs, 4-H programs, lawful slaughter, research and veterinary purposes.  Provides misdemeanor penalties, including a fine not to exceed $1,000 and/or imprisonment in jail for up to 180 days.  Summary of estimate by Legislative Analyst and Director of Finance of fiscal impact on state and local government: Probably minor local and state enforcement and prosecution costs, partly offset by increased fine revenue.  (Initiative 07-0041.)



IN WITNESS WHEREOF, I hereunto set my hand and affix the Great Seal of the State of California this 9th day of April, 2008.

DEBRA BOWEN
Secretary of State

1274. Treatment of Farm Animals. Statute.

| COUNTY | PETITION FILED W/COUNTY | SOS REC'D RAW | SOS REC'D RANDOM | | RAW COUNT | RANDOM SAMPLE/ FULL CHECK | VALID SIGS. | INVALID | DUP. | VALID OR PROJ. VALID | % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. ALAMEDA | 02/27/08 | 03/17/08 | 03/24/08 | | 42,383 | 1,271 | 1,038 | 233 | 0 | 34,613 | 81.7% |
| 2. ALPINE | 03/06/08 | 03/06/08 | | Random Notice: | 4 | 4 | 3 | 1 | 0 | 3 | 75.0% |
| 3. AMADOR | 02/27/08 | 03/04/08 | 03/17/08 | 03/13/08 | 416 | 416 | 337 | 79 | 2 | 337 | 81.0% |
| 4. BUTTE | 02/27/08 | 03/13/08 | 03/13/08 | Random Due: | 4,423 | 500 | 358 | 142 | 4 | 2,889 | 65.3% |
| 5. CALAVERAS | 03/05/08 | 03/07/08 | | 04/25/08 | 289 | 289 | 229 | 53 | 7 | 229 | 79.2% |
| 6. COLUSA | 02/27/08 | 03/28/08 | | | 32 | 32 | 25 | 7 | 0 | 25 | 78.1% |
| 7. CONTRA COSTA | 02/27/08 | 03/11/08 | 03/20/08 | | 22,729 | 682 | 562 | 120 | 0 | 18,730 | 82.4% |
| 8. DEL NORTE | 02/27/08 | 03/07/08 | 03/24/08 | | 60 | 60 | 44 | 16 | 0 | 44 | 73.3% |
| 9. EL DORADO | 02/28/08 | 03/03/08 | 03/17/08 | | 1,655 | 500 | 395 | 105 | 3 | 1,285 | 77.6% |
| 10. FRESNO | 02/27/08 | 03/06/08 | 03/21/08 | | 13,152 | 500 | 408 | 92 | 0 | 10,732 | 81.6% |
| 11. GLENN | 02/27/08 | 03/04/08 | 03/21/08 | | 233 | 233 | 167 | 66 | 2 | 167 | 71.7% |
| 12. HUMBOLDT | 02/26/08 | 03/10/08 | 04/04/08 | | 1,593 | 500 | 352 | 148 | 5 | 1,087 | 68.2% |
| 13. IMPERIAL | 02/26/08 | 02/26/08 | 03/27/08 | | 981 | 500 | 241 | 258 | 1 | 471 | 48.0% |
| 14. INYO | 02/27/08 | 03/03/08 | 03/03/08 | | 35 | 35 | 29 | 6 | 0 | 29 | 82.9% |
| 15. KERN | 02/27/08 | 03/04/08 | 04/03/08 | | 4,935 | 500 | 371 | 129 | 1 | 3,574 | 72.4% |
| 16. KINGS | 02/27/08 | 03/04/08 | 03/21/08 | | 557 | 500 | 352 | 148 | 3 | 392 | 70.3% |
| 17. LAKE | 02/28/08 | 03/03/08 | 04/01/08 | | 792 | 500 | 342 | 158 | 6 | 536 | 67.7% |
| 18. LASSEN | 02/28/08 | 03/03/08 | | | 8 | | | | | 0 | 0.0% |
| 19. LOS ANGELES | 02/28/08 | 03/10/08 | 04/07/08 | | 187,577 | 5,627 | 4,266 | 1,361 | 5 | 136,818 | 72.9% |
| 20. MADERA | | 03/24/08 | | | 2,010 | | | | | 0 | 0.0% |
| 21. MARIN | 02/27/08 | 03/07/08 | 03/20/08 | | 22,941 | 688 | 571 | 117 | 0 | 19,040 | 83.0% |
| 22. MARIPOSA | 02/27/08 | 03/05/08 | 03/18/08 | | 176 | 176 | 140 | 36 | 1 | 140 | 79.5% |
| 23. MENDOCINO | 02/27/08 | 02/27/08 | 03/18/08 | | 1,228 | 500 | 414 | 86 | 4 | 1,002 | 81.6% |
| 24. MERCED | 02/27/08 | 03/17/08 | 03/19/08 | | 2,379 | 500 | 364 | 136 | 0 | 1,732 | 72.8% |
| 25. MODOC | 02/23/08 | 03/06/08 | 03/06/08 | | 61 | 61 | 50 | 11 | 0 | 50 | 82.0% |
| 26. MONO | | | | | | | | | | 0 | 0.0% |
| 27. MONTEREY | 02/27/08 | 03/03/08 | 04/04/08 | | 6,676 | 500 | 402 | 98 | 1 | 5,203 | 77.9% |
| 28. NAPA | 02/27/08 | 03/03/08 | 03/19/08 | | 2,707 | 500 | 409 | 91 | 4 | 2,119 | 78.3% |
| 29. NEVADA | 02/28/08 | 03/04/08 | 03/19/08 | | 2,484 | 500 | 405 | 95 | 6 | 1,894 | 76.2% |
| 30. ORANGE | 02/27/08 | 03/10/08 | 03/28/08 | | 72,930 | 2,188 | 1,699 | 489 | 4 | 52,320 | 71.7% |
| 31. PLACER | 02/28/08 | 02/28/08 | 03/03/08 | | 4,126 | 500 | 425 | 75 | 2 | 3,387 | 82.1% |
| 32. PLUMAS | 02/27/08 | 03/16/08 | 03/16/08 | | 81 | 81 | 61 | 20 | 0 | 61 | 75.3% |
| 33. RIVERSIDE | 02/27/08 | 03/10/08 | 03/25/08 | | 27,324 | 820 | 664 | 156 | 2 | 19,972 | 73.1% |
| 34. SACRAMENTO | 02/27/08 | 03/07/08 | 03/31/08 | | 21,065 | 632 | 502 | 130 | 0 | 16,732 | 79.4% |
| 35. SAN BENITO | 02/27/08 | 03/04/08 | 03/21/08 | | 993 | 500 | 387 | 113 | 7 | 755 | 76.0% |
| 36. SAN BERNARDINO | 02/27/08 | 03/07/08 | 03/25/08 | | 27,975 | 839 | 677 | 162 | 1 | 21,495 | 76.8% |
| 37. SAN DIEGO | 02/27/08 | 03/05/08 | 04/03/08 | | 134,204 | 4,026 | 3,256 | 770 | 9 | 98,836 | 73.6% |
| 38. SAN FRANCISCO | 02/27/08 | 03/04/08 | | | 38,586 | | | | | 0 | 0.0% |
| 39. SAN JOAQUIN | 02/27/08 | 03/05/08 | | | 5,125 | | | | | 0 | 0.0% |
| 40. SAN LUIS OBISPO | 02/28/08 | 02/29/08 | | | 3,596 | | | | | 0 | 0.0% |
| 41. SAN MATEO | 02/27/08 | 03/05/08 | | | 15,316 | | | | | 0 | 0.0% |
| 42. SANTA BARBARA | 02/27/08 | 03/04/08 | 04/01/08 | | 13,645 | 500 | 403 | 97 | 2 | 9,563 | 70.1% |
| 43. SANTA CLARA | 02/27/08 | 03/10/08 | 03/18/08 | | 34,050 | 1,022 | 876 | 146 | 1 | 28,109 | 82.6% |
| 44. SANTA CRUZ | | | | | | | | | | 0 | 0.0% |
| 45. SHASTA | 02/27/08 | 03/04/08 | | | 1,237 | | | | | 0 | 0.0% |
| 46. SIERRA | 02/27/08 | 03/28/08 | 03/28/08 | | 13 | 13 | 9 | 4 | 0 | 9 | 69.2% |
| 47. SISKIYOU | 02/28/08 | 02/28/08 | 03/14/08 | | 92 | 92 | 67 | 25 | 0 | 67 | 72.8% |
| 48. SOLANO | 02/27/08 | 03/10/08 | 03/25/08 | | 8,981 | 500 | 387 | 113 | 1 | 6,647 | 74.0% |
| 49. SONOMA | 02/27/08 | 03/14/08 | 03/14/08 | | 18,851 | 566 | 473 | 93 | 1 | 14,678 | 77.9% |
| 50. STANISLAUS | 02/27/08 | 02/27/08 | 03/21/08 | | 9,157 | 500 | 412 | 88 | 3 | 6,594 | 72.0% |
| 51. SUTTER | 02/27/08 | 03/04/08 | 03/13/08 | | 334 | 334 | 271 | 63 | 4 | 271 | 81.1% |
| 52. TEHAMA | 02/27/08 | 03/06/08 | 03/27/08 | | 267 | 267 | 208 | 59 | 0 | 208 | 77.9% |
| 53. TRINITY | 02/27/08 | 03/11/08 | | | 104 | | | | | 0 | 0.0% |
| 54. TULARE | 02/20/08 | 03/03/08 | | | 3,140 | | | | | 0 | 0.0% |
| 55. TUOLUMNE | 02/27/08 | 02/27/08 | 03/18/07 | RANGE: | 247 | 247 | 209 | 38 | 0 | 209 | 84.6% |
| 56. VENTURA | 02/27/08 | 03/11/08 | 03/12/08 | 110% = 477,369 | 13,540 | 500 | 422 | 78 | 2 | 10,015 | 74.0% |
| 57. YOLO | 02/27/08 | 03/07/08 | 03/20/08 | 100% = 433,971 | 4,696 | 500 | 394 | 106 | 5 | 3,306 | 70.4% |
| 58. YUBA | 02/27/08 | 02/27/08 | 03/20/08 | 95% = 412,273 | 316 | 316 | 231 | 85 | 0 | 231 | 73.1% |
| TOTAL | | | | | 782,507 | 31,017 | 24,307 | 6,702 | 99 | 536,605 | 75.22% |

For questions regarding this spreadsheet please contact:
Secretary of State Elections Division  916.657.2166
04/09/2008 12:58 PM

# Exhibit 4

DRAFT

MINUTES

**EXECUTIVE COMMITTEE**
American Egg Board

Silverado Resort
Napa, CA
November 1, 2007

<u>Executive Committee Present</u>
Wayne Mooney, Chairman
Jacques Klempf
Paul Sauder
Brian Hayward
Greg Herbruck
Bruce Dooyema
Beth Schnell, ex-officio
Joanne C. Ivy, ex-officio

<u>Others Present</u>
Angie Snyder, USDA
Rex Barnes, USDA
Dennis Kane (p.t.)

<u>Committee Chairmen Present</u>
Jerry Kil, Advertising
Jim Brock, Industry & Market Development
Blair Van Zetten, Nutrition
Steve Gemperle, Consumer Education/Foodservice

Chairman Wayne Mooney called the meeting to order at 7:30 a.m. **It was moved by Jacques Klempf, seconded by Greg Herbruck, to approve the minutes of the previous meeting as presented. Motion carried unanimously.**

Dennis Kane, AEB's Controller, gave a review of AEB's Balance Sheet and Financial Statement through September 30. Kane reported that AEB's Liability and Board Equity amounts to approximately $20.8 million. AEB's assessment revenue is slightly above budget and program expenses were under budget with revenue over expenses by $2.4 million. AEB remains in a strong financial condition. **A motion was made by Klempf and seconded by Paul Sauder to approve the financial report. Motion carried unanimously.**

Joanne Ivy presented the revised 2008 Administration Budget to reflect adjustments due to the transfer of Egg Nutrition Center management from UEP to AEB. **A motion was made by Greg Herbruck to approve the revised 2008 Administrative budget in the amount of $23,550,680. The motion was seconded by Sauder and it carried unanimously.** Ivy reviewed the 2008 Special Projects budget that had been revised to include a $50,000 transfer fee to UEP. **A motion was made by Sauder and seconded by Klempf to approve the revised 2008 Special Projects budget in the amount of $1,575,000. The motion passed unanimously.** It was agreed that AEB would pay UEP a transfer fee for the Egg Nutrition Center in the amount of $50,000 per year for three years (2008-2010) for a total of $150,000.

Jeff Armstrong, Michigan State University, presented "a multi-university proposal for a coordinated agricultural project for the health and welfare of egg laying hens." This project would evaluate the short and long-term effects of any proposed changes to production practices on animal health and welfare; food safety, security, and quality; supply chain dynamics; consumer economics; and industry sustainability. **A motion was made by Herbruck, seconded by Bruce Dooyema to approve up to $406,000 from the 2008 Contingency Fund to cover the cost of the multi-university study. The motion passed unanimously.**

Mooney appointed the Nominating Committee for the 2008 Executive Committee. The Nominating Committee will be chaired by Paul Sauder and includes Dolph Baker, Tom Hertzfeld, Beth Schnell, Bruce Dooyema, and Craig Willardson.

Herbruck, who represents the American Egg Board on the AARC Board, gave an update on the environmental research project. He reported that all three locations – North Carolina, Indiana, and California – are up and running. He also mentioned that Dennis Kane serves on the financial committee to assure appropriate use of project funds.

Ivy gave a progress report on the transfer of ENC Management from UEP to AEB. She reported that UEP President Gene Gregory and she met with the Egg Nutrition Center staff in August to review all AEB staff benefits and answer questions regarding the transfer. She reported that all benefits were comparable to UEP except that UEP pays full health coverage for spouse and family and AEB pays half. Don McNamara requested a one-time payment to cover the balance of the spouse medical coverage, which would amount to approximately $5,000. It was agreed by the Executive Committee to make the requested one-time payment to cover the actual out-of-pocket amount not covered by AEB. McNamara is the only ENC employee who would be affected by AEB's medical payment policy.

There was a discussion about increasing AEB's assessment rate and the percentage by which a referendum would pass. Mooney stated that he plans to expand the existing Assessment Exploratory Subcommittee which includes Dolph Baker, Jacques Klempf, and Craig Willardson, and a conference call would be conducted before the end of the year to determine next steps to ascertain the opinions of producers regarding an increased AEB assessment.

Due to the retirement of Dennis Casey, President of Hy-Line International, Mooney appointed Terry Pollard with Diamond Automation to fill Casey's position as AEB's Allied Industry Advisor.

Ivy provided an update on the 2008 Strategic Plan and stated that each Committee would approve final objectives, measurements, and strategies. Upon approval of the Board, the final 2008 Strategic Plan will be sent to all producers.

Ivy reported that she has received a lot of concern from producers about the current redistricting plan for representation on the American Egg Board. One concern is that there are states where there are only production facilities, but the management is located in another state. Angie Snyder said that she would look into the feasibility for the 2008 Caucuses to have nominations

Executive Committee                    - 3 -                    November 1, 2007

of producers who are located at the company headquarters to represent their production in another state.

Producer delinquencies were discussed by the committee, which showed that there were only two producers delinquent. AEB plans to conduct a compliance audit to be conducted by USDA of one of the delinquent producers in January 2008. Ivy stated that a second audit would be planned if the other producer does not make payment by the end of 2007. She also reviewed two candidates for write-offs as they have both gone out of business. It was requested that a letter be written to one of the producers, who has gone out of the egg business, although is now in a lucrative business. It is felt that AEB should attempt to get outstanding payments from this producer as paying AEB's assessment is a legal financial obligation. This producer should be in a financial position to satisfy his obligation.

Ivy requested that AEB's salaries and benefits be reviewed at the fall Board Meeting to be effective January 1 to coincide with the calendar year. Currently, AEB benefits are reviewed at the March Board Meeting and made effective on April 1. **A motion was made by Klempf and seconded by Sauder to change the annual benefit and salary review to the fall Board Meeting to coincide with the calendar year budget schedule. The motion passed unanimously.**

Administrative cost for University research projects was discussed. **A motion was made by Klempf and seconded by Sauder to establish a policy that would not allow for overhead costs to be included in University research project costs. The motion passed unanimously.**

The Executive Committee adjourned at 10:50 a.m.

At the evening Executive Committee Meeting, a special request was made for financial assistance to address an animal welfare situation. **A motion was made by Herbruck and seconded by Klempf for $3 million to be held in reserve for a consumer education campaign to educate the public about current production practices. The motion passed unanimously.**


_____        _____
V. Wayne Mooney, Chairman                Date

# Exhibit 5

# AEB Supports California Egg Battle

By John Todd

The American Egg Board unanimously passed a motion at its recent fall meeting in California that $3 million be held in reserve to assist the state if necessary in the industry's current battle with animal activists. Animal welfare groups are attempting to place a referendum on the November 2008 ballot that would eliminate cage production in California.

As pointed out by California egg producer Arnie Riebli, animal rights groups are also attempting to include hog farrowing crates and veal pens on the referendum. Riebli said there is virtuously no hog or veal business in California, so this is a direct and all-inclusive attack on the egg industry. He went on to make an impassioned plea for support on the issue. If California loses this one, animal rights groups will take the battle to the rest of the country.

Speakers said that a great deal of work needs to be done on this challenge as it is estimated that if the referendum vote were held today it would pass, and the California producers would be in grave danger.

## Strategic Plan

AEB President Joanne Ivy gave a review of the new strategic plan resulting from the May meeting in Dallas of AEB staff, committee members, agency personnel, and industry experts. It is planned to have a similar meeting annually.

The basic mission of the plan is to increase the demand for eggs and egg products domestically. During this meeting all committees addressed the plan in their individual marketing programs and initiatives.

Plan strategies include developing and presenting nutrition science as part of a healthy diet to reduce barriers against eggs, as well as using a blend of traditional and new media to promote health and versatility of eggs. Strategies also include: programs directed to target business audiences such as food manufacturers, expanding advertising campaigns, and developing partnerships to enhance sales through additional size, scope and efficiency of marketing efforts. Detailed information and goals are part of this document and will target audiences such as consumers, foodservice, retailers, food manufacturers, health professionals and public relations media.

Jim Brock, Chairman of the Industry and Market Development Committee reported, along with members of this team, how efforts will follow the strategic plan. He noted that better information for producers to take to their retail customers will be available. In addition, more work will be done by AEB staff with retailers. Relative to egg products, increased pressure will be exerted through related publications and ongoing communications with retailers in the National Accounts Program. There will also be a program called On-Pack that will be in effect during slower times in the egg business year. It was pointed out that 93 percent of households in the United States have eggs. Coupons and on-carton public relations can be used. Charts and graphs were presented to show the slow egg sales periods and how the On-Pack program can work within the time frames. Some USDA-approved carton and coupon ideas were shown. In addition, several ideas for billboard and truck signage were presented.

In 2007, a grocery study showed the tremendous opportunity that retailers have for profitability with egg sales. Eggs are the highest profit per unit sold in the entire store. Other statistics in this regard like high cash flow and square footage profit margins were also discussed. All features can be used by producers with their customers to promote the sale of eggs.

## Selling Eggs to Food Manufacturers

John Howeth presented new ways that egg products can be sold to food manufacturers. The industry needs new and additional information it can share with food manufacturers. There are now many different ways to spread the messages using the web, in person, and printed messages.

Howeth reported that they have achieved good scores on their advertising efforts in various food publications. Because of their timely advertising, they also have obtained many free pages that talk about egg products in articles. There is also much information on the web site regarding the nutritional benefits of eggs. Some of the publications that are featuring egg product ads and information are: *Food Prod-*



*Dr. Glenn Froning and Lynn Froning, and Jennifer Geck, USAPEEC, at the American Egg Board's fall meeting in Napa, Calif.*

*uct Design* and *Prepared Foods* magazines.

AEB publishes two related newsletters. *Eggsaminer* is a six-page newsletter relating to egg products and *Eggsolutions* is a digital piece covering the same data. In addition, there is the *Egg Products Buyers Guide* listing names of those that purchase these products. Recently a very positive article appeared in *Baking Management* magazine about the benefits of egg products. This committee also oversees the Research and Fellowship Program relating to Food Science. This supports a PhD prospect working in this field as well as other university projects relating to the egg products business.

## Good News on Export Growth

Jim Sumner, USA Poultry and Egg Export Council, said there is good news regarding consistent growth of export sales in both shell eggs and egg products. The weak dollar has helped this business as well as the effort of the United States Egg Marketers. In 2007 Sumner expects about $137 million in sales of both egg products and shell eggs. Japan is currently the No. 1 buyer followed by Hong Kong, Canada,

Mexico and Germany.

USAPEEC continues to conduct seminars in many countries and has used Howard Helmer, who is very popular overseas, in the promotion of eggs. They have also invited groups from several countries to the United States to study first hand how things are done here. These efforts have resulted in many inquiries and sales. Eggs have received good publicity in the foreign press and USAPEEC has sponsored advertising in baking and food manufacturing publications, as well.

The organization had a booth at the largest food show in the world held in Cologne, Germany this year. It was successful, obtaining over 60 trade references. Next year, a similar show will be held in Paris and Jim Sumner urged egg producers, processors and marketers to attend if possible. He also referenced the upcoming International Egg Commission meeting to be held in Shanghai and how important this will be to exports from the United States. Several motions were passed from the Industry and Market Development Committee relating to the Strategic Plan, support for the UEP Harvest Food Bank donation and future funding for AI research in egg products.

AEB's Kevin Burkum presented advertising plans and suggestions to the board. He reviewed the cracked egg campaign that is currently being seen on television and showed clips of the two ads called "PeeWee" and "Triathelon". Both ads feature the high protein, nutritional value of eggs. Burkum also commented on the work AEB is doing online. Yahoo.com, Food Network.com and Weight Watchers.com are just some of the web sites that can be seen with eggs as part of the program. Burkum reported results of some research that this committee has done regarding advertising efforts. The nutritional value of eggs, emphasized in current promotional material, is well known to heavy egg users. Target audiences have included "moms with kids" and it is found that they have a good knowledge of the nutritional value of eggs. For 2008, advertising will take a more focused approach, especially for television and radio. Much attention will be given to digital, print, a new web site, truck signage and a new initiative to use carton advertising. AEB currently has all materials ready for use by producers.

## New Ad Idea

A new advertising idea was introduced to the board by Burkum. AEB would work with the Rachael Ray talk show, which would feature an accomplished, "Incredible", person to be interviewed at her VIP table. This would be partially sponsored by AEB and AEB's presence would be featured throughout the segment. Similar promotional work has been done in the past with other businesses, and currently Staples is the only other one doing this sort of thing. A total of 14 shows and an online presence would be included in the program.

Questions from the board relative to this project included concern over animal activists possible involvement. United Egg Producers CEO Gene Gregory remarked that the industry needs to press on with plans and not hold back because of potential problems. The board unanimously passed a motion to continue work on this new idea, and agreed on its funding. The 2008 advertising budget was approved .

The AEB Nutrition Committee, chaired by Blair Van Zetten, featured a detailed report by Dr. Don McNamara, head of the Egg Nutrition Center (ENC) in Washington, D.C. McNamara gave an overview of the many research projects that the ENC is currently sponsoring and will be working on in the future. These projects have targets such as weight control, elderly and how eggs in the diet are beneficial, animal protein, choline and



*Kevin Burkum, AEB, presented the board's new advertising plan.*

even a breakfast program for college students eating eggs in one group and not eating eggs in another. In addition, a study is being done on free-range eggs versus other production systems.

## Crack 300 Program

McNamara also mentioned a book by Gary Taubes pointing out that the cholesterol scare from eggs was totally invalid. Work is being continued by the ENC on the Crack 300 program. This is an effort to dispel the theory that egg consumption should be limited due to cholesterol limits. A steering committee is working on the issue, and making progress. Protein is becoming more important as a nutritional factor which benefits eggs.

In 2008, research projects will continue with several new ones added. All will continue to discover how eggs are beneficial dietary choices for young and old. The Edelmann Public Relations Co. reported on their many activities promoting the benefits of eggs. Recent research has proven that expecting mothers and those that are breast-feeding can see many benefits from consumption of eggs.

Edelman is using various methods for getting the word out to the right people. Press releases are a good way to spread the good news of egg's benefits. Programs are continuing such as the Kristine Lilly project where a gifted, young athlete is shown using eggs in her training diet. In 2008, public relations will continue to work with health professionals, media outreach and consumer



*Dr. Dennis Casey, former AEB allied consultant and retired president, Hy-Line International.*



| AEB Supports California Egg Battle |

education. Various clips were shared from television, radio and the Web depicting the free publicity that can be received from these media sources.

Dr. Hilary Thesmar updated the group on the activities of the Egg Safety Center, which she heads in Washington. Her remarks included information about the work being done with the Safe Quality Food (SQF) pro-gram. She referenced several studies being done in egg processing plants regarding sal-monella, E. Coli and Listeria potential prob-lems. This office anticipates an improved programs relating to overall food safety.

Steve Gemperle, Chairman of the Consum-er Education and Foodservice Committee in-troduced members of the AEB staff to report on that committee's many activities. Kristine





Lilly has been used with the school promo-tion kits emphasizing the nutritional value of eggs in her diet. A new design is planned for the newsletter "Eggscetera" which has been rated well in the industry. Many articles and news releases have appeared in all national food service magazines. The foodservice team has many plans to conform to the new AEB Strategic Plan. Among the efforts will be an increase in the volume and goals to influence breakfasts with major fast food chains and to increase advertising activi-ties related to food service. They will better utilize the research data available with food-service providers and increase the amount of advertising in foodservice publications.

Linda Braun and Howard Helmer updated the board on the activities in consumer edu-cation. There have been many features that include eggs in major publications as well as on radio, in newspaper and on-line outlets. The new media kit has included nutritional material, recipes and other positive informa-tion on eggs and it has paid off with positive results.

## Media Exposure

Helmer has been used extensively with some new videos that show him making ome-lets. Some clips were shown at the meeting with Helmer performing on various television shows throughout the country. Other possibili-ties for media exposure are being planned with Helmer on TV programs such as Jay Leno, Mr. Food and the Food Network. Publications from the committee include the "Eggscyclo-pedia" and the Egg Handling Care and Guide. Strategic Plans relating the Consumer Educa-tion and Foodservice Committee will be an increase in the positive impressions presented and an increase in overall newspaper place-ments.

Also an increase in the use of the digital media is in the works as well as a more vis-ual use of Helmer's activities. His activities continue to concentrate on maintaining con-tact with the major women's magazines in the United States. He was at the inauguration of the new Rachel Ray test kitchen this year with omelet making demonstrations. Many articles in the women's magazines including recipes containing eggs have appeared in the past four months. Total value to the industry for these timely articles is over $6 million as compared to advertising costs. **EI**

# Exhibit 6



United States          Agricultural          Room 3932-S, STOP 0256
Department of         Marketing             1400 Independence Avenue, SW
Agriculture           Service               Washington, DC 20250-0256

## WEEKLY ACTIVITY REPORT

TO:       Lloyd C. Day
          Administrator
          Agricultural Marketing Service

FROM:     Rex A. Barnes
          Deputy Administrator
          Poultry Programs

DATE:     November 5, 2007

## I.    KEY DEPARTMENT NEWS – PAST

**International Trade Data System (ITDS) Plenary Session:** On October 29, members of AMS attended a Plenary Session to discuss the modification of the USDA Plan previously submitted for use of the Automated Commercial Environment/International Trade Data System (import/export data system). Representatives for Customs and Border Protection (CBP) and contractors (Robins-Gioia, LLC and DHS Associates) provided technical guidance explaining the necessity of each participating government agency and describing the status of integration with the system. Over forty government agencies are now participating in the project to interface with ITDS. Each agency's plan must describe the status of their business processes, definition of elements for the standard data sets, projected regulatory rulemaking, establishment of performance measures, and assessment of budget needs. The revised report must be prepared and submitted by November 12.

On October 31, AMS discussed a draft of the Statement of Work (SOW) prepared by the Office of Information and Technology, CBP. The draft SOW outlines the associated Business Planning, Investment Management, and Program Management support to the ITDS program for integration with ACE/ITDS. Efforts will focus upon development of an AMS plan for integration of business processes and identification of the architecture of supporting IT systems.

**Review of Export Certification Procedures for Singapore:** In September 2007, the Agri-Food and Veterinary Authority (AVA), of Singapore, selected samples from a small import shipment of table eggs (450 dozen) certified by AMS. The AVA test results showed a cross reaction in the DNA test for *Salmonella Enteritidis* (SE). This implied that the eggs originated from a flock that was potentially vaccinated for SE. Eggs originating from flocks vaccinated for SE are not eligible for export certification to Singapore. Currently, AMS works jointly with the Animal and Plant Health Inspection Service and the Veterinary Service for the State of Pennsylvania to provide assurances that the layer production facilities approved by AVA meet the animal health criteria established by Singapore. Investigation by State officials revealed that eggs from a production

facility identified through monitoring under the Pennsylvania Quality Assurance Program (PQAP) as SE positive had been presented to AMS for certification at the R.W. Sauder egg processing facility in Lititz, PA. Although information had been distributed restricting the eggs from the identified flock, the AMS grader did not verify the source of the eggs. Corrective action has been implemented to prevent a recurrence. On November 1, members of AMS and APHIS visited the Sauder processing facility to review procedures to maintain the identity and segregation of eggs originating from the approved egg production sources. Additionally, the group visited the Robert Keller Farm, Lititz, PA, to review elements of the PQAP monitoring program. The APHIS officials subsequently met with members of the Veterinary Service for the State of Pennsylvania to review criteria for the certification of eggs destined for Singapore.

**Industry Services Audit and Accreditation Programs (ISAAP) Meeting:** The National Supervisor of Audits, represented the Poultry Programs at the multi-program ISAAP meeting on November 1, 2007. As with many previous meetings, the purpose of this meeting was to continue to finalize the ISAAP standards currently in draft. This meeting focused primarily on finalizing the language in AMS2C – USDA Process Verified Program (PVP) and AMS1 – AMS, ISAAP Manual. Although many issues surrounding the two documents were discussed, two issues surfaced as being paramount. First, there was a discussion of the design and development of one shield for the USDA PVP to be used by industry under any of the commodity Programs. Second, there was a discussion of the development of another ISAAP standard that addresses the "Client Requested" audit-like programs that are not currently considered an ISAAP audit program.

**Meeting to Discuss the Approval of DonLevy Laboratories:** AMS representatives from Science and Technology and Poultry Programs met November 1, to discuss Donlevy Laboratories, an approved laboratory program for testing Frozen Cooked Diced Chicken. Since the company responded positively via corrective actions to the nonconformities listed in the August 2007 laboratory review report, the laboratory was accepted as a certified laboratory under the AMS - Approved Laboratory Program for Microbiological testing of Frozen Cooked Diced Chicken. Next steps include finalizing an approval letter to DonLevy Laboratories and completing a "Notice to the Trade" informing industry of their acceptance and approval status for the testing of Frozen Cooked Diced Chicken.

**Meeting with Los Angeles Unified School District:** On November 1, a representative of the Commodity Procurement Branch, along with representatives of the Grading Branch, attended a meeting with members of the Los Angeles Unified School District (LA Unified). LA Unified is currently restructuring its school lunch program and wanted to learn what services AMS could provide them. Both the procurement process and grading services were described in detail. We also discussed the possibility of AMS purchasing commodities directly for the school district with its own funds. They are particularly interested in new items, such as peeled, hard-cooked eggs.

**Ballot Initiative Threatens California Egg Industry:** In November 2008, California voters will consider a ballot initiative that threatens the California egg industry and jeopardizes the U.S. Egg Industry as a whole. Titled the Farm Animal Cruelty Act, the initiative calls for the elimination of hog gestation crates, veal crates, and battery cages for laying hens. As the hog and veal industries are non-existent in California, the initiative -- backed by the People for the Ethical Treatment of

Animals and the Humane Society of the United States--singularly targets the California egg industry.

Egg producers across the country are concerned that if the measure passes in California, similar initiatives will be introduced in other States. Colorado voters may consider such an initiative as early as next year.

California egg producers are undertaking a campaign to defeat the measure. To supplement these efforts, the American Egg Board voted at its November 2, 2007, meeting to set aside $3 million to fund public relations and other projects to educate consumers about current agriculture practices.

AMS PURCHASES

| Product | Quantity 000 lbs. | Delivered Cost 000 dols. | Average Price $/lb. |
|---------|------------------|--------------------------|---------------------|
| Chicken Burgers | Offer Rejected | - | - |

## II.    KEY DEPARTMENT NEWS – UPCOMING

**Quarterly Small Business Meeting:** The next meeting of the Agency's Small Business Specialists will be held on November 8. Topics of discussion will include the revised DR 5090-01 (Full Small Business Participation & Clearance Process for Contracts Not Set-Aside or Reserved for Small Business Participation), the USDA and SBA Scorecards as well as goaling procedures and submissions. Updates on the Service Disabled Veteran-Owned Small Business and Subcontracting Programs will be provided along with other topics of interest.

**ACDA Processing Committee schedules Annual Meeting:** The American Commodity Distribution Association's (ACDA) processing committee has set the date for their annual meeting for November 27 – 29, 2007, at the Food and Nutrition Headquarters in Alexandria, VA. ACDA is comprised of Industry, State, and Federal representatives involved in the Commodity Programs. Additionally, representatives from each of the Procurement Branches in AMS will attend the meeting in order to offer updates and discuss regulatory and policy issues affecting Commodity Program participants.

## III.    OUTSTANDING MEDIA ISSUES

## IV.    FREEDOM OF INFORMATION (FOIA) REQUESTS

# Exhibit 7

# AMERICAN EGG BOARD
## ANNUAL BUDGET
### 2008

| | 2007 APPROVED BUDGET | 2007 REVISED BUDGET | 2008 APPROVED BUDGET | 2008 REVISED BUDGET |
|---|---|---|---|---|
| **REVENUE** | | | | |
| ASSESSMENTS | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 |
| INTEREST INCOME | 200,000 | 200,000 | 500,000 | 500,000 |
| RESERVES | 2,932,607 | 2,954,607 | 3,063,430 | 5,952,930 |
| CARRYOVER | | | | |
| **TOTAL REVENUE** | **$23,132,607** | **$23,154,607** | **$23,563,430** | **$26,452,930** |
| | | | | |
| **EXPENDITURES** | | | | |
| **PROGRAMS:** | | | | |
| ADVERTISING | 9,251,200 | 10,573,200 | 10,039,000 | 10,539,000 |
| FOODSERVICE | 1,414,500 | 1,414,500 | 1,529,100 | 1,529,100 |
| NUTRITION | 4,602,340 | 4,657,340 | 4,039,700 | 4,114,200 |
| SPECIAL PROJECTS | 1,525,000 | 170,000 | 1,525,000 | 3,730,000 |
| CONSUMER EDUCATION | 1,128,300 | 1,128,300 | 1,180,100 | 1,180,100 |
| STATE SUPPORT & MATERIALS DISTRIBUTION | 1,670,400 | 1,670,400 | 1,659,000 | 1,659,000 |
| INDUSTRY DEVELOPMENT PROGRAMS | 2,324,700 | 2,324,700 | 1,300,000 | 1,300,000 |
| EGG PRODUCT MARKETING | | | 1,021,800 | 1,121,800 |
| ENVIRONMENTAL | 50,000 | 50,000 | 50,000 | 50,000 |
| **TOTAL PROGRAMS** | **$ 21,966,440** | **$ 21,988,440** | **$ 22,343,700** | **$ 25,223,200** |
| **ADMINISTRATION & COLLECTIONS:** | | | | |
| ADMINISTRATION | 550,230 | 550,230 | 564,830 | 574,830 |
| COLLECTIONS | 145,400 | 145,400 | 161,900 | 161,900 |
| BOARD MEETING | 192,500 | 192,500 | 197,000 | 197,000 |
| USDA ADMINISTRATION | 278,037 | 278,037 | 296,000 | 296,000 |
| **TOTAL ADMIN & COLLECTIONS** | **$ 1,166,167** | **$ 1,166,167** | **$ 1,219,730** | **$ 1,229,730** |
| | | | | |
| **TOTAL PROJECTED EXPENDITURES** | **$ 23,132,607** | **$ 23,154,607** | **$ 23,563,430** | **$ 26,452,930** |
| | | | | |
| **REVENUES LESS EXPENDITURES** | | | | |

# AMERICAN EGG BOARD
## ADVERTISING
## BUDGET
## 2008

| A/C # | DESCRIPTION | 2007 APPROVED BUDGET | 2007 REVISED BUDGET | 2008 APPROVED BUDGET | 2008 REVISED BUDGET |
|---|---|---|---|---|---|
| | **ADVERTISING** | | | | |
| 10.533.3 | PROGRAM ADMINISTRATION | 221,500 | 221,500 | 186,500 | 186,500 |
| 10.570.4 | STAFF TRAVEL | 10,000 | 10,000 | 15,000 | 15,000 |
| 10.752.1 | MARKET RESEARCH | | 39,000 | 78,000 | 78,000 |
| 10.753.9 | MARKET RESEARCH CARRYOVER 06 | 40,000 | 40,000 | | |
| 10.752.2 | TALENT | 250,000 | 250,000 | 120,000 | 120,000 |
| 10.752.3 | PRODUCTION | 650,000 | 650,000 | 500,000 | 500,000 |
| 10.752.4 | MEDIA ( TV, RADIO, PRINT ) | 8,000,000 | 8,000,000 | 9,000,000 | 9,000,000 |
| 10.753.0 | TRAVEL / MISCELLANEOUS | 55,000 | 55,000 | 50,000 | 50,000 |
| 10.753.6 | STATE / MISCELLANEOUS PROJECTS | 20,000 | 3,000 | 20,000 | 20,000 |
| 10.819.3 | POSTAGE | 500 | 500 | 500 | 500 |
| 0.840.1 | COMMITTEE EXPENSE | 4,200 | 4,200 | 4,000 | 4,000 |
| 10.840.2 | INTEGRATED MARKETING COM. MTG | | | 25,000 | 25,000 |
| 10.840.3 | SPECIAL PROJECTS | | | 40,000 | 40,000 |
| 10.754.5 | RACHAEL RAY TRANSFER | | 1,300,000 | | 500,000 |
| | **TOTAL ADVERTISING AND PROMOTION** | **$9,251,200** | **$10,573,200** | **$10,039,000** | **$10,539,000** |

# AMERICAN EGG BOARD
## FOODSERVICE
## BUDGET
## 2008

| A/C # | DESCRIPTION | 2007 APPROVED BUDGET | 2007 REVISED BUDGET | 2008 APPROVED BUDGET | 2008 REVISED BUDGET |
|---|---|---|---|---|---|
| | FOODSERVICE | | | | |
| | | | | | |
| | PROGRAM ADMINISTRATION | 233,300 | 233,300 | 222,900 | 222,900 |
| | | | | | |
| 12.570.4 | TRAVEL | 20,000 | 20,000 | 22,000 | 22,000 |
| 12.580.2 | TRADE SHOW PARTICIPATION | 21,000 | 21,000 | 21,000 | 21,000 |
| 12.674.2 | NATIONAL EGG MONTH | 3,000 | 3,000 | | |
| 12.680.3 | MEDIA & RELATED AGENCY COSTS | 494,700 | 494,700 | 400,000 | 400,000 |
| 12.680.5 | FS PROMO FULFILLMENT | 7,000 | 7,000 | 7,000 | 7,000 |
| 12.680.6 | FOODSERVICE NEWSLETTERS | 30,000 | 30,000 | 30,000 | 30,000 |
| 12.680.8 | FOODSERVICE PRINT PUBLICITY | 15,000 | 15,000 | | |
| 12.680.9 | FOODSERVICE AD PRODUCTION | 30,000 | 30,000 | 60,000 | 60,000 |
| 12.681.1 | MATERIALS DISTRIBUTED | 1,000 | 1,000 | 1,000 | 1,000 |
| 12.681.3 | NATIONAL ACCOUNTS | 165,000 | 165,000 | 400,000 | 400,000 |
| 12.681.7 | FOODSERVICE WEBSITE | 10,000 | 10,000 | 10,000 | 10,000 |
| 12.681.8 | CHEF PROGRAM | 75,000 | 75,000 | 80,000 | 80,000 |
| 12.681.9 | CULINARY SCHOOL DEMOS | 10,000 | 10,000 | | |
| 12.682.1 | FS COLLATERAL PRODUCTION | 1,000 | 1,000 | 1,000 | 1,000 |
| 12.682.6 | SCHOOL FS PROMO PROG | 70,000 | 70,000 | | |
| 12.683.1 | EGG SAFETY & HANDLING | 75,000 | 75,000 | | |
| 12.683.2 | EGG SAFETY VIDEO CARRYOVER 06 | 45,000 | 45,000 | | |
| 12.683.3 | ADVISORY COUNCIL | 16,000 | 16,000 | 16,000 | 16,000 |
| 12.683.4 | CHEF AMBASSADOR PROG C-OVR 06 | 49,000 | 49,000 | | |
| 12.684.3 | SPENT FOWL RECIPE DEV C-OVR 06 | 6,000 | 6,000 | | |
| 12.684.7 | MERCHANDISING BROCHURE | 30,000 | 30,000 | | |
| 12.684.8 | RESEARCH / MEASUREMENT | | | 150,000 | 150,000 |
| 12.684.9 | OTHER COMMUNICATIONS PROGRAMS | | | 100,000 | 100,000 |
| | | | | | |
| 12.730.1 | POSTAGE | 6,000 | 6,000 | 6,700 | 6,700 |
| 12.830.1 | MEMBERSHIPS & SUBSCRIPTIONS | 1,500 | 1,500 | 1,500 | 1,500 |
| | | | | | |
| | | | | | |
| | TOTAL FOODSERVICE PROMOTION | $1,414,500 | $1,414,500 | $1,529,100 | $1,529,100 |

# AMERICAN EGG BOARD
## NUTRITION
### BUDGET
#### 2008

| A/C # | DESCRIPTION | 2007 APPROVED BUDGET | 2007 REVISED BUDGET | 2008 APPROVED BUDGET | 2008 REVISED BUDGET |
|---|---|---|---|---|---|
| | **NUTRITION** | | | | |
| | PROGRAM ADMINISTRATION | 163,700 | 163,700 | 195,700 | 854,700 |
| 15.533.4 | NUTRITION CENTER AUDIT | 9,500 | 9,500 | 10,000 | admin |
| 15.533.5 | AGENCY REVIEW | | | - | |
| 15.570.4 | AEB STAFF TRAVEL | | | 15,000 | 15,000 |
| | **Total Nutrition-Admin** | 173,200 | 173,200 | 220,700 | 869,700 |
| | | | | | |
| | **HEALTH & NUTRITION P.R.** | | | | |
| | | | | | |
| 15.779.1 | NEWS BUREAU | 250,000 | 267,995 | 312,000 | 312,000 |
| 15.779.2 | KRISTINE LILLY SPOKESPERSON | 400,000 | 400,000 | - | - |
| 15.779.3 | CHOLINE HP EDUCATION PROGRAM | 125,000 | 125,000 | 355,000 | 355,000 |
| 15.779.4 | TRACK / MEASURE RESEARCH | 100,000 | 100,000 | 130,500 | 130,500 |
| 15.779.5 | ISSUES / CRISIS | 75,000 | 75,000 | 75,000 | 75,000 |
| 15.779.6 | AMBASSADOR / SCIENTIFIC PANEL | 110,000 | 110,000 | 140,000 | 140,000 |
| 15.779.7 | NUTRITION PARTNERSHIPS / HP OUTREACH | 100,000 | 100,000 | 135,000 | 135,000 |
| 15.779.8 | ACCT SUPPORT / TRAVEL | 88,000 | 88,000 | 146,000 | 146,000 |
| 15.780.0 | HEALTH COMMUNICATORS CONFERENCE | 100,000 | 100,000 | | |
| 15.776.7 | EGGS FOR PETS | 50,000 | 32,005 | | |
| 15.780.1 | PROTEIN / WEIGHT MANAGEMENT | | | 131,500 | 131,500 |
| 15.780.2 | OPPORTUNISTIC | | | 25,000 | 25,000 |
| | | | | | |
| 15.787.1 | FOODMINDS / 300 MG REMOVAL | 350,000 | 350,000 | 394,000 | 394,000 |
| 15.787.2 | FOODMINDS / 300 MG REMOVAL /C-OVR 06 | 121,412 | 121,412 | | |
| 15.787.3 | FM EXPONENT ECONOMIC STUDY C-OVER 07 | | | | 7,750 |
| 15.787.4 | FM OMNIBUS SURVEY CARRYOVER 07 | | | | 14,500 |
| | | | | | |
| | **Total Health & Nutrition P.R.** | 1,869,412 | 1,869,412 | 1,844,000 | 1,866,250 |

## AMERICAN EGG BOARD
## NUTRITION
## BUDGET
## 2008

| A/C # | DESCRIPTION | 2007 APPROVED BUDGET | 2007 REVISED BUDGET | 2008 APPROVED BUDGET | 2008 REVISED BUDGET |
|-------|-------------|------------------------|----------------------|------------------------|----------------------|
| | **EGG NUTRITION CENTER** | | | | |
| | | | | | |
| 15.785.1 | NUTRITION CENTER | 795,000 | 795,000 | 799,000 | |
| 15.870.4 | STAFF TRAVEL | | | | 17,500 |
| 15.810.1 | OFFICE RENT | | | | 70,000 |
| 15.870.7 | INTERNET | | | | 7,500 |
| 15.870.1 | INSURANCE-OFFICE | | | | 9,500 |
| 15.850.1 | TELEPHONE & FAX | | | | 8,500 |
| 15.832.3 | POSTAGE & SHIPPING | | | | 12,250 |
| 15.810.2 | EQUIPMENT RENTAL | | | | 7,500 |
| 15.890.1 | DEPRECIATION | | | | 3,500 |
| 15.851.1 | OFFICE SUPPLIES | | | | 25,000 |
| 15.870.5 | COMPUTER | | | | 7,000 |
| 15.890.2 | DUES EDUCATION TRAINING | | | | 7,000 |
| 15.852.2 | MISCELLANEOUS TAXES | | | | 2,000 |
| 15.785.2 | ENC COSTS PAID BY AEB | 100,000 | 100,000 | 100,000 | |
| 15.860.1 | RESEARCH MONITORING | 43,250 | 43,250 | 38,000 | 38,000 |
| 15.860.2 | NEWSLETTERS & EDUCATION MTL | 159,500 | 159,500 | 121,000 | 121,000 |
| 15.860.3 | EXHIBITS & PROGRAMS | 127,250 | 127,250 | 111,500 | 111,500 |
| 15.860.4 | EGG SAFETY CENTER | | | 55,500 | 55,500 |
| 15.787.6 | DIETARY COLESTORIAL SCIENCE SYMPOSIUM TRANSFER | | 30,000 | | |
| | | | | | |
| | **Total Egg Nutrition Center** | 1,225,000 | 1,255,000 | 1,225,000 | 503,250 |
| | | | | | |
| | **GRANTS & RESEARCH** | | | | |
| VARIOUS | RESEARCH GRANTS | 620,000 | 620,000 | 750,000 | 750,000 |
| VARIOUS | RESEARCH GRANTS - CARRYOVERS 05/06 | 584,728 | 584,728 | | |
| 15.792.8 | HEALTH PROFESSIONAL RESEARCH | 130,000 | 130,000 | | |
| 15.797.4 | OPP 07/ 08 LIFE SCIENCE RESEARCH TRF | | 25,000 | | 125,000 |
| | | | | | |
| | **Total Grants** | 1,334,728 | 1,359,728 | 750,000 | 875,000 |
| | | | | | |
| | | | | | |
| | **TOTAL NUTRITION** | $4,602,340 | $4,657,340 | $4,039,700 | $4,114,200 |

4:30 PM

# AMERICAN EGG BOARD
## SPECIAL PROJECTS
### BUDGET
### 2008

| A/C # | DESCRIPTION | 2007 APPROVED BUDGET | 2007 REVISED BUDGET | 2008 APPROVED BUDGET | 2008 REVISED BUDGET |
|---|---|---|---|---|---|
| | **SPECIAL PROJECTS** | | | | |
| 20.873.9 | PARTNERSHIP FOR FOOD SAFETY | 25,000 | 25,000 | 25,000 | 25,000 |
| 20.868.1 | CONTINGENCY | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 |
| 20.907.1 | TRANSFER TO STRATEGIC PLANNING | -35,000 | -35,000 | | |
| 20.907.2 | STRATEGIC PLANNING MEETING | 35,000 | 35,000 | | |
| 20.908.0 | UEP TRANSITION FEE | | | | 50,000 |
| 20.909.0 | RACHAEL RAY | | -1,300,000 | | -500,000 |
| 20.910.0 | AVIAN INFLUENZA RESEARCH | | | | -100,000 |
| 20.911.0 | DIETARY COLESTORIAL SCIENCE SYMPOSIUM | | -30,000 | | -120,000 |
| 20.912.0 | CONSUMER ANIMAL WELFARE ED. CAMPAIGN | | | | 3,000,000 |
| 20.913.1 | TRANS. TO MULTI UNIVERSITY ANIMAL WELFARE RESEARCH | | | | -406,000 |
| 20.913.2 | MULTI UNIVERSITY ANIMAL WELFARE RESEARCH | | | | 406,000 |
| 20.913.3 | TRANS. TO NUTRITION, LIFE SCIENCE RESEARCH | | -25,000 | | -125,000 |
| | **TOTAL SPECIAL PROJECTS** | $ 1,525,000 | $ 170,000 | $ 1,525,000 | $ 3,730,000 |

# AMERICAN EGG BOARD
## CONSUMER EDUCATION
### BUDGET
#### 2008

| A/C # | DESCRIPTION | 2007 APPROVED BUDGET | 2007 REVISED BUDGET | 2008 APPROVED BUDGET | 2008 REVISED BUDGET |
|---|---|---|---|---|---|
| | CONSUMER EDUCATION | | | | |
| | | | | | |
| | PROGRAM ADMINISTRATION | 342,800 | 342,800 | 333,100 | 333,100 |
| | | | | | |
| 25.550.7 | OMELET KING PUBLICITY | | | 257,000 | 257,000 |
| 25.551.3 | AEB NEW YORK TRAVEL | 6,000 | 6,000 | | |
| 25.570.4 | TRAVEL | 17,000 | 17,000 | 25,000 | 25,000 |
| 25.595.1 | MAGAZINE PUBLICITY | 13,500 | 13,500 | | |
| 25.595.2 | MAGAZINE PUBLICITY - NY | 15,000 | 15,000 | | |
| 25.615.1 | PRINT PUBLICITY | 145,000 | 145,000 | 165,000 | 165,000 |
| 25.615.4 | SPMKT CONSUMER AFFAIRS DIR | 1,000 | 1,000 | | |
| 25.636.2 | PRINT MATERIALS DEVELOPMENT | 25,000 | 25,000 | | |
| 25.636.4 | CULINARY PROFESSIONALS MAILING | 11,000 | 11,000 | | |
| 25.636.5 | CULINARY WRITING FELLOWSHIP | 6,500 | 6,500 | | |
| 25.640.1 | EXT HOME ECONST / STATE LEADERS | 7,000 | 7,000 | | |
| 25.661.1 | MATERIALS GIVEN AWAY | 5,500 | 5,500 | | |
| 25.661.8 | SENIOR PROGRAM | 108,000 | | | |
| 25.662.0 | OPPORTUNISTIC | 3,000 | 3,000 | 25,000 | 25,000 |
| 25.662.1 | HOME BAKING ASSOCIATION | 6,000 | 6,000 | | |
| 25.662.3 | WEBSITE / ONLINE PROGRAMMING | 30,000 | 30,000 | 100,000 | 100,000 |
| 25.662.6 | OMELET KING PUBLICITY (SMT) | | 95,000 | | |
| 25.662.7 | INCREDIBLE EDIBLE EGG PUBLICITY | | 13,000 | | |
| 25.730.1 | POSTAGE & SHIPPING | 2,000 | 2,000 | 5,000 | 5,000 |
| 25.830.1 | MEMBERSHIPS & SUBSCRIPTIONS | 2,000 | 2,000 | 2,000 | 2,000 |
| 25.860.1 | COMMITTEE EXPENSE | 2,000 | 2,000 | | |
| 25.662.5 | EGG BASICS PR CAMPAIGN | 130,000 | 130,000 | 268,000 | 268,000 |
| 25.662.4 | PRODUCTION PROCESS EDUCATION | 250,000 | 250,000 | | |
| | | | | | |
| | TOTAL CONSUMER EDUCATION | $ 1,128,300 | $ 1,128,300 | $ 1,180,100 | $ 1,180,100 |

4:30 PM

# AMERICAN EGG BOARD
## STATE PROMOTION
### BUDGET
#### 2008

| A/C # | DESCRIPTION | 2007 APPROVED BUDGET | 2007 REVISED BUDGET | 2008 APPROVED BUDGET | 2008 REVISED BUDGET |
|---|---|---|---|---|---|
| | **STATE PROMOTION** | | | | |
| | PROGRAM ADMINISTRATION | 333,800 | 333,800 | 341,900 | 341,900 |
| 30.570.4 | TRAVEL | 15,000 | 15,000 | 15,000 | 15,000 |
| 30.695.1 | STATE SUPPORT FUNDING | 990,000 | 990,000 | 990,000 | 990,000 |
| 30.697.1 | STATE REPRESENTATIVE TRAVEL | 10,000 | 10,000 | 12,000 | 12,000 |
| 30.730.1 | POSTAGE & SHIPPING | 3,000 | 3,000 | 3,000 | 3,000 |
| 30.755.2 | OMELET WORKSHOP | 18,000 | 18,000 | 15,000 | 15,000 |
| 30.765.2 | 'EGGSCHANGE' NEWSLETTER | 2,000 | 2,000 | 2,000 | 2,000 |
| 30.765.3 | PROMOTION MEETINGS | 16,000 | 16,000 | 16,000 | 16,000 |
| 30.820.1 | STATE MATERIALS DEVELOPMENT | 25,500 | 25,500 | 22,000 | 22,000 |
| 30.820.2 | NATIONAL EGG MONTH | 5,000 | 5,000 | | |
| 30.820.3 | MERCHANDISING CAMPAIGNS | 26,000 | 26,000 | 26,000 | 26,000 |
| 30.820.6 | ADVERTISING TALENT PAYMENTS | 10,000 | 10,000 | | |
| 30.820.7 | WHITE HOUSE DISPLAY | 3,000 | 3,000 | 3,000 | 3,000 |
| 30.830.1 | MEMBERSHIP & SUBSCRIPTIONS | 500 | 500 | 500 | 500 |
| | **TOTAL STATE SUPPORT** | 1,457,800 | 1,457,800 | 1,446,400 | 1,446,400 |
| | **TOTAL MATERIALS DISTRIBUTION** | 212,600 | 212,600 | 212,600 | 212,600 |
| | **TOTAL STATE SUPPORT & MAT'L DIST'R** | $ 1,670,400 | $ 1,670,400 | $ 1,659,000 | $ 1,659,000 |

# AMERICAN EGG BOARD
## MATERIALS DISTRIBUTION
### BUDGET
### 2008

| A/C # | DESCRIPTION | 2007 APPROVED BUDGET | 2007 REVISED BUDGET | 2008 APPROVED BUDGET | 2008 REVISED BUDGET |
|---|---|---|---|---|---|
| | **MATERIALS DISTRIBUTION** | | | | |
| | PROGRAM ADMINISTRATION | 246,800 | 246,800 | 250,700 | 250,700 |
| 33.570.4 | TRAVEL | 2,000 | 2,000 | 2,500 | 2,500 |
| DETAIL | PRODUCT SALES GROSS PROFIT | -57,100 | -57,100 | -60,500 | -60,500 |
| 33.705.1 | SHRINKAGE | 2,500 | 2,500 | 1,500 | 1,500 |
| 33.709.1 | MATERIALS CATALOG | 13,000 | 13,000 | 13,000 | 13,000 |
| 33.765.1 | PRINTING & SHIPPING SUPPLIES | 3,000 | 3,000 | 3,000 | 3,000 |
| 33.770.1 | GENERAL SHIPPING | 19,000 | 19,000 | 19,000 | 19,000 |
| 33.770.4 | BILLED FREIGHT | -16,000 | -16,000 | -16,000 | -16,000 |
| 33.770.5 | BILLED HANDLING CHARGES | -600 | -600 | -600 | -600 |
| | **TOTAL MATERIALS DISTRIBUTION** | $ 212,600 | $ 212,600 | $ 212,600 | $ 212,600 |

## AMERICAN EGG BOARD
## INDUSTRY DEVELOPMENT PROGRAMS
### BUDGET
### 2008

| A/C # | DESCRIPTION | 2007 APPROVED BUDGET | 2007 REVISED BUDGET | 2008 APPROVED BUDGET | 2008 REVISED BUDGET |
|---|---|---|---|---|---|
| | **INDUSTRY PROGRAMS** | | | | |
| | PROGRAM ADMINISTRATION | 406,700 | 406,700 | 289,000 | 289,000 |
| 35.570.4 | STAFF TRAVEL | 35,000 | 35,000 | 30,000 | 30,000 |
| 35.577.1 | ANNUAL REPORT | 18,000 | 18,000 | 15,000 | 15,000 |
| 35.577.3 | NEWSLETTERS | 38,000 | 38,000 | 40,000 | 40,000 |
| 35.578.5 | AUDIO-VISUAL SUPPORT | 25,000 | 25,000 | 10,000 | 10,000 |
| 35.579.9 | SPECIAL PROJECTS | 15,000 | 15,000 | 15,000 | 15,000 |
| 35.580.1 | INDUSTRY EXHIBITS / MEETINGS | 20,000 | 20,000 | 35,000 | 35,000 |
| 35.580.2 | RETAIL MERCHANDISING | 300,000 | 300,000 | 400,000 | 400,000 |
| 35.580.3 | EXPORT PROMOTION | 285,000 | 285,000 | 200,000 | 200,000 |
| 35.580.4 | TRADE SHOWS | 30,000 | 30,000 | EGG PROD | EGG PROD |
| 35.580.5 | PROCESSED PRODUCTS | 750,000 | 750,000 | EGG PROD | EGG PROD |
| 35.580.7 | WEBSITE DEVELOPMENT | 35,000 | 35,000 | CONSUMER ED | CONSUMER ED |
| 35.580.8 | WEBSITE-CONSUMER NUTR CARRYOVER 06 | 6,000 | 6,000 | | |
| 35.583.9 | FOOD SCIENCE GRANT | 60,000 | 60,000 | EGG PROD | EGG PROD |
| 35.584.1 | EGG TECHNOLOGY ADVISORY PANEL | 35,000 | 35,000 | EGG PROD | EGG PROD |
| 5.585.1 | GENERAL PUBLICITY ACTIVITIES | 35,000 | 35,000 | 35,000 | 35,000 |
| 35.730.1 | POSTAGE & SHIPPING | 10,000 | 10,000 | 10,000 | 10,000 |
| 35.830.1 | MEMBERSHIPS & SUBSCRIPTIONS | 1,000 | 1,000 | 1,000 | 1,000 |
| | | | | | |
| | **SUB-TOTAL** | 2,104,700 | 2,104,700 | 1,080,000 | 1,080,000 |
| | **UEP PROJECTS FUNDING** | | | | |
| 35.850.1 | ENVIRONMENTAL SUPPORT | 70,000 | 70,000 | 70,000 | 70,000 |
| 35.850.2 | ANIMAL WELFARE SUPPORT | 150,000 | 150,000 | 150,000 | 150,000 |
| | | | | | |
| | **TOTAL UEP PROJECTS** | 220,000 | 220,000 | 220,000 | 220,000 |
| | | | | | |
| | **TOTAL INDUSTRY PROGRAMS** | **$2,324,700** | **$2,324,700** | **$1,300,000** | **$1,300,000** |

| | | 2007 APPROVED BUDGET | 2007 REVISED BUDGET | 2008 APPROVED BUDGET | 2008 REVISED BUDGET |
|---|---|---|---|---|---|
| | AMERICAN EGG BOARD | | | | |
| | EGG PRODUCT MARKETING | | | | |
| | BUDGET | | | | |
| | 2008 | | | | |
| **A/C #** | **DESCRIPTION** | | | | |
| | EGG PRODUCT MARKETING | | | | |
| | PROGRAM ADMINISTRATION | 0 | 0 | 141,800 | 141,800 |
| | 2007 PROCESSED PRODUCTS BUDGET LINE ITEM | IMD--750,000 | IMD--750,000 | | |
| 38.570.4 | STAFF TRAVEL | | | 10,000 | 10,000 |
| 38.580.2 | TRADE SHOW PARTICIPATION | IMD--30,000 | IMD--30,000 | 20,000 | 20,000 |
| 38.580.3 | MEDIA AND RELATED AGENCY COSTS | | | 434,000 | 434,000 |
| 38.580.4 | NEWSLETTERS / EGGSolutions and EGGSaminer | | | 52,000 | 52,000 |
| 38.580.5 | PRINT PUBLICITY | | | 25,000 | 25,000 |
| 38.580.6 | AD PRODUCTION | | | 30,000 | 30,000 |
| 38.580.7 | COLLATERAL PRODUCTION | | | 50,000 | 50,000 |
| 38.580.8 | EGG SCIENCE & TECH ADVISORY COUNCIL | IMD--35,000 | IMD--35,000 | 20,000 | 20,000 |
| 38.580.9 | EGG PRODUCTION EDUCATIONAL MATERIALS | | | 5,000 | 5,000 |
| 38.581.0 | EGG PRODUCT SCHOOL | | | 18,000 | 18,000 |
| 38.581.1 | EGGSOLUTIONS PROGRAM  (Dr. Froning + Hotline) | | | 30,000 | 30,000 |
| 38.581.2 | EGG PRODUCT RESEARCH | | | 65,000 | 65,000 |
| 38.581.3 | FOOD SCIENCE PHD GRANT PROGRAM | IMD--60,000 | IMD--60,000 | 60,000 | 60,000 |
| 38.581.4 | EGG PRODUCT INDUSTRY RESEARCH (A&U) | | | 50,000 | 50,000 |
| 38.581.5 | AVIAN INFLUENZA RESEARCH TRANSFER | | | | 100,000 |
| 38.730.1 | POSTAGE & SHIPPING | | | 10,000 | 10,000 |
| 38.830.1 | MEMBERSHIPS & SUBSCRIPTIONS | | | 1,000 | 1,000 |
| | **TOTAL EGG PRODUCT MARKETING** | **IMD--$875,000** | **IMD--$875,000** | **$  1,021,800** | **$  1,121,800** |

# AMERICAN EGG BOARD
## ENVIRONMENTAL STUDY
### BUDGET
### 2008

| A/C # | DESCRIPTION | 2007 APPROVED BUDGET | 2007 REVISED BUDGET | 2008 APPROVED BUDGET | 2008 REVISED BUDGET |
|---|---|---|---|---|---|
| | ENVIRONMENTAL STUDY | | | | |
| | | | | | |
| 45.580.1 | AIR EMMISSIONS CARRYOVER 2004 | | | | |
| 45.580.2 | AEB PORTION FOR $1MIL AIR RESEARCH | 50,000 | 50,000 | | |
| 45.580.3 | AARC CARRYOVER TO 2008 | | | 50,000 | 50,000 |
| | | | | | |
| | | | | | |
| | | | | | |
| | TOTAL ENVIRONMENTAL STUDY | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 |

# AMERICAN EGG BOARD
## ADMINISTRATION
## BUDGET
## 2008

| A/C # | DESCRIPTION | 2007 APPROVED BUDGET | 2007 REVISED BUDGET | 2008 APPROVED BUDGET | 2008 REVISED BUDGET |
|---|---|---|---|---|---|
| | **ADMINISTRATION** | | | | |
| | PROGRAM ADMINISTRATION | 512,900 | 512,900 | 507,000 | 507,000 |
| 70.570.4 | STAFF TRAVEL | 45,000 | 45,000 | 48,000 | 48,000 |
| 70.610.1 | EQUIPMENT RENTAL | 1,500 | 1,500 | 1,500 | 1,500 |
| 70.630.1 | EQUIPMENT REPAIRS & MAINTENANCE | 9,000 | 9,000 | 9,300 | 9,300 |
| 70.650.1 | OFFICE SUPPLIES & INCIDENTALS | 17,000 | 17,000 | 24,000 | 24,000 |
| 70.670.1 | INSURANCE & BONDS | 10,000 | 10,000 | 10,000 | 10,000 |
| 70.672.1 | INVESTMENT SERVICE CHARGES | 20,500 | 20,500 | 20,500 | 20,500 |
| 70.672.2 | BANK SERVICE FEES-CUSTODY A/C | 21,000 | 21,000 | 21,000 | 21,000 |
| 70.672.3 | BANK SERVICE FEES-CHECKING | 8,000 | 8,000 | 6,000 | 6,000 |
| 70.690.1 | DEPRECIATION--EQUIP & COMPUTER | 5,000 | 5,000 | 5,000 | 5,000 |
| 70.710.1 | OFFICE RENT | 203,800 | 203,800 | 216,800 | 216,800 |
| 70.730.1 | POSTAGE & SHIPPING | 5,800 | 5,800 | 6,500 | 6,500 |
| 70.750.1 | TELEPHONE & FAX | 19,000 | 19,000 | 19,000 | 19,000 |
| 70.752.0 | MISCELLANEOUS | 21,830 | 21,830 | 21,830 | 21,830 |
| 70.770.2 | COMPUTER MAINTENANCE | 5,000 | 5,000 | 5,000 | 5,000 |
| 70.770.3 | COMPUTER TECHNICAL SUPPORT | 21,000 | 21,000 | 21,000 | 21,000 |
| 70.770.4 | COMPUTER PROGRAMMING | 21,000 | 21,000 | 18,000 | 18,000 |
| 70.770.5 | COMPUTER SUPPLIES | 4,000 | 4,000 | 6,000 | 6,000 |
| 70.770.6 | COMPUTER ENHANCEMENTS | 7,000 | 7,000 | 12,000 | 12,000 |
| 70.770.7 | COMPUTER ON-LINE SERVICES | 2,000 | 2,000 | 3,000 | 3,000 |
| 70.786.1 | PAYROLL SERVICE | 2,400 | 2,400 | 2,400 | 2,400 |
| 70.810.1 | PERSONNEL SEARCH | 1,000 | 1,000 | 1,000 | 1,000 |
| 70.830.1 | MEMBERSHIPS & SUBSCRIPTIONS | 3,000 | 3,000 | 3,000 | 3,000 |
| 70.830.2 | COMMODITY ROUNDTABLE | 12,000 | 12,000 | 12,000 | 12,000 |
| 70.870.1 | LEGAL FEES | 4,000 | 4,000 | 4,000 | 4,000 |
| 70.870.2 | ANNUAL AUDIT | 22,000 | 22,000 | 23,000 | 33,000 |
| 70.870.3 | OTHER CONSULTANTS | 12,000 | 12,000 | 12,000 | 12,000 |
| 70.901.2 | ADMIN CHARGE-BACK TO DEPTS | -466,500 | -466,500 | -474,000 | -474,000 |
| | **TOTAL ADMINISTRATION** | $550,230 | $550,230 | $564,830 | $574,830 |

# AMERICAN EGG BOARD
## COLLECTIONS
### BUDGET
### 2008

| A/C # | DESCRIPTION | 2007 APPROVED BUDGET | 2007 REVISED BUDGET | 2008 APPROVED BUDGET | 2008 REVISED BUDGET |
|---|---|---|---|---|---|
| | COLLECTIONS | | | | |
| | PROGRAM ADMINISTRATION | 134,400 | 134,400 | 135,900 | 135,900 |
| 75.550.2 | COMPUTER ASSISTANCE | 3,000 | 3,000 | 3,000 | 3,000 |
| 75.570.4 | STAFF TRAVEL | 3,000 | 3,000 | 3,000 | 3,000 |
| 75.590.1 | COLLECTIONS COMMUNICATIONS | 5,000 | 5,000 | 5,000 | 5,000 |
| 75.590.3 | COLLECTIONS AUDITS | | | 15,000 | 15,000 |
| | TOTAL COLLECTIONS | $ 145,400 | $ 145,400 | $ 161,900 | $ 161,900 |

# AMERICAN EGG BOARD
## BOARD MEETINGS & USDA
### BUDGET
#### 2008

| A/C # | DESCRIPTION | 2007 APPROVED BUDGET | 2007 REVISED BUDGET | 2008 APPROVED BUDGET | 2008 REVISED BUDGET |
|---|---|---|---|---|---|
| | **BOARD MEETINGS** | | | | |
| 80.570.1 | TRAVEL - MEMBERS | 50,000 | 50,000 | 50,000 | 50,000 |
| 80.570.2. | TRAVEL - ALTERNATES | 50,000 | 50,000 | 50,000 | 50,000 |
| 80.570.3 | EXECUTIVE COMMITTEE | 25,000 | 25,000 | 25,000 | 25,000 |
| 80.850.1 | MEETINGS EXPENSE | 67,500 | 67,500 | 72,000 | 72,000 |
| | | | | | |
| | **TOTAL BOARD MEETINGS** | $192,500 | $192,500 | $197,000 | $197,000 |
| | | | | | |
| | **USDA ADMINISTRATION** | | | | |
| 85.890.1 | USDA - ADMINISTRATIVE EXPENSE | 272,797 | 272,797 | 288,000 | 288,000 |
| 85.890.2 | USDA - OGC EXPENSE | 2,000 | 2,000 | 2,000 | 2,000 |
| 85.890.3 | USDA - COMPLIANCE AUDITS | 3,240 | 3,240 | 6,000 | 6,000 |
| | | | | | |
| | **TOTAL USDA ADMINISTRATION** | $278,037 | $278,037 | $296,000 | $296,000 |

# Exhibit 8

# AMERICAN EGG BOARD
# ANNUAL BUDGET
## 2008

| | 2007 APPROVED BUDGET | 2007 REVISED BUDGET | 2008 APPROVED BUDGET | |
|---|---|---|---|---|
| **REVENUE** | | | | |
| | | | | |
| ASSESSMENTS | 20,000,000 | 20,000,000 | 20,000,000 | |
| INTEREST INCOME | 200,000 | 200,000 | 500,000 | |
| RESERVES | 2,932,607 | 2,932,607 | 3,085,430 | |
| CARRYOVER | | | | |
| | | | | |
| **TOTAL REVENUE** | **$23,132,607** | **$23,132,607** | **$23,585,430** | |
| | | | | |
| | | | | |
| **EXPENDITURES** | | | | |
| | | | | |
| PROGRAMS: | | | | |
| | | | | |
| ADVERTISING | 9,251,200 | 9,251,200 | 10,061,000 | 42.7% |
| FOODSERVICE | 1,414,500 | 1,414,500 | 1,529,100 | 6.5% |
| NUTRITION | 4,602,340 | 4,602,340 | 4,039,700 | 17.1% |
| SPECIAL PROJECTS | 1,525,000 | 1,525,000 | 1,525,000 | 6.5% |
| CONSUMER EDUCATION | 1,128,300 | 1,128,300 | 1,180,100 | 5.0% |
| STATE SUPPORT & MATERIALS DISTRIBUTION | 1,670,400 | 1,670,400 | 1,659,000 | 7.0% |
| INDUSTRY DEVELOPMENT PROGRAMS | 2,324,700 | 2,324,700 | 1,300,000 | 5.5% |
| EGG PRODUCT MARKETING | | | 1,021,800 | 4.3% |
| ENVIRONMENTAL | 50,000 | 50,000 | 50,000 | 0.2% |
| | | | | |
| **TOTAL PROGRAMS** | **$ 21,966,440** | **$ 21,966,440** | **$ 22,365,700** | |
| | | | | |
| ADMINISTRATION & COLLECTIONS: | | | | |
| | | | | |
| ADMINISTRATION | 550,230 | 550,230 | 564,830 | 2.4% |
| COLLECTIONS | 145,400 | 145,400 | 161,900 | 0.7% |
| BOARD MEETING | 192,500 | 192,500 | 197,000 | 0.8% |
| USDA ADMINISTRATION | 278,037 | 278,037 | 296,000 | 1.3% |
| | | | | |
| **TOTAL ADMIN & COLLECTIONS** | **$ 1,166,167** | **$ 1,166,167** | **$ 1,219,730** | |
| | | | | |
| | | | | |
| **TOTAL PROJECTED EXPENDITURES** | **$ 23,132,607** | **$ 23,132,607** | **$ 23,585,430** | 100.00% |
| | | | | |
| | | | | |
| **REVENUES LESS EXPENDITURES** | **$0** | **$0** | **$0** | |

8:55 AM

# AMERICAN EGG BOARD
## ADVERTISING
## BUDGET
## 2008

| A/C # | DESCRIPTION | 2007 APPROVED BUDGET | 2007 REVISED BUDGET | 2008 APPROVED BUDGET |
|---|---|---|---|---|
| | ADVERTISING | | | |
| | | | | |
| 10.533.3 | PROGRAM ADMINISTRATION | 221,500 | 221,500 | 186,500 |
| | | | | |
| 10.570.4 | STAFF TRAVEL | 10,000 | 10,000 | 15,000 |
| | | | | |
| 10.752.1 | MARKET RESEARCH | 0 | 17,000 | 100,000 |
| 10.753.9 | MARKET RESEARCH CARRYOVER 06 | 40,000 | 40,000 | 0 |
| 10.752.2 | TALENT | 250,000 | 250,000 | 120,000 |
| 10.752.3 | PRODUCTION | 650,000 | 650,000 | 500,000 |
| 10.752.4 | MEDIA ( TV, RADIO, PRINT ) | 8,000,000 | 8,000,000 | 9,000,000 |
| 10.753.0 | TRAVEL / MISCELLANEOUS | 55,000 | 55,000 | 50,000 |
| 10.753.6 | STATE / MISCELLANEOUS PROJECTS | 20,000 | 3,000 | 20,000 |
| | | | | |
| 10.819.3 | POSTAGE | 500 | 500 | 500 |
| 10.840.1 | COMMITTEE EXPENSE | 4,200 | 4,200 | 4,000 |
| 10.840.2 | INTEGRATED MARKETING COM. MTG | | | 25,000 |
| 10.840.3 | SPECIAL PROJECTS | | | 40,000 |
| | | | | |
| | TOTAL ADVERTISING AND PROMOTION | $9,251,200 | $9,251,200 | $10,061,000 |

# AMERICAN EGG BOARD
## FOODSERVICE
### BUDGET
#### 2008

| A/C # | DESCRIPTION | 2007 APPROVED BUDGET | 2007 REVISED BUDGET | 2008 APPROVED BUDGET |
|---|---|---|---|---|
| | FOODSERVICE | | | |
| | PROGRAM ADMINISTRATION | 233,300 | 233,300 | 222,900 |
| 12.570.4 | TRAVEL | 20,000 | 20,000 | 22,000 |
| 12.580.2 | TRADE SHOW PARTICIPATION | 21,000 | 21,000 | 21,000 |
| 12.674.2 | NATIONAL EGG MONTH | 3,000 | 3,000 | 0 |
| 12.680.3 | MEDIA & RELATED AGENCY COSTS | 494,700 | 494,700 | 400,000 |
| 12.680.5 | FS PROMO FULFILLMENT | 7,000 | 7,000 | 7,000 |
| 12.680.6 | FOODSERVICE NEWSLETTERS | 30,000 | 30,000 | 30,000 |
| 12.680.8 | FOODSERVICE PRINT PUBLICITY | 15,000 | 15,000 | 0 |
| 12.680.9 | FOODSERVICE AD PRODUCTION | 30,000 | 30,000 | 60,000 |
| 12.681.1 | MATERIALS DISTRIBUTED | 1,000 | 1,000 | 1,000 |
| 12.681.3 | NATIONAL ACCOUNTS | 165,000 | 165,000 | 400,000 |
| 12.681.7 | FOODSERVICE WEBSITE | 10,000 | 10,000 | 10,000 |
| 12.681.8 | CHEF PROGRAM | 75,000 | 75,000 | 80,000 |
| 12.681.9 | CULINARY SCHOOL DEMOS | 10,000 | 10,000 | 0 |
| 12.682.1 | FS COLLATERAL PRODUCTION | 1,000 | 1,000 | 1,000 |
| 12.682.6 | SCHOOL FS PROMO PROG | 70,000 | 70,000 | 0 |
| 12.683.1 | EGG SAFETY & HANDLING | 75,000 | 75,000 | 0 |
| 12.683.2 | EGG SAFETY VIDEO CARRYOVER 06 | 45,000 | 45,000 | 0 |
| 12.683.3 | ADVISORY COUNCIL | 16,000 | 16,000 | 16,000 |
| 12.683.4 | CHEF AMBASSADOR PROG C-OVR 06 | 49,000 | 49,000 | 0 |
| 12.684.3 | SPENT FOWL RECIPE DEV C-OVR 06 | 6,000 | 6,000 | 0 |
| 12.684.7 | MERCHANDISING BROCHURE | 30,000 | 30,000 | 0 |
| 12.684.8 | RESEARCH / MEASUREMENT | | | 150,000 |
| 12.684.9 | OTHER COMMUNICATIONS PROGRAMS | | | 100,000 |
| 12.730.1 | POSTAGE | 6,000 | 6,000 | 6,700 |
| 12.830.1 | MEMBERSHIPS & SUBSCRIPTIONS | 1,500 | 1,500 | 1,500 |
| | **TOTAL FOOSDERVICE PROMOTION** | **$1,414,500** | **$1,414,500** | **$1,529,100** |

# AMERICAN EGG BOARD
## NUTRITION
## BUDGET
## 2008

| A/C # | DESCRIPTION | 2007 APPROVED BUDGET | 2007 REVISED BUDGET | 2008 APPROVED BUDGET |
|---|---|---|---|---|
| | NUTRITION | | | |
| 15.533.3 | PROGRAM ADMINISTRATION | 163,700 | 163,700 | 195,700 |
| 15.533.4 | NUTRITION CENTER AUDIT | 9,500 | 9,500 | 10,000 |
| 15.533.5 | AGENCY REVIEW | | | - |
| 15.570.4 | STAFF TRAVEL | | | 15,000 |
| | **Total Nutrition-Admin** | 173,200 | 173,200 | 220,700 |
| | | | | |
| | **HEALTH & NUTRITION P.R.** | | | |
| | | | | |
| 15.779.1 | NEWS BUREAU | 250,000 | 267,995 | 312,000 |
| 15.779.2 | KRISTINE LILLY SPOKESPERSON | 400,000 | 400,000 | - |
| 15.779.3 | CHOLINE HP EDUCATION PROGRAM | 125,000 | 125,000 | 355,000 |
| 15.779.4 | TRACK / MEASURE RESEARCH | 100,000 | 100,000 | 130,500 |
| 15.779.5 | ISSUES / CRISIS | 75,000 | 75,000 | 75,000 |
| 15.779.6 | AMBASSADOR / SCIENTIFIC PANEL | 110,000 | 110,000 | 140,000 |
| 15.779.7 | NUTRITION PARTNERSHIPS / HP OUTREACH | 100,000 | 100,000 | 135,000 |
| 15.779.8 | ACCT SUPPORT / TRAVEL | 88,000 | 88,000 | 146,000 |
| 15.780.0 | HEALTH COMMUNICATORS CONFERENCE | 100,000 | 100,000 | |
| 15.776.7 | EGGS FOR PETS | 50,000 | 32,005 | |
| 15.780.1 | PROTEIN / WEIGHT MANAGEMENT | | | 131,500 |
| 15.780.2 | OPPORTUNISTIC | | | 25,000 |
| | | | | |
| | **Total Health & Nutrition P.R.** | 1,398,000 | 1,398,000 | 1,450,000 |
| | | | | |
| | **EGG NUTRITION CENTER** | | | |
| 15.785.1 | NUTRITION CENTER | 795,000 | 795,000 | 799,000 |
| 15.785.2 | ENC COSTS PAID BY AEB | 100,000 | 100,000 | 100,000 |
| 15.785.3 | RESEARCH MONITORING | 43,250 | 43,250 | 38,000 |
| 15.785.4 | NEWSLETTERS & EDUCATION MTL | 159,500 | 159,500 | 121,000 |
| 15.785.5 | EXHIBITS & PROGRAMS | 127,250 | 127,250 | 111,500 |
| 15.787.1 | FOODMINDS / 300 MG REMOVAL | 350,000 | 350,000 | 394,000 |
| 15.787.2 | FOODMINDS / 300 MG REMOVAL /C-OVR 06 | 121,412 | 121,412 | |
| 15.787.3 | EGG SAFETY CENTER | | | 55,500 |
| | | | | |
| | **Total Egg Nutrition Center** | 1,696,412 | 1,696,412 | 1,619,000 |
| | | | | |
| | **GRANTS** | | | |
| VARIOUS | RESEARCH GRANTS | 620,000 | 620,000 | 750,000 |
| VARIOUS | RESEARCH GRANTS - CARRYOVERS 05/06 | 584,728 | 584,728 | |
| 15.792.8 | HEALTH PROFESSIONAL RESEARCH | 130,000 | 130,000 | |
| | | | | |
| | **Total Grants** | 1,334,728 | 1,334,728 | 750,000 |
| | | | | |
| | **TOTAL NUTRITION** | $ 4,602,340 | $ 4,602,340 | $ 4,039,700 |

8:55 AM

# AMERICAN EGG BOARD
## SPECIAL PROJECTS
### BUDGET
### 2008

| A/C # | DESCRIPTION | 2007 APPROVED BUDGET | 2007 REVISED BUDGET | 2008 APPROVED BUDGET |
|---|---|---|---|---|
| | **SPECIAL PROJECTS** | | | |
| 20.873.9 | PARTNERSHIP FOR FOOD SAFETY | 25,000 | 25,000 | 25,000 |
| 20.868.1 | CONTINGENCY | 1,500,000 | 1,500,000 | 1,500,000 |
| 20.907.1 | TRANSFER TO STRATEGIC PLANNING | -35,000 | -35,000 | |
| 20.907.2 | STRATEGIC PLANNING MEETING | 35,000 | 35,000 | |
| | | | | |
| | **TOTAL SPECIAL PROJECTS** | $ 1,525,000 | $ 1,525,000 | $ 1,525,000 |

8:55 AM

# AMERICAN EGG BOARD
## CONSUMER EDUCATION
### BUDGET
### 2008

| A/C # | DESCRIPTION | 2007 APPROVED BUDGET | 2007 REVISED BUDGET | 2008 APPROVED BUDGET |
|---|---|---|---|---|
| | **CONSUMER EDUCATION** | | | |
| | PROGRAM ADMINISTRATION | 342,800 | 342,800 | 333,100 |
| 25.550.7 | OMELET KING PUBLICITY | | | 257,000 |
| 25.551.3 | AEB NEW YORK TRAVEL | 6,000 | 6,000 | 0 |
| 25.570.4 | TRAVEL | 17,000 | 17,000 | 25,000 |
| 25.595.1 | MAGAZINE PUBLICITY | 13,500 | 13,500 | |
| 25.595.2 | MAGAZINE PUBLICITY - NY | 15,000 | 15,000 | |
| 25.615.1 | PRINT PUBLICITY | 145,000 | 145,000 | 165,000 |
| 25.615.4 | SPMKT CONSUMER AFFAIRS DIR | 1,000 | 1,000 | |
| 25.636.2 | PRINT MATERIALS DEVELOPMENT | 25,000 | 25,000 | |
| 25.636.4 | CULINARY PROFESSIONALS MAILING | 11,000 | 11,000 | |
| 25.636.5 | CULINARY WRITING FELLOWSHIP | 6,500 | 6,500 | |
| 25.640.1 | EXT HOME ECONST / STATE LEADERS | 7,000 | 7,000 | |
| 25.661.1 | MATERIALS GIVEN AWAY | 5,500 | 5,500 | |
| 25.661.8 | SENIOR PROGRAM | 108,000 | 0 | |
| 25.662.0 | OPPORTUNISTIC | 3,000 | 3,000 | 25,000 |
| 25.662.1 | HOME BAKING ASSOCIATION | 6,000 | 6,000 | |
| 25.662.3 | WEBSITE / ONLINE PROGRAMMING | 30,000 | 30,000 | 100,000 |
| 25.662.6 | OMELET KING PUBLICITY (SMT) | 0 | 95,000 | |
| 25.662.7 | INCREDIBLE EDIBLE EGG PUBLICITY | 0 | 13,000 | |
| 25.730.1 | POSTAGE & SHIPPING | 2,000 | 2,000 | 5,000 |
| 25.830.1 | MEMBERSHIPS & SUBSCRIPTIONS | 2,000 | 2,000 | 2,000 |
| 25.860.1 | COMMITTEE EXPENSE | 2,000 | 2,000 | |
| 25.662.5 | EGG BASICS PR CAMPAIGN | 130,000 | 130,000 | 268,000 |
| 25.662.4 | PRODUCTION PROCESS EDUCATION | 250,000 | 250,000 | |
| | **TOTAL CONSUMER EDUCATION** | $   1,128,300 | $   1,128,300 | $   1,180,100 |

8/28/2007

6 OF 14

8:55 AM

# AMERICAN EGG BOARD
## STATE PROMOTION
## BUDGET
## 2008

| A/C # | DESCRIPTION | 2007 APPROVED BUDGET | 2007 REVISED BUDGET | 2008 APPROVED BUDGET |
|---|---|---|---|---|
| | STATE PROMOTION | | | |
| | | | | |
| | PROGRAM ADMINISTRATION | 333,800 | 333,800 | 341,900 |
| | | | | |
| 30.570.4 | TRAVEL | 15,000 | 15,000 | 15,000 |
| 30.695.1 | STATE SUPPORT FUNDING | 990,000 | 990,000 | 990,000 |
| 30.697.1 | STATE REPRESENTATIVE TRAVEL | 10,000 | 10,000 | 12,000 |
| 30.730.1 | POSTAGE & SHIPPING | 3,000 | 3,000 | 3,000 |
| 30.755.2 | OMELET WORKSHOP | 18,000 | 18,000 | 15,000 |
| 30.765.2 | 'EGGSCHANGE' NEWSLETTER | 2,000 | 2,000 | 2,000 |
| 30.765.3 | PROMOTION MEETINGS | 16,000 | 16,000 | 16,000 |
| 30.820.1 | STATE MATERIALS DEVELOPMENT | 25,500 | 25,500 | 22,000 |
| 30.820.2 | NATIONAL EGG MONTH | 5,000 | 5,000 | |
| 30.820.3 | MERCHANDISING CAMPAIGNS | 26,000 | 26,000 | 26,000 |
| 30.820.6 | ADVERTISING TALENT PAYMENTS | 10,000 | 10,000 | |
| 30.820.7 | WHITE HOUSE DISPLAY | 3,000 | 3,000 | 3,000 |
| 30.830.1 | MEMBERSHIP & SUBSCRIPTIONS | 500 | 500 | 500 |
| | | | | |
| | | | | |
| | TOTAL STATE SUPPORT | 1,457,800 | 1,457,800 | 1,446,400 |
| | | | | |
| | | | | |
| | TOTAL MATERIALS DISTRIBUTION | 212,600 | 212,600 | 212,600 |
| | | | | |
| | TOTAL STATE SUPPORT & MAT'L DIST'R | $    1,670,400 | $    1,670,400 | $    1,659,000 |

# AMERICAN EGG BOARD
## MATERIALS DISTRIBUTION
### BUDGET
#### 2008

| A/C # | DESCRIPTION | 2007 APPROVED BUDGET | 2007 REVISED BUDGET | 2008 APPROVED BUDGET |
|---|---|---|---|---|
| | MATERIALS DISTRIBUTION | | | |
| | | | | |
| | PROGRAM ADMINISTRATION | 246,800 | 246,800 | 250,700 |
| | | | | |
| 33.570.4 | TRAVEL | 2,000 | 2,000 | 2,500 |
| DETAIL | PRODUCT SALES GROSS PROFIT | -57,100 | -57,100 | -60,500 |
| 33.705.1 | SHRINKAGE | 2,500 | 2,500 | 1,500 |
| 33.709.1 | MATERIALS CATALOG | 13,000 | 13,000 | 13,000 |
| 33.765.1 | PRINTING & SHIPPING SUPPLIES | 3,000 | 3,000 | 3,000 |
| 33.770.1 | GENERAL SHIPPING | 19,000 | 19,000 | 19,000 |
| 33.770.4 | BILLED FREIGHT | -16,000 | -16,000 | -16,000 |
| 33.770.5 | BILLED HANDLING CHARGES | -600 | -600 | -600 |
| | | | | |
| | | | | |
| | TOTAL MATERIALS DISTRIBUTION | $        212,600 | $        212,600 | $        212,600 |

# AMERICAN EGG BOARD
## INDUSTRY DEVELOPMENT PROGRAMS
### BUDGET
### 2008

| A/C # | DESCRIPTION | 2007 APPROVED BUDGET | 2007 REVISED BUDGET | 2008 APPROVED BUDGET |
|---|---|---|---|---|
| | **INDUSTRY PROGRAMS** | | | |
| | | | | |
| | PROGRAM ADMINISTRATION | 406,700 | 406,700 | 289,000 |
| | | | | |
| 35.570.4 | STAFF TRAVEL | 35,000 | 35,000 | 30,000 |
| 35.577.1 | ANNUAL REPORT | 18,000 | 18,000 | 15,000 |
| 35.577.3 | NEWSLETTERS | 38,000 | 38,000 | 40,000 |
| 35.578.5 | AUDIO-VISUAL SUPPORT | 25,000 | 25,000 | 10,000 |
| 35.579.9 | SPECIAL PROJECTS | 15,000 | 15,000 | 15,000 |
| 35.580.1 | INDUSTRY EXHIBITS / MEETINGS | 20,000 | 20,000 | 35,000 |
| 35.580.2 | RETAIL MERCHANDISING | 300,000 | 300,000 | 400,000 |
| 35.580.3 | EXPORT PROMOTION | 285,000 | 285,000 | 200,000 |
| 35.580.4 | TRADE SHOWS | 30,000 | 30,000 | EGG PROD |
| 35.580.5 | PROCESSED PRODUCTS | 750,000 | 750,000 | EGG PROD |
| 35.580.7 | WEBSITE DEVELOPMENT | 35,000 | 35,000 | CONSUMER ED |
| 35.580.8 | WEBSITE-CONSUMER NUTR CARRYOVER 06 | 6,000 | 6,000 | |
| 35.583.9 | FOOD SCIENCE GRANT | 60,000 | 60,000 | EGG PROD |
| 35.584.1 | EGG TECHNOLOGY ADVISORY PANEL | 35,000 | 35,000 | EGG PROD |
| 35.585.1 | GENERAL PUBLICITY ACTIVITIES | 35,000 | 35,000 | 35,000 |
| 35.730.1 | POSTAGE & SHIPPING | 10,000 | 10,000 | 10,000 |
| 35.830.1 | MEMBERSHIPS & SUBSCRIPTIONS | 1,000 | 1,000 | 1,000 |
| | | | | |
| | | | | |
| | **SUB-TOTAL** | 2,104,700 | 2,104,700 | 1,080,000 |
| | | | | |
| | **UEP PROJECTS FUNDING** | | | |
| 35.850.1 | ENVIRONMENTAL SUPPORT | 70,000 | 70,000 | 70,000 |
| 35.850.2 | ANIMAL WELFARE SUPPORT | 150,000 | 150,000 | 150,000 |
| | | | | |
| | | | | |
| | | | | |
| | **TOTAL UEP PROJECTS** | 220,000 | 220,000 | 220,000 |
| | | | | |
| | **TOTAL INDUSTRY PROGRAMS** | **$2,324,700** | **$2,324,700** | **$1,300,000** |

# AMERICAN EGG BOARD
## EGG PRODUCT MARKETING
## BUDGET
## 2008

| A/C # | DESCRIPTION | 2007 APPROVED BUDGET | 2007 REVISED BUDGET | 2008 APPROVED BUDGET |
|---|---|---|---|---|
| | **EGG PRODUCT MARKETING** | | | |
| | | | | |
| | PROGRAM ADMINISTRATION | 0 | 0 | 141,800 |
| | | | | |
| | 2007 PROCESSED PRODUCTS BUDGET LINE ITEM | IMD--750,000 | IMD--750,000 | |
| | | | | |
| 38.570.4 | STAFF TRAVEL | | | 10,000 |
| | | | | |
| 38.580.2 | TRADE SHOW PARTICIPATION | IMD--30,000 | IMD--30,000 | 20,000 |
| 38.580.3 | MEDIA AND RELATED AGENCY COSTS | | | 434,000 |
| 38.580.4 | NEWSLETTERS / EGGSolutions and EGGSaminer | | | 52,000 |
| 38.580.5 | PRINT PUBLICITY | | | 25,000 |
| 38.580.6 | AD PRODUCTION | | | 30,000 |
| 38.580.7 | COLLATERAL PRODUCTION | | | 50,000 |
| 38.580.8 | EGG SCIENCE & TECH ADVISORY COUNCIL | IMD--35,000 | IMD--35,000 | 20,000 |
| 38.580.9 | EGG PRODUCTION EDUCATIONAL MATERIALS | | | 5,000 |
| 38.581.0 | EGG PRODUCT SCHOOL | | | 18,000 |
| 38.581.1 | EGGSOLUTIONS PROGRAM  (Dr. Froning + Hotline) | | | 30,000 |
| 38.581.2 | EGG PRODUCT RESEARCH | | | 65,000 |
| 38.581.3 | FOOD SCIENCE PHD GRANT PROGRAM | IMD--60,000 | IMD--60,000 | 60,000 |
| 38.581.4 | EGG PRODUCT INDUSTRY RESEARCH (A&U) | | | 50,000 |
| | | | | |
| | | | | |
| 38.730.1 | POSTAGE & SHIPPING | | | 10,000 |
| 38.830.1 | MEMBERSHIPS & SUBSCRIPTIONS | | | 1,000 |
| | | | | |
| | | | | |
| | **TOTAL EGG PRODUCT MARKETING** | IMD--$875,000 | IMD--$875,000 | $    1,021,800 |

# AMERICAN EGG BOARD
## ENVIRONMENTAL STUDY
## BUDGET
## 2008

| A/C # | DESCRIPTION | 2007 APPROVED BUDGET | 2007 REVISED BUDGET | 2008 APPROVED BUDGET |
|---|---|---|---|---|
| | ENVIRONMENTAL STUDY | | | |
| 45.580.1 | AIR EMMISSIONS CARRYOVER 2004 | | | 0 |
| 45.580.2 | AEB PORTION FOR $1MIL AIR RESEARCH | 50,000 | 50,000 | |
| 45.580.3 | AARC CARRYOVER TO 2008 | | | 50,000 |
| | TOTAL ENVIRONMENTAL STUDY | $     50,000 | $     50,000 | $     50,000 |

# AMERICAN EGG BOARD
## ADMINISTRATION
### BUDGET
#### 2008

| A/C # | DESCRIPTION | 2007 APPROVED BUDGET | 2007 REVISED BUDGET | 2008 APPROVED BUDGET |
|---|---|---|---|---|
| | ADMINISTRATION | | | |
| | | | | |
| | PROGRAM ADMINISTRATION | 512,900 | 512,900 | 507,000 |
| | | | | |
| 70.570.4 | STAFF TRAVEL | 45,000 | 45,000 | 48,000 |
| 70.610.1 | EQUIPMENT RENTAL | 1,500 | 1,500 | 1,500 |
| 70.630.1 | EQUIPMENT REPAIRS & MAINTENANCE | 9,000 | 9,000 | 9,300 |
| 70.650.1 | OFFICE SUPPLIES & INCIDENTALS | 17,000 | 17,000 | 24,000 |
| 70.670.1 | INSURANCE & BONDS | 10,000 | 10,000 | 10,000 |
| 70.672.1 | INVESTMENT SERVICE CHARGES | 20,500 | 20,500 | 20,500 |
| 70.672.2 | BANK SERVICE FEES-CUSTODY A/C | 21,000 | 21,000 | 21,000 |
| 70.672.3 | BANK SERVICE FEES-CHECKING | 8,000 | 8,000 | 6,000 |
| 70.690.1 | DEPRECIATION--EQUIP & COMPUTER | 5,000 | 5,000 | 5,000 |
| 70.710.1 | OFFICE RENT | 203,800 | 203,800 | 216,800 |
| 70.730.1 | POSTAGE & SHIPPING | 5,800 | 5,800 | 6,500 |
| 70.750.1 | TELEPHONE & FAX | 19,000 | 19,000 | 19,000 |
| 70.752.0 | MISCELLANEOUS | 21,830 | 21,830 | 21,830 |
| 70.770.2 | COMPUTER MAINTENANCE | 5,000 | 5,000 | 5,000 |
| 70.770.3 | COMPUTER TECHNICAL SUPPORT | 21,000 | 21,000 | 21,000 |
| 70.770.4 | COMPUTER PROGRAMMING | 21,000 | 21,000 | 18,000 |
| 70.770.5 | COMPUTER SUPPLIES | 4,000 | 4,000 | 6,000 |
| 70.770.6 | COMPUTER ENHANCEMENTS | 7,000 | 7,000 | 12,000 |
| 70.770.7 | COMPUTER ON-LINE SERVICES | 2,000 | 2,000 | 3,000 |
| 70.786.1 | PAYROLL SERVICE | 2,400 | 2,400 | 2,400 |
| 70.810.1 | PERSONNEL SEARCH | 1,000 | 1,000 | 1,000 |
| 70.830.1 | MEMBERSHIPS & SUBSCRIPTIONS | 3,000 | 3,000 | 3,000 |
| 70.830.2 | COMMODITY ROUNDTABLE | 12,000 | 12,000 | 12,000 |
| 70.870.1 | LEGAL FEES | 4,000 | 4,000 | 4,000 |
| 70.870.2 | ANNUAL AUDIT | 22,000 | 22,000 | 23,000 |
| 70.870.3 | OTHER CONSULTANTS | 12,000 | 12,000 | 12,000 |
| 70.901.2 | ADMIN CHARGE-BACK TO DEPTS | -466,500 | -466,500 | -474,000 |
| | | | | |
| | TOTAL ADMINISTRATION | $550,230 | $550,230 | $564,830 |

# AMERICAN EGG BOARD
## COLLECTIONS
## BUDGET
## 2008

| A/C # | DESCRIPTION | 2007 APPROVED BUDGET | 2007 REVISED BUDGET | 2008 APPROVED BUDGET |
|---|---|---|---|---|
| | COLLECTIONS | | | |
| | | | | |
| | PROGRAM ADMINISTRATION | 134,400 | 134,400 | 135,900 |
| | | | | |
| 75.550.2 | COMPUTER ASSISTANCE | 3,000 | 3,000 | 3,000 |
| 75.570.4 | STAFF TRAVEL | 3,000 | 3,000 | 3,000 |
| 75.590.1 | COLLECTIONS COMMUNICATIONS | 5,000 | 5,000 | 5,000 |
| 75.590.3 | COLLECTIONS AUDITS | | | 15,000 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | TOTAL COLLECTIONS | $      145,400 | $      145,400 | $      161,900 |

# AMERICAN EGG BOARD
# BOARD MEETINGS & USDA
# BUDGET
# 2008

| A/C # | DESCRIPTION | 2007 APPROVED BUDGET | 2007 REVISED BUDGET | 2008 APPROVED BUDGET |
|---|---|---|---|---|
| | **BOARD MEETINGS** | | | |
| 80.570.1 | TRAVEL - MEMBERS | 50,000 | 50,000 | 50,000 |
| 80.570.2 | TRAVEL - ALTERNATES | 50,000 | 50,000 | 50,000 |
| 80.570.3 | EXECUTIVE COMMITTEE | 25,000 | 25,000 | 25,000 |
| 80.850.1 | MEETINGS EXPENSE | 67,500 | 67,500 | 72,000 |
| | | | | |
| | **TOTAL BOARD MEETINGS** | $192,500 | $192,500 | $197,000 |
| | | | | |
| | **USDA ADMINISTRATION** | | | |
| 85.890.1 | USDA - ADMINISTRATIVE EXPENSE | 272,797 | 272,797 | 288,000 |
| 85.890.2 | USDA - OGC EXPENSE | 2,000 | 2,000 | 2,000 |
| 85.890.3 | USDA - COMPLIANCE AUDITS | 3,240 | 3,240 | 6,000 |
| | | | | |
| | **TOTAL USDA ADMINISTRATION** | $278,037 | $278,037 | $296,000 |

# Exhibit 9

**THE HUMANE SOCIETY**
OF THE UNITED STATES

OFFICERS

David O. Wiebers, M.D.
*Chair of the Board*

Anita W. Coupe, Esq.
*Vice Chair of the Board*

Walter J. Stewart, Esq.
*Board Treasurer*

Wayne Pacelle
*President & CEO*

G. Thomas Waite III
*Treasurer & CFO*

Roger A. Kindler, Esq.
*General Counsel & CLO*

Janet D. Frake
*Secretary*

Andrew N. Rowan, Ph.D.
*Executive Vice President Operations*

Michael Markarian
*Executive Vice President External Affairs*

STAFF VICE PRESIDENTS

John Balzar
*Senior Vice President Communications*

Patricia A. Forkan
*Senior Vice President External Affairs International*

John W. Grandy, Ph.D.
*Senior Vice President Wildlife & Habitat Protection*

Holly Hazard
*Chief Innovations Officer*

Heidi Prescott
*Senior Vice President Campaigns*

Katherine B. Liscomb
*Administration & Animal Care Centers*

Richard M. Clugston, Ph.D.
*Higher Education*

Geoffrey L. Handy
*Media and Online Communications*

Jonathan R. Lovvorn, Esq.
*Animal Protection Litigation*

Kathleen C. Milani
*Investigations and Video*

Miyun Park
*Farm Animal Welfare*

Nancy Perry, Esq.
*Government Affairs*

Steve Putnam
*Business Development & Corporate Relations*

Robert G. Roop, Ph.D., SPHR
*Human Resources & Education Programs*

Melissa Seide Rubin, Esq.
*Field & Disaster Services*

John M. Snyder
*Companion Animals*

Martin L. Stephens, Ph.D.
*Animal Research Issues*

DIRECTORS

Leslie Lee Alexander, Esq.
Patricia Mares Asip
Peter A. Bender
Barbara S. Brack
Anita W. Coupe, Esq.
Neil B. Fang, Esq., C.P.A.
Judi Friedman
David John Ihrad, Ph.D.
Jennifer Leaning, M.D., S.M.H.
Kathleen M. Linehan, Esq.
William F. Mancuso
Mary I. Max
Patrick L. McDonnell
Judy Ney
Judy J. Peil
Marian G. Probst
Joshua S. Reichert, Ph.D.
Jeffery O. Rose
James D. Ross, Esq.
Marilyn G. Seyler
Walter J. Stewart, Esq.
John E. Taft
Andrew Weinstein
Persia White
David O. Wiebers, M.D.

Printed on recycled paper.

March 6, 2008

**Via Facsimile and First Class Mail**

Lloyd Day, Administrator
Agricultural Marketing Service
United States Department of Agriculture
1400 Independence Avenue, SW, Rm. 3071 SAB
Washington, DC  20250

Joanne Ivy, President
American Egg Board
1460 Renaissance Drive
Park Ridge, IL  60068

**Re:   Notice of Violations of Federal Law Regarding the American Egg Board's Decision to Spend Funds in Opposition to a State Ballot Initiative**

Dear Administrator Day and Ms. Ivy,

On behalf of Californians For Humane Farms, the Humane Society of the United States, and Farm Sanctuary, we are writing  to notify you that the motion passed at the American Egg Board's ("AEB" or "Board") November 2007 annual meeting to reserve $3 million to spend in opposition to a ballot initiative concerning prevention of cruelty to farm animals currently in circulation for placement on the November 4, 2008 California general election ballot is unlawful and, unless rescinded, likely to subject the AEB and USDA to litigation.

Pursuant to the Egg Research and Consumer Information Act of 1974 (P.L. 93-428; 7 U.S.C. § 2701, *et seq*.), the AEB was created to facilitate a coordinated program of research, producer and consumer education, and promotion by egg producers.  This enabling legislation explicitly restricts the Board's use of funds collected, prohibiting any spending for "political purposes." 7 U.S.C. § 2707(h).

Specifically, Congress has directed that "no funds collected by the Egg Board under the [egg research and promotion orders] shall in any manner be used for the purpose of influencing governmental policy or action, except [the Egg Board may recommend to the Secretary of Agriculture amendments to such orders]." *Id*.  Congress reaffirmed this prohibition in the Commodity Promotion, Research, and Information Act of 1996 (P.L. 104-127; 7 U.S.C. § 7411, *et seq*.), stating that a commodity promotion board shall not use its assessment funds "for the purpose

*Celebrating Animals, Confronting Cruelty*

of influencing any legislation or governmental action or policy other than recommending to the Secretary amendments to the [promotion orders]." 7 U.S.C. § 7414(d).

The powers and duties of the AEB are thus limited. As a commodity promotion program, the AEB's powers and duties are defined under the Secretary's egg research and promotion orders and "shall include only" the authority to administer the orders, make rules for its constituent members to effectuate the terms of the orders, investigate and report to the Secretary any violations of the orders, and recommend to the Secretary appropriate amendments to the orders. 7 U.S.C. § 2707(a) (emphasis added). Because the prohibition on spending for the purpose of influencing governmental policy is an express statutory limitation on all research and promotion orders, any activities undertaken in opposition to election ballot initiatives are clearly beyond the scope of the Board's charter and contrary to law.

It is also clear that Congress intended that the Department of Agriculture ensure the AEB's activities are limited to non-political advertising, education, research, and marketing. The restriction on political spending by the AEB is a required condition of every research and promotion order issued by the Secretary. 7 U.S.C. § 2707. Thus, the failure of the Secretary to limit the AEB's activities may also subject the Department of Agriculture to civil suit under the Administrative Procedure Act, 5 U.S.C. § 551, *et seq.*

In addition, the Egg Research and Consumer Information Act requires that "[a]ll expenditures of the Egg Board must be approved by the Secretary." H. Report 93-1032, 93rd Cong., 2d Sess. (1974); 7 U.S.C. § 2707(d). Moreover, the Act requires that all "plans or projects" of the AEB "must be approved by the Secretary before becoming effective." 7 U.S.C. § 2707(c). The Secretary is obligated to terminate or suspend operation of any term of an order that does not operate consistently with the provisions of the Act. 7 U.S.C. § 2709(a). In creating the AEB through federal legislation, rather than simply leaving egg producers to voluntarily form their own private industry promotion organization, Congress stressed the "greater accountability" associated with an entity the "research and information program [of which] will be subject to the Secretary's review and approval." S. Rep. 93-1109, 93rd Cong., 2d Sess. (1974).

The House and Senate reports accompanying the Egg Research and Consumer Information Act state that the purpose of the Board is to facilitate "specific work to be done in promotion and research," as compared to the "production and marketing" activities with which individual egg producers are typically occupied. H. Rep. 93-1032; S. Rep. 93-1109. Congress thus limited the permissive terms and conditions of the Secretary's orders to advertising, sales promotion, and consumer education plans or projects; research, marketing, and development projects and studies; recordkeeping and reporting requirements; other incidental and necessary terms; and "no others." 7 U.S.C. § 2706 (emphasis added). These limitations are also set forth in the Commodity Promotion, Research, and Information Act, which authorizes the Department of Agriculture to oversee the AEB and other commodity promotion boards. 7 U.S.C. § 7414(e).

The AEB's expenditure of funds in opposition to a citizen ballot initiative is not only contrary to law, but also infringes upon the rights and interests of egg producers subject to the Secretary's orders who do not share the Board's political viewpoint on the citizen initiative in question. Unlike the Board's advertising, sales promotion and research

activities, which focus on promoting a coordinated commercial message for the industry, active participation in the legislative process would tend to restrain the unique political interests of individual producers.

Moreover, because the Department of Agriculture oversees the programs and spending of the AEB, any unlawful expenditure by AEB in opposition to a ballot initiative would indicate to the voting public that political positions advocated by the AEB have the imprimatur of the Department of Agriculture and the federal government.  Such result is clearly prohibited by the Egg Research and Consumer Information Act, as well as the Hatch Act, which restricts the activities of certain federal employees to avoid improper political influence by Executive Branch personnel. 5 U.S.C. § 7321, *et seq*. While most federal employees are permitted to engage in political management activities and political campaigns, no employee or officer of an Executive agency, other the President or Vice President, may "use his official authority or influence for the purpose of interfering with or affecting the result of an election." *Id*. §§ 7322(1)(A), 7323(a)(1).

The Egg Research and Consumer Information Act provides that civil enforcement proceedings may be brought against any person, including any individual, association or "any other entity," to restrain and prevent violations of the terms of an order. 7 U.S.C. §§ 2714(a), 7419(a). Such actions are automatically referred to the Attorney General for "appropriate action." 7 U.S.C. §§ 2714(a), 7419(b). The Egg Research and Consumer Information Act limits the AEB's powers and duties to administering the terms of the Secretary's research and promotion orders, and the prohibition on political spending is a required term and condition of all such orders. 7 U.S.C. § 2707. Therefore, it is a violation of an express, mandatory term of the existing research and promotion orders for the AEB to spend funds received from producer assessments in "any manner" in order to "influenc[e] governmental policy or action,"*id*., and this violation is actionable under 7 U.S.C. § 2714(a).

Accordingly, please advise in writing, within 20 business days, whether the AEB intends to rescind the aforementioned resolution to expend funds in support of a political campaign in opposition to California ballot initiative 07-0041, and whether the Department of Agriculture intends to withdraw approval of that decision, in light of the statutory prohibition and limitations described herein. If this matter remains unresolved, we and/or producer-members of the AEB harmed by these activities will have no choice but to consider initiating litigation against USDA and the Board to ensure that the Board's funds are not used for the unlawful purpose of influencing a state election.  If you desire to discuss this matter further, please contact me at 202-676-2324.

Sincerely,

Ralph E. Henry, Esq.
Peter J. Brandt, Esq.
Counsel for Californians For Humane Farms,
The Humane Society of the United States,
and Farm Sanctuary

# Exhibit 10



**USDA**

| | | |
|---|---|---|
| **United States Department of Agriculture** | **Agricultural Marketing Service** | **Room 3071-S, STOP 0201 1400 Independence Avenue, SW Washington, DC 20250-0201** |

MAR 1 4 2008

Ralph E. Henry, Esq.
Peter J. Brandt, Esq.
Counsel for Californians for Humane Farms
℅ The Humane Society of the United States
2100 L Street, NW
Washington, D.C. 20037

Dear Messrs. Henry and Brandt:

This is in response to your letter dated March 6, 2008, concerning an allocation of $3 million made by the American Egg Board (AEB). You state that the allocation was to be spent in opposition to a ballot initiative in which California voters will consider the California Farm Animal Cruelty Prevention Act in the November 2008 general election and that such expenditures are unlawful.

The motion that was approved at AEB's November 2007 meeting reads: "Motion was made and approved for $3 million to be held in reserve for a consumer education campaign to educate the public about current egg production practices." The funds are not only for use by California producers but are available for use in any State or region. These funds are to be used for consumer education and similar projects, which are allowed by the legislation.

Agricultural Marketing Service (AMS) has advised that anything developed with AEB funds must be factual, must not attempt to influence legislation or voting, must not attempt to affect the opinions of the public concerning legislation, and must not attempt to affect the outcome of proposed legislation. Any materials funded by AEB should stick to the facts about egg production, animal care, and similar topics. We further advised that these materials should not reference the ballot initiative and cannot be perceived as attempting to sway opinion. In other words, AEB-funded materials should be strictly educational about agriculture, not about proposed legislation.

To date, no expenditure of funds has been made from this $3 million allocation. Any request from a State or region to use any of this allocation will be reviewed by AMS to ensure compliance with the Egg Research and Consumer Information Act. AMS will carefully monitor any projects to be funded for this purpose and ensure they are appropriate in light of legislative, regulatory, and policy requirements.

We appreciate your interest in this matter.

Sincerely,

Lloyd C. Day
Administrator

# Exhibit 11

The incredible edible egg

# American Egg Board

March 17, 2008

Ralph E. Henry, Esq.
Peter J. Brandt, Esq.
Counsel for Californians for Humane Farms
c/o The Humane Society of the United States
2100 L. Street, NW
Washington, D.C. 20037

Dear Mssrs. Henry and Brandt:

I received your letter dated March 6, 2008, in which you state that the motion passed by the American Egg Board to reserve $3 million to spend in opposition to a ballot initiative is unlawful and likely to subject AEB and USDA to litigation.

While it is true that AEB voted to set aside $3 million, AEB will not be spending this to oppose the ballot initiative to which you refer. California egg producers who are aware of AEB's legislative requirements asked that these funds be set aside to conduct consumer education and public relations activities about current agricultural practices, including the care of laying hens. These funds are not limited to California and are available for use in any State or region.

We have consulted with USDA representatives on this matter, including the types of materials that can be funded. We have been assured that this allocation is appropriate, and no projects will be funded with this allocation without first being reviewed and approved by USDA.

Sincerely,

Joanne C. Ivy

Joanne C. Ivy
President & CEO

JCI/ps

# Exhibit 12

**Snyder, Angie**

| | |
|---|---|
| From: | JIVY@vzw.blackberry.net |
| Sent: | Tuesday, December 18, 2007 9:57 PM |
| To: | Snyder, Angie |
| Subject: | Re: CA use of funds |


Yes, This is for the use of the 3 million. Joanne Sent from my Verizon Wireless BlackBerry

-----Original Message-----
From: "Snyder, Angie" <Angie.Snyder@usda.gov>
Date: Tue, 18 Dec 2007 20:34:22
To:<JIvy@aeb.org>
Subject: RE: CA use of funds

Is this for the $3 million draw-down?

The most important thing I can say is that the material can't advocate a position,
encourage a certain vote, incite people to lobby, etc.  I will fax you a document tomorrow
with some more specific guidance about that, unless I can find an electronic copy.  I'll
look, because I'm sure that would be easiest for you to distribute.

If I think of anything else, I'll send that along, too.

Angie


-----------------
 From: JIvy@aeb.org [mailto:JIvy@aeb.org]
Sent: Tuesday, December 18, 2007 5:01 PM
To: Snyder, Angie
Subject: CA use of funds


Gary West called and asked if I could provide the guidelines as to what they can say on
their billboards (regarding the CA animal welfare ballot campaign).  I do not have any
written guidelines, so could you provide a few bullet points as to what they can't say on
billboards.  Joanne

# Exhibit 13

**Snyder, Angie**

---

| | |
|---|---|
| **From:** | Snyder, Angie |
| **Sent:** | Friday, November 02, 2007 11:05 AM |
| **To:** | Barnes, Rex |
| **Subject:** | CA ballot initiative threatens egg industry |

Rex, here's the activity report item I sent Patsy.
------
Ballot Initiative Threatens California Egg Industry:

In November 2008, California voters will consider a ballot initiative that threatens the California egg industry and jeopardizes the U.S. egg industry as a whole. Called the Farm Animal Cruelty Act, the initiative calls for the elimination of hog gestation crates, veal crates, and battery cages for laying hens. As the hog and veal industries are non-existent in California, the initiative--backed by the People for the Ethical Treatment of Animals and the Humane Society of the United States--singularly targets the California egg industry.

Egg producers across the country are concerned that if the measure passes in California, similar initiatives will be introduced in other States. Colorado voters may consider such an initiative as early as next year.

California egg producers are undertaking a campaign to defeat the measure. To supplement these efforts, the American Egg Board voted at its November 2, 2007, meeting to set aside $3 million to fund public relations and other projects to educate consumers about current agriculture practices.

# Exhibit 14

**THE HUMANE SOCIETY**
OF THE UNITED STATES

**OFFICERS**
David O. Wiebers, M.D.
*Chair of the Board*
Anita W. Coupe, Esq.
*Vice Chair of the Board*
Walter J. Stewart, Esq.
*Board Treasurer*
Wayne Pacelle
*President & CEO*
G. Thomas Waite III
*Treasurer & CFO*
Roger A. Kindler, Esq.
*General Counsel & CLO*
Janet D. Frake
*Secretary*
Andrew N. Rowan, Ph.D.
*Executive Vice President
Operations*
Michael Markarian
*Executive Vice President
External Affairs*

**STAFF VICE PRESIDENTS**
John Balzar
*Senior Vice President
Communications*
Patricia A. Forkan
*Senior Vice President
External Affairs International*
John W. Grandy, Ph.D.
*Senior Vice President
Wildlife & Habitat Protection*
Holly Hazard
*Chief Innovations Officer*
Heidi Prescott
*Senior Vice President
Campaigns*
Katherine B. Liscomb
*Administration &
Animal Care Centers*
Richard M. Clugston, Ph.D.
*Higher Education*
Geoffrey L. Handy
*Media and Online
Communications*
Jonathan R. Lovvorn, Esq.
*Animal Protection Litigation*
Kathleen C. Milani
*Investigations and Video*
Miyun Park
*Farm Animal Welfare*
Nancy Perry, Esq.
*Government Affairs*
Steve Putnam
*Business Development &
Corporate Relations*
Robert G. Roop, Ph.D., SPHR
*Human Resources &
Education Programs*
Melissa Seide Rubin, Esq.
*Field & Disaster Services*
John M. Snyder
*Companion Animals*
Martin L. Stephens, Ph.D.
*Animal Research Issues*

**DIRECTORS**
Leslie Lee Alexander, Esq.
Patricia Mares Asip
Peter A. Bender
Barbara S. Brack
Anita W. Coupe, Esq.
Neil B. Fang, Esq., C.P.A.
Judi Friedman
David John Jhirad, Ph.D.
Jennifer Leaning, M.D., S.M.H.
Kathleen M. Linehan, Esq.
Mary I. Max
Patrick L. McDonnell
Gil Michaels
Judy Ney
Judy J. Peil
Marian G. Probst
Joshua S. Reichert, Ph.D.
Jeffery O. Rose
James D. Ross, Esq.
Marilyn G. Seyler
Walter J. Stewart, Esq.
John E. Taft
Andrew Weinstein
Persia White
David O. Wiebers, M.D.

Printed on recycled paper.

May 15, 2008

**Via Facsimile and First Class Mail**

Lloyd Day, Administrator
Agricultural Marketing Service
United States Department of Agriculture
1400 Independence Avenue, SW, Rm. 3071 SAB
Washington, DC 20250

> **Re: Notice of Violations of Federal Law Regarding the American
> Egg Board's Decision to Spend Funds in Opposition to a
> State Ballot Initiative**

Dear Administrator Day,

Thank you for your recent response to our letter dated March 6, 2008. On behalf of Californians For Humane Farms, the Humane Society of the United States, and Farm Sanctuary, we would also like to thank you for your statement of commitment to oversight of the AEB, and its compliance with the Egg Research and Consumer Information Act ("ERCIA").

However, we are writing to address an additional concern raised by your response, namely the misconception that any AEB-funded advertising and messaging campaign is lawful so long as it is intended to be factual in nature and is among the types of marketing and promotional activities permitted under the ERCIA. In fact, any AEB-funded campaign that is initiated for the purpose of influencing voter response to a ballot initiative is unlawful, regardless of whether the campaign falls within the scope of the marketing and promotional activities to which the AEB is limited by the ERCIA. For this reason, we again ask you to withdraw your approval of the AEB's budgetary allowance for the use of $3 million to spend for the purpose of opposing our clients' ballot initiative concerning prevention of cruelty to farm animals, and to take all other actions necessary to prevent such unlawful expenditure.

As described below, the AEB's November 2007 motion to reserve $3 million for use in a targeted state campaign in 2008 was indisputably passed for the purpose of defeating the citizen initiative sponsored by Californians For Humane Farms. Thus, unless and until the AEB rescinds this motion, and presents the Department of Agriculture with a budget indicating that no AEB funds will be used for the purpose of swaying voter opinion in the November 4, 2008 election, the USDA's approval of the AEB's 2008 budget and the $3 million special allocation is contrary to law, and will likely result in litigation over this matter.

Your letter indicates that the $3 million dollar reserve of AEB funds is "available for use in any state or region," for the purpose of conducting "consumer education and similar projects" that are not politically motivated nor targeted at Californians For Humane Farms' 2008 ballot initiative.  However, this directly conflicts with statements made in an Egg Industry magazine article published on December 1, 2007, entitled "AEB Supports California Egg Battle."  The article describes AEB President Joanne Ivy's review of the AEB's new Strategic Plan, stating: "The American Egg Board unanimously passed a motion at its recent fall meeting in California that $3 million be held in reserve to assist *the state* if necessary in the industry's current battle with animal activists." (emphasis added).  Thus, the Board's Strategic Plan indicates to both producers and the public that the $3 million, if used, will be targeted only to California, and will be used for the purpose of attacking legislative efforts sponsored by animal protection organizations and supported by hundreds of thousands of California citizens.

Moreover, your description of the language of the motion reported in the minutes from the AEB's November 2007 Board meeting overlooks the fact that the $3 million was explicitly reserved "to address an animal welfare situation," as also reported in the minutes from the meeting.  Att. 1.  While the minutes do not specifically state that the $3 million was approved for the purpose of opposing the California farm animal welfare initiative, in an email exchange with Angie Snyder of the USDA Agricultural Marketing Service's Poultry Programs office on December 18, 2007, Ms Ivy asked for the agency's guidance on the content of advertisements that the AEB intends to run "regarding the CA animal welfare ballot campaign."  Att. 2.  When Ms. Snyder wrote back, asking whether this involved the "$3 million draw-down," Ms. Ivy responded: "Yes, This is for the use of the 3 million."  *Id*.  Thus, the statement in your response letter indicating that the $3 million is intended for use in any or all states, and is not intended to be targeted at the farm animal welfare initiative, contradicts statements AEB officials have made in email correspondence with your staff.

Of further concern is Ms. Ivy's statement that Gary West of J.S. West Milling Co. prompted her December 18, 2007 email to Ms. Snyder, because he wanted to know "what they can say on their billboards" concerning the potential animal welfare legislation.  *Id*.  Mr. West is the Chairman of the United Egg Producers, an industry group that is leading the opposition to the California farm animal welfare initiative. This private industry group is not permitted to use the AEB's government-mandated producer assessment funds for its own purposes.  No AEB check-off funds are permitted to be used for the purpose of influencing governmental policy or action, including citizen supported ballot initiatives, even if these funds are passed on to the UEP under the guise of legitimate AEB programming activities.  Part of the USDA's duty to oversee the activities and expenditures of the AEB is to prevent such collusion to avoid the prohibition on using AEB funds to influence legislation or other governmental policy.  In fact, the AEB may only allow third-party use of producer assessment funds to carry out AEB projects if all such contracts or agreements are first subject to the approval of the USDA to ensure their compliance with law.  7 U.S.C. § 2707(g).

Clearly, some USDA officials are aware of the purpose of the AEB motion, and the AEB's close cooperation with industry lobbyists and trade groups actively campaigning against the ballot measure.  In an email sent to Deputy Administrator Rex Barnes on November 2, 2007, the *same day the AEB motion passed*, Ms. Snyder states that

"California egg producers are undertaking a campaign to defeat the [ballot initiative]. To support these efforts, the American Egg Board voted . . . to set aside $3 million. . . ." Att. 3.  The same statement was repeated in Mr. Barnes' Weekly Activity Report to you for the first week of November 2007.  Att. 4.

The AEB's intended expenditure of funds for the purpose of influencing voter opinion to defeat the farm animal welfare initiative offends the plain language of the Egg Research and Consumer Information Act of 1974 (P.L. 93-428; 7 U.S.C. § 2701, *et seq.*), under which the AEB was created, and which explicitly restricts the Board's use of funds collected, prohibiting any use of these funds "for the purpose of influencing governmental policy or action."  7 U.S.C. § 2707(h).  Congress reaffirmed this broad prohibition in the Commodity Promotion, Research, and Information Act of 1996 (P.L. 104-127; 7 U.S.C. § 7411, *et seq.*), stating that a commodity promotion board shall not use its assessment funds "for the purpose of influencing any legislation or governmental action or policy."  7 U.S.C. § 7414(d).

The ERCIA limits the AEB's activities to advertising, sales promotion, and consumer education plans or projects; research, marketing, and development projects and studies; required recordkeeping activities; and "no others."  7 U.S.C. § 2706.  However, ensuring that the AEB's expenditures are limited to funding these statutorily permissible activities does not address the wholly separate statutory requirement that the AEB's expenditures shall not be used "for the purpose of influencing governmental policy or action."  *Id*. at § 2707(h).  Thus, advertising and consumer education campaigns about current agricultural practices are permitted under the ERCIA, but not if intended to influence public opinion or affect the outcome of proposed legislation.

The USDA Agricultural Marketing Service's Guidelines for Oversight of Research and Promotion Boards, specifically define "influencing governmental policy or action" as including "any action the principal purpose of which is to bring about a change in existing policy or regulation *or affect the outcome of proposed policy or regulation* . . . ." Att. 5 (emphasis added).  Moreover, the Guidelines define "influencing legislation" as including "any attempt to affect the opinions of the general public or any segment thereof concerning legislation."  *Id*.  Notably, because of the quasi-governmental character of the commodity promotion boards, "[p]roviding factual information to Federal, State or local governmental officials" concerning proposed legislation is allowed, but the same is not true for the public at large, because "[a]ttempting to affect the opinions of the public or a segment of it" concerning proposed legislation is prohibited.  *Id*.

Despite the plain language of the statute, and the broad nature of the USDA's own Guidelines, the AEB apparently intends to expend its federally administered assessment funds in an effort to defeat the farm animal welfare initiative.  It is the duty of the Secretary of Agriculture to enforce the prohibition on "political spending."  7 U.S.C. § 2707(d) ("the Egg Board shall . . . submit to the Secretary for his approval budgets on a fiscal period basis of its anticipated expenses and disbursements in the administration of the order"); H. Report 93-1032, 93rd Cong., 2d Sess. (1974) ("All expenditures of the Egg Board must be approved by the Secretary.").  The Secretary is obligated to terminate or suspend operation of any term of an order that does not operate consistently with the provisions of the Act.  7 U.S.C. § 2709(a).  Further, the

prohibition on political spending is a required condition of every research and promotion order issued by the Secretary. 7 U.S.C. § 2707. Thus, the Secretary's approval of the planned expenditure, as well as the failure of the Secretary to suspend the terms of the order so as to prohibit the planned expenditure may subject the Department of Agriculture to civil suit under the Administrative Procedure Act, 5 U.S.C. § 551, *et seq.*

We are deeply concerned that the USDA is knowingly or unwittingly supporting the expenditure of funds by a quasi-governmental entity in order to defeat a citizen initiative. In Mr. Barnes' Weekly Activity Report to you for the first week of November 2007, he states that the ballot initiative "threatens the California egg industry," and offers implicit approval of the AEB's use of approximately one-tenth of its total annual budget to "defeat the measure." Att. 4. This document is publicly available by information request. While individual officers of the Department are entitled to their personal opinions about the consequences of providing greater protections to farm animals, it is inappropriate and unlawful for such officials to support the "defeat" of a citizen-supported ballot initiative intending to create legislation requiring these protections within the course of his or her official actions. This type of action is clearly prohibited by federal law, including the Hatch Act, under which no Executive agency employee or officer, other the President or Vice President, may "use his official authority or influence for the purpose of interfering with or affecting the result of an election." *Id.* §§ 7322(1)(A), 7323(a)(1).

Given the content of AEB President Joanne Ivy's statements describing the AEB's new strategic plan and her emails to USDA Agricultural Marketing Service staff members, the minutes of the AEB's November 2007 Board meeting, and the USDA emails and Weekly Activity Report cited herein, it cannot now be reasonably maintained that the AEB passed the motion to reserve $3 million for any purpose other than attempting to sway public opinion related to Californians For Humane Farms' farm animal welfare initiative. As such, we must again renew our request that the Department of Agriculture withdraw its approval of the motion, and take all steps necessary to prevent the unlawful expenditure.

Therefore, please advise in writing, within 15 business days, whether the Department of Agriculture intends to take such action. We cannot allow the interests of our clients to be harmed by the expenditure of funds by a quasi-governmental entity for the unlawful purpose of influencing a state election. If the USDA does not revoke its approval of the unlawful expenditure, we will be forced to consider initiating litigation to enjoin the action. If you desire to discuss this matter further, please contact me at 202-676-2324.

Sincerely,

Ralph E. Henry, Esq.
Peter J. Brandt, Esq.
Counsel for Californians For Humane Farms,
The Humane Society of the United States,
and Farm Sanctuary

**THE HUMANE SOCIETY**
OF THE UNITED STATES

**OFFICERS**

David O. Wiebers, M.D.
*Chair of the Board*

Anita W. Coupe, Esq.
*Vice Chair of the Board*

Walter J. Stewart, Esq.
*Board Treasurer*

Wayne Pacelle
*President & CEO*

G. Thomas Waite III
*Treasurer & CFO*

Roger A. Kindler, Esq.
*General Counsel & CLO*

Janet D. Frake
*Secretary*

Andrew N. Rowan, Ph.D.
*Executive Vice President
Operations*

Michael Markarian
*Executive Vice President
External Affairs*

**STAFF VICE PRESIDENTS**

John Balzar
*Senior Vice President
Communications*

Patricia A. Forkan
*Senior Vice President
External Affairs International*

John W. Grandy, Ph.D.
*Senior Vice President
Wildlife & Habitat Protection*

Holly Hazard
*Chief Innovations Officer*

Heidi Prescott
*Senior Vice President
Campaigns*

Katherine B. Liscomb
*Administration &
Animal Care Centers*

Richard M. Clugston, Ph.D.
*Higher Education*

Geoffrey L. Handy
*Media and Online
Communications*

Jonathan R. Lovvorn, Esq.
*Animal Protection Litigation*

Kathleen C. Milani
*Investigations and Video*

Miyun Park
*Farm Animal Welfare*

Nancy Perry, Esq.
*Government Affairs*

Steve Putnam
*Business Development &
Corporate Relations*

Robert G. Roop, Ph.D., SPHR
*Human Resources &
Education Programs*

Melissa Seide Rubin, Esq.
*Field & Disaster Services*

John M. Snyder
*Companion Animals*

Martin L. Stephens, Ph.D.
*Animal Research Issues*

**DIRECTORS**

Leslie Lee Alexander, Esq.
Patricia Mares Asip
Peter A. Bender
Barbara S. Brack
Anita W. Coupe, Esq.
Neil B. Fang, Esq., C.P.A.
Judi Friedman
David John Jhirad, Ph.D.
Jennifer Leaning, M.D., S.M.H.
Kathleen M. Linehan, Esq.
William F. Mancuso
Mary I. Max
Patrick L. McDonnell
Gil Michaels
Judy Ney
Judy J. Peil
Marian G. Probst
Joshua S. Reichert, Ph.D.
Jeffery O. Rose
James D. Ross, Esq.
Marilyn G. Seyler
Walter J. Stewart, Esq.
John E. Taft
Andrew Weinstein
Persia White
David O. Wiebers, M.D.

Printed on recycled paper.

May 15, 2008

**Via Facsimile and First Class Mail**

Joanne Ivy, President
American Egg Board
1460 Renaissance Drive
Park Ridge, IL  60068

**Re:  Notice of Violations of Federal Law Regarding the American Egg Board's Decision to Spend Funds in Opposition to a State Ballot Initiative**

Dear Ms. Ivy,

Thank you for your recent response to our letter dated March 6, 2008.  On behalf of Californians For Humane Farms, the Humane Society of the United States, and Farm Sanctuary, we are writing to address an additional concern raised by your response, namely the misconception that any AEB-funded advertising and messaging campaign is lawful so long as it is intended to be factual in nature and is among the types of marketing and promotional activities permitted under the Egg Research and Consumer Information Act ("ERCIA").  In fact, any AEB-funded campaign that is initiated for the purpose of influencing voter response to a ballot initiative is unlawful, regardless of whether the campaign falls within the scope of the marketing and promotional activities to which the AEB is limited by the ERCIA.  For this reason, we again ask you to rescind the motion to reserve $3 million to spend in opposition to our clients' ballot initiative concerning prevention of cruelty to farm animals passed at your November 2007 Board meeting, so as to avoid potential litigation over this matter.

Your letter indicates that the $3 million dollar reserve of AEB funds is "available for use in any state or region," for the purpose of conducting "consumer education and public relations activities about current agricultural practices" that are not politically motivated nor targeted at Californians for Humane Farms' 2008 ballot initiative.  However, this directly conflicts with statements made in an Egg Industry magazine article published on December 1, 2007, entitled "AEB Supports California Egg Battle."  The article describes your review of the AEB's new Strategic Plan, stating: "The American Egg Board unanimously passed a motion at its recent fall meeting in California that $3 million be held in reserve to assist *the state* if necessary in the industry's current battle with animal activists."  (emphasis added).  Thus, the Board's Strategic Plan indicates to both producers and the public that the $3 million, if used, will be targeted only to California, and used for the purpose of attacking legislative efforts sponsored by

animal protection organizations and supported by hundreds of thousands of California citizens.

Moreover, the minutes of the AEB's November Board meeting at which the motion was passed state: "a special request was made for financial assistance to address an animal welfare situation . . . [specifically,] for $3 million to be held in reserve for a consumer education campaign . . . ." Att. 1. While the minutes do not specifically state that the $3 million was approved for the purpose of opposing the California farm animal welfare initiative, in an email exchange with Angie Snyder of the USDA Agricultural Marketing Service's Poultry Programs office on December 18, 2007, you asked for the agency's guidance on the content of advertisements that the AEB intends to run "regarding the CA animal welfare ballot campaign." Att. 2. When Ms. Snyder wrote back, asking whether this involved the "$3 million draw-down," you responded: "Yes, This is for the use of the 3 million. *Id*. Thus, your statement that the $3 million is intended for use in any or all states, and not for the purpose of opposing the farm animal welfare initiative, contradicts the statements you have made to USDA officials.

Of further concern is your statement that Gary West of J.S. West Milling Co. prompted your December 18, 2007 email to Ms. Snyder, because he wanted to know "what they can say on their billboards" concerning the potential animal welfare legislation. *Id*. Mr. West is the Chairman of the United Egg Producers, an industry group that is leading the opposition to the California farm animal welfare initiative. This private industry group is not permitted to use the AEB's government-mandated producer assessment funds for its own purposes. In fact, the AEB may only allow third-party use of producer assessment funds to carry out AEB projects if all such contracts or agreements are first subject to the approval of the USDA to ensure their compliance with law. 7 U.S.C. § 2707(g). No AEB check-off funds are permitted to be used for the purpose of influencing governmental policy or action, including citizen supported ballot initiatives, even if these funds are passed on to the UEP under the guise of legitimate AEB programming activities.

Clearly, some USDA officials are aware of the purpose of the AEB motion, and the AEB's close cooperation with industry lobbyists and trade groups actively campaigning against the ballot measure. In an email sent to Deputy Administrator Rex Barnes on November 2, 2007, the *same day the AEB motion passed*, Ms. Snyder states that "California egg producers are undertaking a campaign to defeat the [ballot initiative]. To support these efforts, the American Egg Board voted . . . to set aside $3 million. . . ." Att. 3. The same statement was repeated in Mr. Barnes' Weekly Activity Report to Agricultural Marketing Service Director Lloyd Day for the first week of November 2007. Att. 4. Since that time, the USDA has explicitly indicated that expenditures of this nature are not permitted, stating, *inter alia*, that any action of the AEB "must not attempt to influence legislation or voting, must not attempt to affect the opinions of the public concerning legislation, and must not attempt to affect the outcome of proposed legislation." Att. 5.

The AEB's intended expenditure of funds for the purpose of influencing voter opinion to defeat the farm animal welfare initiative offends the plain language of the Egg Research and Consumer Information Act of 1974 (P.L. 93-428; 7 U.S.C. § 2701, *et seq*.), under

which the AEB was created, and which explicitly restricts the Board's use of funds collected, prohibiting any use of these funds "for the purpose of influencing governmental policy or action." 7 U.S.C. § 2707(h). Congress reaffirmed this broad prohibition in the Commodity Promotion, Research, and Information Act of 1996 (P.L. 104-127; 7 U.S.C. § 7411, *et seq*.), stating that a commodity promotion board shall not use its assessment funds "for the purpose of influencing any legislation or governmental action or policy." 7 U.S.C. § 7414(d).

The ERCIA limits the AEB's activities to advertising, sales promotion, and consumer education plans or projects; research, marketing, and development projects and studies; required recordkeeping activities; and "no others." 7 U.S.C. § 2706. However, ensuring that the AEB's expenditures are limited to funding these statutorily permissible activities does not address the wholly separate statutory requirement that the AEB's expenditures shall not be used "for the purpose of influencing governmental policy or action." *Id*. at § 2707(h). Thus, advertising and consumer education campaigns about current agricultural practices are permitted under the ERCIA, but not if intended to influence public opinion or affect the outcome of proposed legislation.

The USDA Agricultural Marketing Service's Guidelines for Oversight of Research and Promotion Boards, specifically define "influencing governmental policy or action" as including "any action the principal purpose of which is to bring about a change in existing policy or regulation *or affect the outcome of proposed policy or regulation . . . .*" Att. 6 (emphasis added). Moreover, the Guidelines define "influencing legislation" as including "any attempt to affect the opinions of the general public or any segment thereof concerning legislation." *Id*. Notably, because of the quasi-governmental character of the commodity promotion boards, "[p]roviding factual information to Federal, State or local governmental officials" concerning proposed legislation is allowed, but the same is not true for the public at large, because "[a]ttempting to affect the opinions of the public or a segment of it" concerning proposed legislation is prohibited. *Id*.

We have been informed by Director Day that you were advised by USDA of these rules and are on notice of their proscriptions. Specifically, Director Day has indicated that you were advised that any AEB action "must not attempt to influence legislation or voting, must not attempt to affect the opinions of the public concerning legislation, and must not attempt to affect the outcome of proposed legislation," and that any materials produced by the AEB "cannot be perceived as attempting to sway public opinion." Att. 5.

Given the content of your statements describing the AEB's new strategic plan and your emails to USDA Agricultural Marketing Service staff members, as well as the minutes of the AEB's November 2007 Board meeting, it cannot now be reasonably maintained that the AEB passed the motion to reserve $3 million for any purpose other than attempting to sway public opinion related to Californians For Humane Farms' farm animal welfare initiative. As such, we must again renew our request that the AEB rescind the aforementioned motion.

Therefore, please advise in writing, within 15 business days, whether the AEB intends to take such action. We cannot allow the interests of our clients to be harmed by the

expenditure of funds by a quasi-governmental entity for the unlawful purpose of influencing a state election.  If the AEB does not rescind the motion, we will be forced to consider initiating litigation to enjoin the unlawful action.  If you desire to discuss this matter further, please contact me at 202-676-2324.

Sincerely,

Ralph E. Henry, Esq.
Peter J. Brandt, Esq.
Counsel for Californians For Humane Farms,
The Humane Society of the United States,
and Farm Sanctuary

# Exhibit 15

 **USDA**

| United States | Agricultural | Room 3071-S, STOP 0201 |
| Department of | Marketing | 1400 Independence Avenue, SW |
| Agriculture | Service | Washington, DC 20250-0201 |

MAY 2 8 2008

Ralph E. Henry, Esq.
Peter J. Brandt, Esq.
Counsel for Californians for Humane Farms
℅ The Humane Society of the United States
2100 L Street, N.W.
Washington, DC 20037

Dear Messrs. Henry and Brandt:

This is in response to your letter dated May 15, 2008, concerning $3 million that the American Egg Board (AEB) set aside to fund consumer education activities. You state that any AEB-funded campaign allowed by its governing legislation would be unlawful if it reached consumers who might ultimately cast a vote on a ballot initiative.

As we stated in our March 14, 2008, letter to you, AEB approved $3 million to be held in reserve to fund consumer education activities concerning current egg production practices. Any State or region representative could submit a proposal to utilize this money. At this time, no requests have been received to utilize the reserve funds and USDA has not approved any expenditures of this money. Once a request is submitted, we will carefully evaluate the project prior to any release of funding to ensure that AEB resources will not be used for the purpose of influencing government policy or action.

We appreciate your interest in this matter.

Sincerely,

Lloyd C. Day
Administrator

# Exhibit 16



The incredible edible egg

# American Egg Board

May 29, 2008

Ralph E. Henry, Esq.
Peter J. Brandt, Esq.
Counsel for Californians for Humane Farms
c/o The Humane Society of the United States
2100 L. Street, NW
Washington, D.C. 20037

Dear Mssrs. Henry and Brandt:

I received your letter dated May 15, 2008, in which you state that the motion passed by the American Egg Board to reserve $3 million for consumer education programs is unlawful.

So far, AEB has not spent any of these funds or even allocated them to any specific projects. The funds are available for use in any state. We received guidance from USDA about the types of projects that AEB can and cannot conduct and will weigh that guidance when evaluating any projects submitted for funding. In addition, USDA must review and approve any proposed projects before any of the $3 million is released.

AEB remains committed to working closely with USDA to ensure that only appropriate activities are carried out with AEB funds.

Sincerely,

Joanne C. Ivy

Joanne C. Ivy, CAE
President & CEO

JCI/ps

# Exhibit 17

# WP

## WORLD POULTRY

**Magazine on Production**
**Processing & Marketing**

No 5 Volume 24 2008



**WPC2008 - Brisbane is the place
to be for poultry specialists**

**Welfare activists
pressure
California egg
industry**



**KellyBronze turkeys
enjoy niche market**

# Cost conundrum - poultry
# nutrition against feed costs


Reed Business
www.WorldPoultry.net

**WP**

**WELFARE**

# Welfare activists pressure California egg industry

**Egg producers in California, once the largest egg production state in the US, are facing a ban on laying cages. The Humane Society of the United States collected over 750,000 signatures to introduce a ballot proposal. Political consultants suggest that egg producers need at least US$10 million to mount an effective "counter campaign".**

By Dr Simon M. Shane, Durham, NC, USA



*Activists continue blaming livestock producers for mal-treating the animals they should be taking care of.*

The Humane Society of the United States (HSUS) has introduced a ballot proposal that would effectively ban laying cages in the state of California. At present, the egg industry in the state is composed of both large integrators and smaller independent farmers with a total of 20 million hens representing 7% of the nation's total of 285 million hens in production.

The HSUS is the largest and most aggressive of the organisations opposed to organised livestock production in the US. The intent of the HSUS is to promote a vegan agenda requiring a ban on all slaughter and consumption of poultry and livestock. The organisation is also opposed to hunting and fishing, display of animals in zoological gardens and the conduct of medical research using animals. The HSUS is not a fringe organisation; it claims 10 million members and most importantly at least 30,000 supporters in each of the US congressional districts. This Society generated over US$200 million in revenue during 2006 and under the aggressive leadership of the Chief Executive, Wayne Pacelle, HSUS is now regarded as the 6th-ranked NGO in the US with about 70% consumer recognition.

## Not the first try

During the past five years the organisation has attempted to introduce laws to ban cages, veal crates and tethered sows in a number of states. These activities have been generally unsuccessful as draft legislation is either rejected by select agricultural committees or legislators. Recognising the obvious obstacles to the traditional route of enacting legislation, HSUS has decided to introduce voter initiatives in states where constitutions allow resolutions to be enacted into law by a simple majority of voters. This direct appeal to the electorate bypassing the formal process of drafting, reviewing, amending and approving laws has a greater potential for success as evidenced by the banning of tethered sows in Florida and Arizona.

The constitution of California currently requires approx. 300,000 signatures to place a ballot before the electorate. HSUS obtained over 750,000 signatures ensuring that their proposal will be considered in November at the time of the national general election.

## US$10 million needed

Recognising the potential impact of passage of the proposal, California egg producers are currently raising funds to oppose the proposition. Political consultants have suggested that at least US$10 million will be required to mount an effective "informational campaign" to convince voters of the desirability of retaining cages. To date, approx. US$3 million has been raised in California with the prospect of an additional US$3 million from the American Egg Board. This organisation receives funds on a check-off basis which, by law, must be expended on research, product development, sales promotion and consumer education. The HSUS has initiated legal action to block the use of AEB funding to oppose their proposition.

In a factual presentation at the Midwest Poultry Federation Convention, Chad Gregory, senior vice president of United Egg Producers (UEP), outlined the issues confronting the industry and the strength of the various organisations, including HSUS, PETA (People for the Ethical Treatment of Animals) and others that are opposed to intensive livestock production in the guise of promoting or improving flock and herd welfare.

## Flock welfare committee

In 1999, in awareness of the growing opposition to caged hens, the UEP organised a scientific committee on flock welfare. This group comprising academics, and independent of the industry, produced a set of welfare standards including cage space for hens, requirements for beak treatment, illumination, ventilation, moulting, transportation and disposal of flocks. Over 80% of the US egg industry is currently conformed to the UEP welfare guidelines, which involve compliance with the standards, requiring at least one on-site audit each year. The approx. 200 companies and farmers participating in the UEP programme may use the UEP welfare logo on

# Bravo Delia Smith!

It's about time someone stood up and stated what Delia Smith, renowned British cook, is reported to have said (World Poultry, No.3, Vol.24) about poverty being more important than animal welfare. Nobody, least of all egg and poultry producers, wants to minimise the importance of welfare in the poultry production process. We've been working on this as long as eggs and chicken have been marketed to urban and other consumers. And when some consumers, but by no means a majority, called for specially produced eggs or birds, the industry was willing to provide them. But the idea was to create added-value products for special markets, not replace efficiently mass-produced eggs and chickens entirely with organic or other niche products.

Nobody likes the term "mass produced" but unfortunately, in industrialised countries, this is the only way we can meet demand for reasonably priced food. But because it is mass produced, it does not necessarily mean that it is produced without regard for animal welfare. Take the case of cage-produced eggs, for example. There is now abundant evidence that eggs produced in modern, well maintained cages are every bit as good as those from barn or free-range conditions. Welfare concerns are based to a large extent on emotion and, in many cases, a minority of consumers can have a disproportionate effect on so-called public opinion. The people Delia Smith was talking about, who have difficulty affording nutritious food, are prepared to buy eggs from birds kept in cages, yet are prevented from doing so in some countries, and the list of such countries is growing.

Voluntary or mandatory codes of practice can ensure that agreed minimum standards are met on farms with cages. Space allowances, feed trough and watering space can all be monitored and, if necessary, audited to assure animal welfare advocates that farmers are maintaining proper standards. Producers are also able to advertise the fact that cage-produced eggs are definitely cleaner and less likely to be contaminated with bacteria than those from barn or free-range production. Wouldn't it be nice to see such claims instead of producers almost having to apologise for keeping the birds in cages?

The same goes for meat chickens and turkeys; keeping them intensively in well-managed, properly ventilated housing makes good economic sense and produces healthy, competitively priced meat for increasingly distant (and often disinterested in production details) consumers. To expect large countries like China and India to provide food for their emerging industrial consumers using barn or free-range systems is absurd. Yes, let's have decent space allocations and management practises (without which, of course, productivity will suffer), but there is no reason for these countries to follow in the footsteps of Europe, with unproven enriched cages, large colony cages, etc. The welfare benefits of these may be apparent to government officials, but to many farmers they are highly artificial and done purely to meet demand from mostly poorly informed pressure groups.

Eggs have suffered the bad reputation provoked by the cholesterol scare (now largely disproved), the Salmonella enteritidis affair (dealt with by concerted industry action, sometimes with government regulations as well) and should now be placed back on the front line of human nutrition as "nature's perfect food". For growing children and teenagers with healthy appetites, and for older people with less inclination to eat, the egg is a wonderful, concentrated food item.

Chicken and turkey meat are among the healthiest available proteins, and are also the cheapest. Let's not deny any consumers, but particularly those at the lower end of the socio-economic scale, access to these formerly luxury foods because somebody, somewhere, thinks they should all be running free along with numerous predators and potential diseases.

For too long, some in our industries have been placed in the position of defending products and production methods. We need a few more "Delia Smiths" to come out and confirm that we are doing the right things. Sure, for those who can afford them, we'll produce expensive free-range, organic, vegetarian, nutritionally enhanced, and other varieties of specialty items. And we'll make more money doing so. But let's also keep in mind that there is nothing wrong with our basic products, regardless of the nay-sayers.

*(Peter Hunton, Cambridge, Ontario, Canada)*



*Chad Gregory, vice president of the UEP, reviewing aspects of welfare in relation to legislative and voter initiatives at the 2008 Midwest Poultry Federation Convention.*

packaging. The marketing value of the UEP welfare-certified designation is questionable. The leading brand of specialty eggs does not display the logo despite the fact that all eggs are produced in conformity with UEP standards. A further indication that the UEP programme is irrelevant among concerned consumers is that many supermarket chains and institutional buyers of eggs are now purchasing supplies of non-confined hens subject to a certification programme administered by a subsidiary of HSUS.

## Budget too little too late

The UEP has recently increased their public relations budget to $1.2 million annually, of which a third will be devoted to state legislative and ballot initiatives. This approach is considered to be too little too late, given the strength of HSUS and the skill of the organisation in shaping public opinion. Given the history of ballot initiatives in California and the fact that the proposition includes veal calves, sows, in addition to caged hens, there is every likelihood that the proposal will pass. If cages are phased out in California the eggs required by a population of 36 million will have to be supplied from states in the Midwest.

Currently, California is a net importer of shell eggs from Ohio, Illinois, Indiana, Missouri and Minnesota. Even with labelling as to origin of the eggs and the housing system used, the majority of consumers will opt for caged eggs based on the considerable differential in price with no obvious nutritional or quality benefit.

If the proposition fails in 2008, HSUS will undoubtedly return in subsequent years with greater pressure on the electorate given their vast financial resources and commitment to a breakthrough in the most populous state in the USA. Passage of the initiative and enactment into law will result in a ballot initiative in the neighbouring state of Colorado and further legislative activity in Arizona, New Hampshire, Connecticut, Vermont, Delaware, Washington and New Jersey. ∎

GREEN GAZETTE

# Which Comes First:
# The Chicken or the Profit?

In an effort to promote the more humane treatment of farm animals, some 800,000 Californians have signed petitions to force a vote this November on a new state law against extreme confinement of chickens, calves, pigs and other farm animals. Similar to laws recently passed in Arizona, Colorado, Florida and



Oregon, the initiative would outlaw confining the animals in cages or crates so small they can't spread their wings or stretch their legs.

Meanwhile, the Humane Society of the United States (HSUS) has reported that the American Egg Board hatched an illegal plan to fight the proposed law with a $3 million so-called "general consumer education" campaign funded by mandatory fees collected from egg producers, also known as commodity checkoff "taxes." By law, these funds—more than $20 million a year for the egg industry—can only be used for research, education and marketing. Political activities including attempts to influence legislation are explic-

itly forbidden. The U.S. Department of Agriculture (USDA) is supposed to provide oversight on the use of these funds, yet HSUS has released documents showing that the USDA is not doing its job. The documents provide a perfect example of how powerful vested interests can abuse the controversial checkoff programs.

"By law, The Egg Board is not allowed to engage in any kind of lobbying activity whatsoever," says Paul Shapiro, senior director of HSUS's Factory Farm Campaign. HSUS is threatening to sue the Egg Board the minute it begins spending to oppose California's proposed Prevention of Farm Animal Cruelty Act.

If the Egg Board really wants to increase sales, it might want to quit squawking and support the California initiative. Eliminating crowded cages nationwide would increase the cost of eggs by only a dime a dozen, an egg industry economist reported in 2005. That's a price many would gladly pay for more humanely produced eggs.

We've posted the correspondence between HSUS, the USDA and the Egg Board at *www.MotherEarthNews.com/ Humane-Farming.com*. To learn more about California's campaign to require more humane treatment of farm animals, go to *www.human-ecalifornia.org*.
— *George DeVault*

ISTOCKPHOTO/ALEX SLOBODKIN

# Get this Gardening Guide!

At the age of 68, Thomas Jefferson famously wrote: "Though an old man, I am but a young gardener." When it comes to lifelong learning activities, few can compare with gardening, where the lessons are often separated by seasons, if not years.

Reading Barbara Damrosch's newly updated book, *The Garden Primer*, it's clear that there are several lifetimes of gardening know-how packed between its covers.



That feeling is conveyed in part by the book's heft—it's 820 pages—but more importantly by the quality and scope of its information. If you're looking for a single comprehensive gardening book, you can't do better than *The Garden Primer*.

Damrosch is one of America's best-known garden writers and the better half of organic/ four-season farming guru Eliot Coleman. Their 17 years of farming together have enriched the book's updated information on edibles. Together, they're the "Brangelina" of the organic gardening world.

While certainly informed by this shared life experience, the book stands on its own as the master work of a gardener who has been learning and recording her lessons as she goes. We may not all be able to live as many gardening lives as Damrosch has, but thanks to her book, we don't have to.

— *Roger Doiron*

# Singin' 'bout Sustainability

An inventive new twist to the greening of our future, *This Green Planet*, by Hayes Greenfield, is a playful, jazzy collection of children's music that will appeal to audiences of all ages, using eclectic instrumentation and eco-friendly lyrics.

The album, released this past Earth Day, includes a refreshing look at some of our favorite children's songs. Greenfield, a New York saxophonist, breathes new life into this collection of tunes. His solo sax introduces a new version of "She'll Be Comin' 'Round the Mountain." Verse two becomes "We'll be cruisin' in our hybrid when she comes."



Each song, based on traditional children's tunes, touches on themes of renewable energy, recycling, ecology and more.

The disc holds up to its name; stylistically transporting the listener to Brazil, New Orleans, the Caribbean and more—all without the use of fossil fuels. Plus, the disc was packaged using vegetable and soy-based ink as well as recycled paper.

Like a master weaver, Greenfield fuses jazz and kids' music, children's voices and established musicians throughout the recording in a way that is pleasantly cohesive. Visit *www.musicforagreenplanet. com* to read more about the album and its musicians.

— *Will Kahn*

# Exhibit 18

John Baker
Giving Nature Foods, Inc.
16 South State St.
Newtown, Pa. 18940

June 17, 2008

Joanne Ivy, President
American Egg Board
1460 Renaissance Drive
Park Ridge, IL  60068

**Re:  Egg Board Spending to Defeat Ballot Initiative Promoting Improvements to Animal Welfare in Egg Farming Operations**

Dear Ms. Ivy,

I am a co-owner and operator of Giving Nature Foods in Newton, Pennsylvania.  Giving Nature Foods primarily produces cage free eggs,organic eggs and organic milk under contract with Pennsylvania farmers and processors , in addition to other products.  Those farmers and processors are members of the American Egg Board for many years, specifically Heritage Poultry Management Service, owned and operated by Mel Gehman and Chris Pierce and Lehman's Egg Service, Greencastle Pa..  Because of the size of our egg production operation (over 300,000 laying hens), Giving Nature is required to pay the Board federal check-off funds based upon the number of cases of eggs we sell through the two entities mentioned above.

I am writing to you because I have recently learned that the Egg Board intends to spend at least $3 million of its check-off funds, including funds collected from Giving Nature Foods via the aforementioned entities, in order to defeat a California ballot measure that would require egg producers to adopt additional animal welfare standards to permit laying hens in their operations to fully turn around and spread their wings.  I read an article in the December issue of Egg Industry magazine, which is entitled "AEB Supports California Egg Battle" and is available on the magazine's website, that indicates that the Board has approved spending $3 million in California to fight the animal welfare measure. .

A sponsor of the animal welfare ballot measure, the Humane Society of the United States, has indicated that this plan to spend producer funds to influence an election is illegal. That does not surprise me.  How can a *government-affiliated* entity like the American Egg Board spend *government-mandated* producer assessment funds to convince citizens to vote for or against a proposed law?  Basically, the Board is taking money that Giving Nature Foods was required to pay to the Board under federal law for the promotion of egg production in general, and using it to influence the public to take a position that is

contrary to Giving Nature Foods' production philosophy and may cause financial harm to our company.

All of Giving Nature Foods' layer hens live in a cage-free environment, roaming freely in barns. Because Giving Nature Foods is committed to high standards of animal welfare, it is greatly upsetting that the Egg Board is undertaking an expensive effort to convince the public that state laws providing for minimal increases in animal welfare standards in conventional egg production operations are inappropriate. Basically, the Board is telling the public that egg production methods that are less restrictive to laying hens offer no benefits to the animals' welfare. This undermines the very principles on which Giving Nature Foods was founded and improperly devalues our production practices, which may drive consumers away from purchasing eggs from farms, like Giving Nature Foods, that have invested in more humane farming practices.

In addition, I do not believe that any entity that is a part of, or affiliated with, the federal government should be allowed to undertake a campaign in order to sway the votes of the citizens of a particular state regarding proposed state laws. That is entirely un-democratic. Giving Nature Foods does not have a choice whether to give federal check-off funds to the Board, nor do we get to decide how those funds are spent. The Board should abide by the law and should not use any producer's money for political purposes.

The American Egg Board's opposition to the California animal welfare legislation would align the Board against my political and economic interests, and would tend to marginalize the humane method of egg production at Giving Nature Foods. Our production operation incorporates excellent animal welfare practices and exceeds the welfare standards conventional production practices. It would be unethical and irresponsible of the Egg Board to spend Giving Nature Foods' or any other producer's funds to defeat a law designed to marginally increase required animal welfare standards.

I am asking you not to use any federal check-off funds to advocate a position against the animal welfare ballot measure in California's 2008 election, or any similar measure in any other election. Doing so would essentially force Giving Nature Foods to advocate a political position it does not support.

I would appreciate it if you would write back to me to assure me that you will not use any producer funds to influence any state law efforts relating to laying hen confinement or welfare in the upcoming elections.

Thank you for considering my thoughts on this matter.

Sincerely,

John R. Baker
President,
Giving Nature Foods, Inc.

# Exhibit 19

EARL BLUMENAUER
THIRD DISTRICT, OREGON

COMMITTEE ON WAYS AND MEANS

SUBCOMMITTEES:
TRADE
SELECT REVENUE MEASURES

COMMITTEE ON BUDGET

WASHINGTON OFFICE:
2267 RAYBURN BUILDING
WASHINGTON, DC 20515
(202) 225-4811
FAX: (202) 225-8941

DISTRICT OFFICE:
729 N.E. OREGON STREET
SUITE 115
PORTLAND, OR 97232
(503) 231-2300
FAX: (503) 230-5413

website: blumenauer.house.gov



# Congress of the United States
## House of Representatives
### Washington, DC 20515-3703

July 23, 2008

Secretary Ed Schafer
United States Department of Agriculture
1400 Independence Avenue, SW
Washington, DC 20250

Dear Secretary Schafer,

We are writing today to express concern over the Department of Agriculture's (USDA) approval of the expenditure of $3 million by the American Egg Board to influence California citizens to vote against a state ballot initiative. The ballot initiative at issue is entitled the Prevention of Farm Animal Cruelty Act, and has been approved by the California Secretary of State for the upcoming 2008 election.

As you know, the American Egg Board (AEB) is a federal commodity promotion program that receives legislatively mandated check-off funds from egg producers under the Egg Research and Consumer Information Act (ERCIA). As a federal commodity promotion program, the AEB is strictly prohibited from using its funds for political purposes, including for the purpose of influencing voters in an election.

In November 2007, the AEB unanimously approved a motion to reserve $3 million to combat the ballot initiative. Communications between USDA and AEB officers, provided to us by Californians for Humane Farms (CHF), the sponsor of the initiative, clearly indicate that the funds set aside by this motion are intended to be used to defeat the ballot initiative. In fact, internal USDA communications, also provided by CHF indicate that some members of the agency, including staff members of the USDA's Agricultural Marketing Service charged with overseeing the AEB's budget and activities, are aware of the political purpose for which the motion was approved. By example, agency staff members have stated that the AEB check-off funds are intended to be used to "supplement" current efforts "to defeat the measure." Copies of these communications are attached hereto.

The ERCIA requires that the AEB submit an annual budget to the USDA each year for approval, and no AEB activities using federal check-off funds may be undertaken without prior USDA approval (7 U.S.C. § 2707(c), (d)). Further, it is the duty of the Secretary of Agriculture in approving or rejecting the AEB's annual budgets, and any revisions thereto,

to enforce the prohibition on political spending. Yet, despite the apparent intentions of the AEB to use $3 million for the purpose of defeating the ballot initiative, the USDA approved a revised 2008 budget including this expenditure as a "special project" at the beginning of this year.

Congress has specifically prohibited commodity promotion programs from using check-off funds to promote such activities. The ERCIA (P.L. 93-428), under which the AEB was chartered, explicitly proscribes any use of AEB check-off funds "for the purpose of influencing governmental policy or action" 7 U.S.C. § 2707(h). Moreover, in 1996, Congress applied similarly broad prohibitions on political activity to all commodity promotion programs through the Commodity Promotion, Research, and Information Act (P.L. 104-127), which proscribes any use of check-off funds "for the purpose of influencing any legislation or governmental action or policy" 7 U.S.C. § 7414(d).

In its Guidelines for Oversight of Research and Promotion Boards, the Agricultural Marketing Service has defined "influencing governmental policy or action" as including any action intended to "affect the outcome of proposed policy or regulation," and defined "influencing legislation" as including "any attempt to affect the opinions of the general public or any segment thereof concerning legislation." It is clear that when it passed the motion to reserve $3 million of its annual budget for a special project related to animal welfare, the AEB intended that this money be used for the purpose of affecting the opinions of voters concerning the Prevention of Farm Animal Cruelty Act, and thereby ultimately defeating the ballot initiative.

We are also concerned that AEB's campaign to defeat the ballot initiative appears to include direct assistance to egg industry trade groups opposed to the measure. The communications between USDA and AEB officers previously cited specifically include a reference to a request from the United Egg Producers concerning "what they can say on their billboards" that they plan to produce using the AEB check-off funds. The USDA's oversight of the AEB includes the duty to prevent such collusion between the AEB and any private entity, to ensure that federal check-off funds are not used to influence legislation or other governmental policy. The ERCIA prohibits the AEB from allowing third-party use of federal check-off funds unless the use is consistent with statutory limitations on the AEB's use of the funds, and the third-party use of the funds is first subject to the approval of the USDA 7 U.S.C. § 2707(g).

Commodity promotion programs are not industry trade groups; they are quasi-governmental bodies created by the Congress to promote the marketability of certain commodities. As such, these entities may not attempt to influence the outcome of proposed legislation, even if the legislation will affect the industry they serve. No federal check-off funds given to these programs by statutory mandate are permitted to be used for the purpose of influencing governmental policy or action, including affecting citizen votes on state-approved ballot initiatives, whether used directly by the commodity promotion program itself or by third-party industry groups.

For these reasons, we believe it is incumbent upon the USDA to rescind its approval of the revision to the AEB's 2008 budget that included provision for the expenditure of the $3 million approved by the AEB's November 2007 motion.

Thank you for your consideration of this matter of utmost importance. If we can be of any assistance to you or your administrators and staff, please do not hesitate to contact us.

Sincerely,

Earl Blumenauer
Member of Congress


Cc:

Michael B. Mukasey
Attorney General of the United States

# Exhibit 20

-----Original Message-----
From: Ed@usda.GOV [mailto:Ed@usda.GOV]
Sent: Friday, August 08, 2008 10:28 AM
To: Wayne Pacelle
Cc: Cherri.Carpenter@usda.gov
Subject: EGG BOARD

Hi Wayne. Sorry to take so long to get back to you.  We've had our
lawyers---way too many of them---all over this issue too and have come
to the conclusion that the Egg Board's expenditures are proper.  I'm
sorry that doesn't match with your group and I realize that you might
initiate legal action but that is the conclusion we came to.  Do you
think if you sue it will give ammo to those opposing your initiative
measure to say that you are being unfair by not allowing those who
think differently to express their opinions too?  As you know, the
public charges back and forth can get crazy.  I also have approved some
ads that are generic saying buying local gets you better eggs.  We
changed a bunch of copy, again to make sure we are following the intent
of the law, and the final product in well within the boundaries set by
Congress. I can get you copies of the text if you want to see the ads
before they get into the marketplace. I'm in Delaware today for long
weekend on the beach with my sweetie and looking for a  couple lazy
days.  Hope you have a great weekend too.  E

P.S. We are plugging through the process with the Downer Rule.  After
some public comment we still have some worry about a lawsuit so we
don't want to rush into a final rule.  In the meanwhile, we've asked
the industry to adhere to a voluntary ban and I think they have pretty
much signed on to that.

-----

# Exhibit 21

 **United Egg Producers**

UEP Headquarters
1720 Windward Concourse • Suite 230 • Alpharetta, Georgia 30005
(770) 360-9220 • Fax (770) 360-7058



**UEP Officers**
Gary West, Chairman
Gene Gregory, President
Dolph Baker, Past Chairman
Bob Krouse, First Vice Chairman
David Lathem, Second Vice Chairman
Mark Oldenkamp, Treasurer
Craig Willardson, Secretary

**UEP Staff**
Gene Gregory
President

Chad Gregory
Sr. Vice President

Linda Reickard
Vice President

Sherry Shedd
Vice President of Finance

Mike McGriff
Member Services Director

Kevin Haley
UEP General Council

**Washington Office**
Howard Magwire
Vice President of
Government Relations

Michael McLeod, Esq.
Washington Counsel

Randy Green
Sr. Government Relations Rep.



Official U.S. Council Representative

July 15, 2008

**"Treatment of Farm Animal Statute"**
**Proposition # 2**
**California Ballot Initiative Update**

Dear UEP and UEA Members:

Over the past few weeks I have traveled to California many times in preparation for our campaign to counter the ballot initiative being pushed by HSUS. I've had the opportunity to meet many of the members of the professional team that Mitch Head and Chris Myles of GolinHarris have assembled to represent egg farmers in California and the nation. Each team member understands that this is an issue of national interest to not only egg farmers across the country but animal agriculture in total.

Speaking for both UEP Chairman Gary West and myself, we are highly impressed with the professional team and have grown more confident that we can **WIN** this battle. We have found each team member to be passionate about this issue and willing to work hard for a **VICTORY**.

This team of professional people and firms along with a GolinHarris staff of about 15 people bring years of experience in the following areas:

- Political campaigns
- Coalition building
- Lobbying and legal
- Ballot initiatives
- Advertising
- Opposition research
- Government Relations
- Consumer polling
- Internet and grassroots communications
- Public relations

We also must acknowledge the time and effort put forth by Debbie Murdock with PEPA and the Steering Committee members of California egg farmers.

**Washington Offices**
UEP Government Relations
One Massachusetts Avenue, NW, Suite 800
Washington, D.C. 20001
(202) 842-2345 • Fax (202) 408-7763

**UEP Iowa Office**
Box 170
Eldridge, IA 52748
(563) 285-9100 • Fax (563)285-9109

Page Two
July 15, 2008

For the past few weeks we have been involved in preparation for launching our campaign and putting all the pieces together. Among the many things we have been doing are the following:

- Conducting economic studies and consumer polling
- Creating the www.safecaliforniafood.org website.
- Building coalitions among many groups and individuals.
- Presented egg farmers' position before the Legislative Analysis Office and followed up by presenting arguments in opposition to the ballot initiative to the office of the Secretary of State.
- Testing and formalizing key messages for the voters.
- Planning campaign strategies and budgets.

There was very little value in spending time and money educating voters until the Secretary of State had assigned a proposition number. The number was only recently assigned and now the campaign will begin to inform voters of reasons to vote NO on Proposition # 2.

The real key question is – can we raise enough money to run a successful campaign? As you well know, money and politics go together and this is a political campaign. UEP is raising money in all states other than California. The Pacific Egg & Poultry Association is responsible for raising money in California and doing a good job.

You will find a list of egg farmers, allied companies and associates that have thus far made contributions to United Egg Producers for the Public Awareness Project. Some companies have made commitments but the check is not yet in the bank and therefore not on the current list. The list does not include California companies.

If you have made the commitment and not sent your check – do so today. If you have not made a commitment, please do so as quickly as possible. We are currently approximately $3 million short of our goal.

We appreciate your support. We know you are counting on us to win this battle. Be assured you that your team will do everything possible to honor your trust.

Sincerely,

Gene W. Gregory
President
Attachment

GWG/pb

## Egg Farmers Support California Campaign

| | | |
|---|---|---|
| American Egg Products | Benton County Foods | Berne Hi-Way Hatchery |
| Cal-Maine Foods | Carroll Country Fair Farms | Charles, James H. |
| Coffee Street Acres | Colorado Eggs | Country Charm Egg |
| Creighton Brothers | Crystal Farms | Delta Eggs |
| Dixie Egg Company | Dooyema & Sons | Dutchland Farms |
| E & W Poultry | Esbenshade Enterprises | Farm Crest Foods |
| Fassio Egg Farm | Feather Crest Farms | Fort Recovery Equity |
| Fremont Farms of IA. | Gehman Feed Mill | Gerber Feed |
| Giroux Poultry | Golden Oval Eggs | Green Valley Poultry |
| Hemmelgarn & Sons | Henningsen Foods | Heritage PMS |
| Herbruck's Poultry Ranch | Hertzfeld Poultry Farm | Hickman's Egg Ranch |
| Hidden Springs Farm | Hillside Poultry Farm | ISE America |
| J & A Farms (Amon Baer) | King, Elmer | Kriefer Poultry Farm |
| Kreher's Poultry Farm | LC Browns | L & R Farms |
| Ledge Farms | M.C. Anderson Pullets | Martin, Steve |
| Maxim Production | Michael Foods | Midwest Poultry Services |
| Minnich Poultry Farm | Moark, LLC | Morning Fresh Farms |
| Mountain Hollow Egg Farms | Moyer, Joe | National Foods Corp. |
| Nature's Best Egg Co. | Nebraska Egg | Nelson Poultry Farm |
| Oakdell Egg Farms | Parker & Reichman | Pilgrim's Pride |
| Pine Creek Poultry | Post, Gary | Poultryville |
| Powl Associates | Puglisi Egg Farm | Rigtrup Poultry |
| Rindler Poultry | Ritewood, Inc. | Riverview Farms |
| Rose Acre Farms | S & R Egg Farm | Sauder, R.W. |
| Shepherd & Sons | Simpson's Eggs | Sperry Farms |
| Stiebrs Farms | Sunrise Acres | Tampa Farm Service |
| Thomas Poultry Farm | Valley Fresh (Briarwood) | Valley Fresh (Skylane) |
| Wabash Valley Produce | Wayne County Egg Farm | Weaver Brothers |
| Wenning Poultry | Wilcox Farms | Williamette Egg Farms |
| Yeiter & Sons | | |

## Allied Companies Support California Campaign

| | | |
|---|---|---|
| American Poultry Services | Big Dutchman | Centurion Poultry |
| CEVA Biomune | Chore-Time Equipment | Diamond Systems |
| Dolco Packaging | Egg Clearinghouse, Inc. | Evonik Dugussa Corp. |
| Facco USA | Falcon Packaging | Fort Dodge Animal Health |
| Hartmann USA | Henning Construction | Hy-Line North America |
| Interplast | Kuhl Corporation | Lubing Systems |
| Moba USA | Moore Stephens Frost CPA | Pactiv Corp. |
| Palomar Insurance Co. | Poultry Management Systems | Sanovo Engineering |
| Swanson Packaging | Urner Barry | |

## Association Support or Pledges

| | |
|---|---|
| American Egg Board | Burnbrae Farms |
| Canadian Egg Marketing Agency | U.S. Poultry & Egg Association |

# Exhibit 22

# fax

| | | | | |
|---|---|---|---|---|
| *Subject:* | Guidelines for Materials Funded by AEB | | | |
| *cc:* | | | | |
| *Date:* | December 19, 2007 | | | |

| | | | |
|---|---|---|---|
| *To:* | Joanne Ivy | *From:* | Angie Snyder |
| *Phone Number:* | (847) 296-7043 | *Phone Number:* | (254) 680-4555 |
| *Fax Number:* | (847) 29607007 | *Fax Number:* | (254) 680-7555 |

*Comments:*

Joanne:

You asked for some guidance for California and other States utilizing American Egg Board (AEB) funding to promote animal agriculture. Attached are a couple of pages. One is an excerpt from AMS' Guidelines for Oversight of Research and Promotion Boards. The second, titled "Activities Funded by Checkoff Dollars," expands on those guidelines by providing some examples.

The thrust of both is that anything AEB funds must be factual, must not attempt to influence legislation or voting, must not attempt to affect the opinions of the public concerning legislation, and must not attempt to affect the outcome of proposed legislation.

In short, any materials funded by AEB should stick to the facts about egg production, animal care, etc. They should not reference the ballot initiative and cannot be perceived as attempting to sway opinion. In other words, AEB-funded materials should be strictly educational about agriculture, not about proposed legislation.

I hope that sheds some additional light on this matter. If you have other questions, please let me know. I look forward to reviewing the materials.

If you need to reach me after today, please use my cell phone: (202) 680-3714. I'll be monitoring my e-mail as well.

Angie

**From AMS Guidelines for Oversight of Research and Promotion Boards:**

V.    Influencing Legislation and/or Government Policy.

In the process of monitoring board activities, it is important for AMS to be aware of any actions which may be in conflict with the legislative prohibitions regarding influencing legislative and/or government policy. This prohibition on the use of checkoff funds applies equally to any trade/producer organizations funded wholly or in part by a particular board or contractors to the boards. However, this does not affect a trade/producer organization's ability to lobby with noncheckoff funds. Likewise, there are no restrictions on individual board members, except when acting in an official capacity for the board. The following definitions serve as a guide for commodity divisions.

A.    "Influencing of legislation" is defined as:

1.    Any attempt to influence any legislation or any attempt to affect the opinions of the general public or any segment thereof concerning legislation; or

2.    Any attempt to influence any legislation through communication with any member or employee of a legislative body or with any government official who may participate in the formulation of legislation.

B.    "Influencing of governmental policy or action" is defined as any action the principal purpose of which is to bring about a change in existing policy or regulation or affect the outcome of proposed policy or regulation, except those actions which are specifically provided for in the act, order, and/or rules and regulations.

C.    These prohibitions do not preclude commodity boards from providing factual information to government officials, provided the information is presented in an unbiased manner and does not state a specific course of action.

# ACTIVITIES FUNDED BY CHECKOFF DOLLARS

Legislation governing research and promotion boards prohibits checkoff funds to be used for influencing legislation and/or Federal, State, or local government action or policy. The USDA Agricultural Marketing Service (AMS) has addressed this issue in its guidelines for oversight of research and promotion boards.

## EXAMPLES OF ACTIVITIES INVOLVING GOVERNMENT POLICY OR ACTION

| ALLOWED ACTIVITIES | PROHIBITED ACTIVITIES |
|---|---|
| Recommending changes to regulations governing the research and promotion program | Attempting to influence any legislation |
| | Attempting to affect the opinions of the public or segment of it concerning legislation |
| Providing factual information to Federal, State, or local government officials, but must be unbiased and may not state a specific course of action | Attempting to influence any legislation by communicating with a member or employee of a Federal, State, or local legislative body |
| Providing results of studies to Federal, State, or local government officials, provided no course of action is stated | Attempting to influence a Federal, State, or local government official who may participate in the formulation of legislation or government action or policy |
| | Taking any action to bring about a change in existing policy or regulation (other than as allowed in the act, order, and regulations) |
| | Taking any action to affect the outcome of proposed policy or regulation (other than as allowed in the act, order, and regulations) |

## ENTITIES SUBJECT TO RESTRICTIONS ON INFLUENCING LEGISLATION AND/OR GOVERNMENT POLICY

| | |
|---|---|
| Checkoff boards | Restrictions apply |
| Board members and alternates | No restrictions on individuals, except when acting in an official capacity for the board |
| Board staff/individuals paid by the board | Restrictions apply |
| Trade/producer organizations funded wholly or in part by the board or board contractor(s) | Restrictions apply unless non-checkoff funds are used |
| Contractors, organizations, and other groups | No restrictions unless using checkoff funds |