UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIANS FOR HUMANE FARMS, | No. C 08-03843 MHP |
| Plaintiff, | |
| v. | **MEMORANDUM & ORDER** |
| ED SCHAFER, Secretary, United States Department of Agriculture | **Re: Plaintiff's Motion for a Preliminary Injunction** |
| Defendant. | |

     On August 12, 2008, plaintiff Californians for Humane Farms ("CHF" or "plaintiff") brought this action against defendant Ed Schafer, the United States Secretary of Agriculture ("the Secretary" or "defendant"), asserting a violation of the Administrative Procedure Act, 5 U.S.C., section 706. Now before the court is plaintiff's motion for a preliminary injunction. Having considered the parties' arguments and for the reasons stated below, the court enters the following memorandum and order.

BACKGROUND

I.     The Ballot Initiative

     Plaintiff CHF is a non-profit ballot committee, established for the purpose of sponsoring a California ballot initiative in the November 4, 2008, election. CHF was formed and is supported by the Humane Society of the United States, Farm Sanctuary, and other groups and individuals. Amended Complaint ¶ 4. The ballot initiative, Proposition 2, is entitled the "Prevention of Farm Animal Cruelty Act" ("Prop 2"). If approved by the voters of California, Prop 2 would prohibit,

effective January 1, 2015, the tethering or confinement of egg-laying hens and certain other farm animals in a manner that prevents such animals from lying down, standing up, fully extending their limbs, or turning around freely. Id. ¶ 5. Some 4,000 Californians volunteered thousands of hours between October 2007 and February 2008 to help collect the 800,000 voter signatures that put Prop 2 on the ballot. Fearing Dec. ¶ 4. As of June 30, 2008, CHF had spent about $839,000 on its "Yes on Prop 2" campaign. Id. As of August 14, 2008, the "Yes on Prop 2" campaign had collected just over $4.4 million in donations, while opponents of Prop 2 had raised about $2.1 million dollars. Id. ¶ 11 & 12.

II.     The American Egg Board

Defendant is the United States Secretary of Agriculture. Among his many duties, the Secretary is responsible for implementing the 1974 Egg Research and Consumer Information Act ("the ERCIA") and the 1996 Commodity Promotion, Research and Information ACT ("the CPRIA"). Such implementation includes approval of the American Egg Board's ("the Egg Board's") annual budget and expenditures. The Secretary controls the activities and expenditures of the Egg Board that are at issue in this case. Docket Entry 18 (Joint Stipulation) ¶ 7.

In creating the Egg Board, the ERCIA provided for "a continuous coordinated program of research, consumer and producer education, and promotion designed to strengthen the egg industry's position in the marketplace, and maintain and expand foreign and domestic markets . . . ." 7 U.S.C. § 2701. The Egg Board is one of 19 national commodity research and promotion programs ("commodity boards"). Congress has created commodity boards to promote beef, lamb, pork, dairy, peanuts, avocados, popcorn, mangos, and honey, among other agricultural products. The purpose of these boards, including the Egg Board, is to expand the markets for their respective commodities, as well as to conduct research. Promotions sponsored by commodity boards are responsible for such iconic cultural slogans as "The Incredible, Edible Egg," "Got Milk?" and "Beef. It's What's for Dinner Tonight." The Egg Board consists of 18 members and an equivalent number of alternates, all of whom are egg producers nominated by regional egg industry organizations and appointed by the

1  Secretary. Amended Complaint ¶ 10. The Egg Board's total projected expenditures for 2008 are
2  approximately $26 million. Pl.'s Exh. 7 (revised 2008 Egg Board budget).

3  Congress designed the Egg Board and the other commodity boards to overcome the
4  collective action problem inherent in an industry comprising many producers. See 7 U.S.C. § 2701
5  (congressional findings and declaration of policy). In such an industry, there is no incentive for any
6  one producer, who has but a small share of the market, to spend money advertising for a generic
7  commodity like eggs or beef, because its competitors could "free ride" on those advertisements. A
8  federally-created commodity board solves the free rider problem by establishing an entity, funded
9  through a mandatory assessment mechanism, which works to promote the generic commodity. The
10 Egg Board is funded by a mandatory assessment on producers with more than 75,000 egg-laying
11 hens; the funds collected through such an assessment are called federal "check-off" funds. See
12 Amended Complaint ¶ 10.

13 The scope of a federally-funded commodity board's permitted activities is substantially
14 narrower than that of a private industry trade organization in which participation and contributions
15 are voluntary. Unlike a private industry trade organization, a federal commodity board cannot act as
16 a lobbyist. The ERCIA provides that the Egg Board's powers and duties "shall include *only*" the
17 authority to administer national research and promotion orders issued by the Secretary of
18 Agriculture pursuant to ERCIA, make rules for industry members to effectuate the terms of the
19 orders, investigate and report to the Secretary any violations of the orders, and recommend to the
20 Secretary appropriate amendments to the orders. 7 U.S.C. § 2707(a) (emphasis added). Egg Board
21 expenditures must be approved by the Secretary. See id. § 2707(d). In addition to the limitation on
22 the types of activities the Egg Board may undertake, Congress included a provision explicitly
23 prohibiting the use of the federal check-off funds for political purposes: "[N]o funds collected by
24 the Egg Board under the order shall in any manner be used for the purpose of influencing
25 governmental policy or action, except [for recommending to the Secretary amendments to an
26 order]." 7 U.S.C. § 2707(h). In 1996, Congress passed the CPRIA, which applies to commodity
27 promotion boards for which the Secretary issues national research and promotion orders. Like the
28 ERCIA, the CPRIA includes a limitation on political activity:

3

> A board may not engage in, and shall prohibit the employees and agents of the board from engaging in[,] using funds collected by the board under the order, any action undertaken for the purpose of influencing any legislation or governmental action or policy other than recommending to the Secretary amendments to the order.

7 U.S.C. § 7414(d)(2).

III. <u>The Challenged Egg Board Advertising Campaign</u>

On November 1, 2007, the Egg Board held an executive committee meeting in California during which it unanimously passed a motion to set aside $3 million "to be held in reserve for a consumer education campaign to educate consumers about current production practices." Pl.'s Exh. 4 (Meeting Minutes) at 3. The trade publication "Egg Industry" reported on the motion in its December 1, 2007, issue, in an article entitled "AEB Supports California Egg Battle." The article states, in part:

> The American Egg Board unanimously passed a motion at its recent fall meeting in California that $3 million be held in reserve to assist the state if necessary in the industry's current battle with animal activists. Animal welfare groups are attempting to place a referendum on the November 2008 ballot that would eliminate cage production in California.

Pl.'s Exh. 5 (Dec. 2007 "Egg Industry" article) at 6.

News of the motion was also circulated within the Department of Agriculture (USDA). On November 5, 2007, Rex A. Barnes, Deputy Administrator for Poultry Programs reported to Lloyd C. Day, Administrator of the Agricultural Marketing Service:

> In November 2008, California voters will consider a ballot initiative that threatens the California egg industry and jeopardizes the U.S. Egg Industry as a whole . . . . California egg producers are undertaking a campaign to defeat the measure. To supplement these efforts, the American Egg Board voted at its November 2, 2007, meeting to set aside $3 million to fund public relations and other projects to educate consumers about current agriculture practices.

Pl.'s Exh. 6. ("Weekly Activity Report") at 3.

According the minutes of the November 1, 2007, Egg Board meeting, Rex Barnes and another USDA official, Angie Snyder, had been present at the meeting. Meeting Minutes at 1.

Sometime after passing the motion, the Egg Board submitted a revised 2008 annual budget to the USDA for approval. The revised budget, dated 1/15/2008, contained a new $3 million line item for a "special project," entitled "consumer animal welfare ed. campaign." Pl.'s Exh. 7 (revised 2008 Egg Board budget). The total "special projects" budget in the revised 2008 budget was

4

approximately $3.7 million. Id. The revised budget was approved by the Secretary on or before January 15, 2008. Amended Complaint ¶ 42.

Upon learning of the Egg Board's plans, CHF wrote both the Egg Board and the USDA on March 6, 2008, to protest what it viewed to be a plan to impermissibly use federal check-off funds to oppose Prop 2. An exchange of letters ensued in which CHF maintained, while the Egg Board and USDA denied, that the $3 million was related to efforts to oppose Prop 2. On August 8, 2008, Secretary Schafer wrote an email to Humane Society President Wayne Pacelle stating, in part:

> We've had our lawyers—way too many of them—all over this issue too and have come to the conclusion that the Egg Board's expenditures are proper. . . . Do you think if you sue it will give ammo to those opposing your initiative measure to say that you are being unfair by not allowing those who think differently to express their opinions too? . . . We changed a bunch of copy, again to make sure we are following the intent of the law, and the final product in [sic] well within the boundaries set by Congress. . . .

Pl.'s Exh. 20 (Schafer Email).

CHF soon thereafter brought this action.

Counsel for the Secretary have filed examples of the Egg Board advertisements at issue, which the Egg Board created using federal check-off funds. See Docket Entry 22 (Barnes Dec.). The challenged Egg Board campaign's central theme is the advantageousness of locally-grown eggs. The advertisements aim to remind viewers that "Local eggs are fresh and affordable" and "If you want fresh eggs, you want them locally grown." See Barnes Dec. The narrator of at least one advertisement is identified as a farmer named Ryan Armstrong. Id. at 5 ("A FARMER, RYAN ARMSTRONG, ADDRESSES THE CAMERA. . . ."). There has been no allegation that the challenged Egg Board advertisements have aired in California as of yet.

IV.   "No on Prop 2" Materials

Like supporters of Prop 2, opponents of the ballot measure are currently struggling for the hearts and minds of California voters. The "Californians for SAFE Food: No on Prop 2" website, located at http://www.safecaliforniafood.org/ (last visited Sept. 15, 2008) ("No on Prop 2" Website), claims the support of a coalition of hundreds of entities and individuals, including major business groups, labor unions, state legislators, and food safety experts.[1] This website was created with the

5

1  support of the United Egg Producers, based in Georgia.  Pf.'s Ex. 21 (July 15, 2008, United Egg
2  Producers letter) at 2.  On its homepage, the coalition writes, "WHY OPPOSE PROPOSITION 2?"
3  Two of the six listed answers to this question are: "Eliminates fresh, safe and local eggs; forces a
4  dependence on eggs from Mexico and out-of-state" and "Drives up consumer prices and costs."
5  "Californians for SAFE Food" expresses its support for "<u>S</u>AFE, <u>A</u>FFORDABLE and <u>F</u>RESH
6  EGGS."  <u>See</u> "Proposition 2: The UN-SAFE Food Initiative Fact Sheet," <u>available at</u>
7  http://www.safecaliforniafood.org/node/9 (last visited Sept. 15, 2008) (underlining in original).  <u>See</u>
8  <u>also</u> Meadow Dec., Att. B (other examples of Californians for SAFE Foods materials).  Among
9  featured opponents of Prop 2 has been Ryan Armstrong of Armstrong Farms.  Mr. Armstrong has
10 appeared in at least two Californians for Safe Food press releases and testified as a "Proposition 2
11 Opponent" during at least one joint informational hearing of the Senate and Assembly Committees
12 on Agriculture.  <u>See</u> Meadow Dec., Att. B at 9-10, 13-4, Att. C.

14 V.    <u>Procedural History</u>
15        CHF filed this lawsuit against the Secretary and the Egg Board on August 12, 2008.  On
16 August 18, CHF filed a motion for a temporary restraining order or, in the alternative, a preliminary
17 injunction.  The Secretary and the Egg Board thereafter stipulated that they would not engage in any
18 expenditures or disbursements of the Egg Board's 2008 budget for projects targeted at California
19 while the motion was pending, so that the parties could have time to brief and argue the preliminary
20 injunction motion.  <u>See</u> Joint Stipulation ¶ 2.  The parties also stipulated that the Egg Board would
21 be removed as a named defendant.  <u>Id.</u> ¶ 7.  On August 21, 2008, CHF filed an amended complaint.
22 The court entertained oral argument on the preliminary injunction motion on September 22, 2008.

24 LEGAL STANDARD
25        "A preliminary injunction is a provisional remedy, the purpose of which is to preserve status
26 quo and to prevent irreparable loss of rights prior to final disposition of the litigation."  <u>Napa Valley</u>
27 <u>Publ'g Co. v. City of Calistoga</u>, 225 F.Supp.2d 1176, 1180 (N.D.Cal.2002) (Chen, Mag. J.), <u>citing</u>
28 <u>Sierra On-Line, Inc. v. Phoenix Software, Inc.</u>, 739 F.2d 1415, 1422 (9th Cir.1984).  In light of these

6

considerations, a plaintiff seeking preliminary injunctive relief must demonstrate either: "(1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits [have been] raised and the balance of hardships tips sharply in [the plaintiff's] favor ." Southwest Voter Registration Educ. Project v. Shelley, 344 F.3d 914, 917 (9th Cir. 2003) (en banc) (per curiam), citing Clear Channel Outdoor Inc. v. City of Los Angeles, 340 F.3d 810, 813 (9th Cir. 2003). Plaintiff must also show that the public interest favors issuance of a preliminary injunction. Southwest Voter, 344 F.3d at 917.

The components of these two tests operate on a sliding scale or "continuum." Id. at 918. Consequently, "the less certain the district court is of the likelihood of success on the merits, the more plaintiffs must convince the district court that the public interest and balance of hardships tip in their favor." Id.; see also Miller v. California Pac. Med. Ctr., 19 F.3d 449, 456 (9th Cir.1994) (en banc).

DISCUSSION

The parties agree upon the basic legal standard for the issuance of a temporary injunction. To decide the issue, the court must examine both plaintiff's likelihood of succeeding on the merits and the hardships involved in the grant or denial of preliminary injunctive relief, including questions of public interest.

I.     Success on the Merits

Plaintiff challenges the Secretary's approval of the Egg Board's revised 2008 budget pursuant to the Administrative Procedure Act (APA), 5 U.S.C. § 706. See Amended Complaint ¶ 55. Under the standard of review set forth in the APA, the reviewing court may hold unlawful or set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." See 5 U.S.C. § 706(2)(A). The Supreme Court has set forth a two-part test to determine whether an agency has acted "not in accordance with law." See Chevron, U.S.A. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-843 (1984). The court must first look to the statute's language to determine "whether Congress has directly spoken to the precise question at

7

1 issue. If the intent of Congress is clear, that is the end of the matter; for the Court, as well as the
2 agency, must give effect to the unambiguously expressed intent of Congress." Id. The reading of
3 the statute must be the "only plausible interpretation." Regions Hosp. v. Shalala, 522 U.S. 448, 460
4 (1998). "If, however, the court determines Congress has not directly addressed the precise question
5 at issue . . . the question for the court is whether the agency's answer is based on a permissible
6 construction of the statute." Chevron, 467 U.S. at 843.

7 The question at issue is whether the ERCIA or the CPRIA forbids the use of the federal
8 check-off funds that fund the Egg Board to influence a state ballot initiative. No precedent has been
9 cited on this point. The respective limitations on political activity in both statues are couched in
10 sweeping terms. See 7 U.S.C. § 2707(h) (ERCIA) (". . . *no* funds . . . shall *in any manner* be used . .
11 . ."(emphasis added); 7 U.S.C. § 7414(d)(2) (CPRIA) ("A board may not engage in . . . *any action* . .
12 . .) (emphasis added). The ERCIA proscribes attempts to influence "governmental policy or action,"
13 while the CPRIA's language uses the phrase "any legislation or governmental action or policy." At
14 a minium, a ballot initiative is plainly "legislation," as it is an exercise in law-making by the people
15 of California. There can also be little doubt that to influence the result of a ballot initiative is to
16 influence "governmental . . . policy," since the point of a ballot initiative is to do exactly that.
17 Indeed, the Secretary has not argued otherwise. In light of the ERCIA's and the CPRIA's sweeping
18 and comprehensive language, the only plausible interpretation of each statute's respective restriction
19 is one that prohibits the use of the Egg Board's federal check-off funds to influence a state ballot
20 initiative. If the Secretary authorized the challenged Egg Board expenditures for the purpose of
21 influencing the outcome of the Prop 2, such action would violate the ERCIA and the CPRIA and
22 would, therefore, constitute an action "not in accordance with law" under the APA.

23 CHF alleges that the Egg Board's California advertising campaign is designed to influence
24 the election by supporting the "No on Prop 2" ballot committee's efforts. The Secretary counters
25 that the advertisements are unrelated to Prop 2, because they do not discuss the confinement or
26 treatment of any animal or the ballot initiative itself and do not advocate any political position. See
27 Opp. at 4. The Secretary argues that the ads are "generic" and "educational," and likens the ads to
28

8

similar commodity promotion campaigns such as "The Incredible, Edible Egg," "Got Milk?" and "Beef. It's What's for Dinner Tonight."

The central issue at this stage is whether the characterization of the Egg Board advertisements as unrelated to Prop 2 is supportable. The Egg Board, a national body, chose to allocate $3 million of a total 2008 special projects budget of approximately $3.7 million to a "consumer animal welfare ed. campaign" in California just as ballot initiative proponents were gathering hundreds of thousands of signatures to place their initiative on the ballot. The Secretary asserts that this action had nothing to do with Prop 2, but he offers no alternative explanation or interpretation of the timing of the campaign. Moreover, the approved budget line item bore the title "consumer animal welfare ed. campaign" on January 15, 2008, but the advertisements ultimately produced with this money, according to the Secretary, "do not discuss the confinement or treatment of any animal . . . ." Opp. at 4. How did money initially earmarked for messages about "animal welfare" end up funding advertisements aimed at the apparently unrelated virtues of "local eggs"? Only one theory has been suggested to explain this odd shift.

Specifically, CHF alleges that one of the "No on Prop 2" ballot committee's key messages, noted throughout its website and in ads and press releases, is the claim that buying local gets you better eggs. Amended Complaint ¶ 51. The "Californians for SAFE Food: No on Prop 2" coalition writes on it homepage, "WHY OPPOSE PROPOSITION 2?" Two of the six listed answers to this question are: "Eliminates fresh, safe and local eggs; forces a dependence on eggs from Mexico and out-of-state" and "Drives up consumer prices and costs." The capitalized word "SAFE" in the phrase "Californians for SAFE Food" is apparently an acronym that stands for "<u>S</u>AFE, <u>A</u>FFORDABLE and <u>F</u>RESH <u>E</u>GGS."

The challenged Egg Board campaign, funded by federal check-off funds, aims to remind viewers that "Local eggs are fresh and affordable" and "If you want fresh eggs, you want them locally grown." These Egg Board advertisements would run during the same time period that the "No on Prop 2" coalition's materials argue that Prop 2 "Eliminates fresh, safe, and local eggs." The Egg Board campaign plainly works hand-in-glove with the "No on Prop. 2" campaign by convincing

9

voters of the value of "local" and "fresh" eggs, the very things that Prop 2 opponents claim the ballot initiative will endanger.

A conclusion that the Egg Board campaign does not have the purpose of influencing the outcome of the November election would require the court to accept as merely bizarre coincidences an unlikely series of events, namely: the decision to undertake a special $3 million campaign regarding animal welfare in California only, just as the efforts in support of the California ballot initiative were getting under way; the unexplained shift from a campaign about "animal welfare" to one about fresh and local eggs; the equally unexplained choice to spend money to promote specific desirable aspects of a commodity (local origin and freshness), rather than the commodity itself a la "The Incredible, Edible Egg" or "Beef. It's what's for dinner;" and finally, the unlikely dovetailing of the Egg Board's message and even specific buzzwords ("fresh," "local," "affordable") with those of Prop 2's organized opposition. To accept these as mere coincidences would stretch the limits of credulity.

The most extraordinary coincidence, not yet mentioned, is the prominent role of "Ryan Armstrong" in materials of both "Californians for SAFE Food" and the challenged Egg Board advertisements. In at least two "Californians for SAFE Food" press releases, Ryan Armstrong is the featured voice of California egg producers. Armstrong has also testified during at least one public hearing as a declared "Opponent of Proposition 2." The Egg Board's choice to use the name of a prominent Prop 2 opponent as a face of its campaign supports the conclusion that the Egg Board-funded advertisements are designed as "message reinforcement" of the No on Prop 2 campaign. See Meadow Decl ¶ 7.

With no citation to authority, counsel for the Secretary assert that the only intent or purpose that matters in this case is the Secretary's. Counsel presumably wish to persuade the court to ignore not only the question of the Egg Board's intent, but also the internal USDA document showing that a USDA official, Rex Barnes, who was present at the Egg Board's November 2007 executive committee meeting, viewed the Egg Board campaign as part of the effort to defeat Prop 2. See Pl.'s Ex. 6 (Weekly Activity Report) ("California egg producers are undertaking a campaign to defeat [Prop 2]. *To supplement these efforts*, the American Egg Board voted at its November 2, 2007,

meeting to set aside $3 million to fund public relations and other projects to educate consumers about current agriculture practices.") (emphasis added).  Even if the court were to accept that the only purpose which matters under the relevant statutes is the intent in the Secretary's own mind, plaintiff would likely prevail in showing such an intent.  Secretary Schafer's August 8, 2008, email to Human Society President Wayne Pacelle provides evidence that the Secretary viewed the Egg Board campaign as something more than "generic" and "educational": "Do you think if you sue [over the Egg Board's expenditures] it will give ammo to those opposing your initiative measure to say that you are being unfair by not allowing those who think differently to express their opinions too?"  Pl.'s Exh. 20 (Schafer Email).  The Secretary's stated desire to follow Congress's intent notwithstanding, a jury might reasonably read this email as a concession that the actual purpose of the Egg Board campaign was to allow the board members to "express their opinions [on Prop 2] too"—a use of check-off funds prohibited by the ERCIA and CPRIA.

Plaintiff has demonstrated a likelihood of success on the merits.

II.     Irreparable Harm/Balance of Hardships

Having demonstrated a likelihood of success on the merits, plaintiff need show only "the possibility of irreparable injury" to obtain a temporary injunction.  Southwest Voter, 344 F.3d at 917.  As the ballot committee for Prop 2, CHF's ultimate purpose is to advocate for Prop 2.  As of June 30, 2008, the committee and its donors had spent in excess of $800,000 in pursuit of its goal.  An influx of illegal money to supplement the "No to Prop 2" efforts would directly harm CHF.  Moreover, the potential harm would hardly be trivial.  For good or ill, the availability of funds undeniably plays a role in the outcomes of elections—otherwise there would be no incentive to litigate this case at all.  According to plaintiff, as of August 14, 2008, the "Yes on Prop 2" campaign had collected just over $4.4 million in donations, and the "No on Prop 2" campaign had raised $2.1 million.  Defendant has not contradicted these numbers.  In an election in which a total of approximately $6.5 million has been raised by August, an influx of $3 million to supplement the efforts of one side is significant indeed.  Plaintiff has shown the possibility of irreparable injury.

1    Based on the parties' pleadings, plaintiff would prevail even if it had to meet the stricter test
2 of showing that "the balance of hardships tips sharply in [the plaintiff's] favor." See Southwest
3 Voter, 344 F.3d at 917. The only harm to which the Secretary has pointed is the danger that the
4 grant of a temporary injunction in this case will open the floodgates to interference by special
5 interests groups with the activities of the 19 national commodity research and promotion programs.
6 See Opp. at 7 ("If special interest groups such as Plaintiff or other individuals were able to enjoin the
7 [Egg Board], Beef Board, Pork Board, Lamb Board, [etc.] any time that group or individual thought
8 that the Board's lawful advertising and promotion of the positive image of a commodity may affect a
9 local, state, or other election, the Boards would be unable to fulfill the purpose for which they were
10 created."). There are two fundamental problems with this argument. First, as discussed above,
11 plaintiff is likely to prevail in showing that the advertising at issue is not "lawful" and is not for "the
12 purpose for which" the Egg Board was created. Second, the Secretary's argument is a *reductio ad*
13 *absurdum*. CHF could just as easily (and spuriously) argue that if an injunction does not issue, the
14 commodity boards will run amok, with no constraint on their political activities. The court trusts
15 that any future reviewing court presented with a motion for a preliminary injunction against a
16 commodity board will review the particularized facts of that case—as, indeed, it would be bound to
17 do under the law—regardless of today's ruling. The Secretary has not shown (indeed, has not
18 asserted) that he or, for that matter, any members of the egg industry will suffer harm by a short
19 delay of the Egg Board's purportedly generic and educational campaign until after Election Day,
20 which is less than seven weeks away. See Nelson v. Nat'l Aeronautics & Space Admin., 530 F.3d
21 865, 872 (9th Cir. 2008) (holding balance of hardships tips sharply in favor of plaintiffs where "there
22 was no exigent reason for performing [the challenged background] investigations *during the few*
23 *months pending appeal*") (emphasis added). The Secretary's argument fails to show any hardship,
24 and plaintiff would prevail even under a "balance of hardships" standard.
25    The court must also consider whether a preliminary injunction would serve the public
26 interest. The public interest primarily at issue today has nothing to do with the freshness of eggs or
27 the happiness of chickens; rather, it is the interest in protecting nothing less than the democratic
28 process, federalism, and the rule of law. A government agency's "failure to comply with a statute . .

12

. invokes a public interest of the highest order." <u>High Sierra Hikers Ass'n v. Powell</u>, No. C-00-01239-EDL, 2002 WL 240067 at *3 (N.D. Cal. 2002) (LaPorte, Mag. J.); <u>see also</u> <u>Olmstead v. United States</u>, 277 U.S. 438, 485 (1928) (Brandeis, J., dissenting) ("If the government becomes a lawbreaker, it breeds contempt for law . . . .). This is particularly true where, as here, the allegation is one of unlawful interference by federal entities in a state election. The public interest is plainly served by ensuring that federal officials do not illegally interfere with the state legislative process in California. Such unlawful meddling would threaten the integrity of the democratic process and contradict the premises of our federal system of government.[2]

III.   <u>Scope of the Preliminary Injunction</u>

The Secretary objects that the injunction requested by plaintiff is overbroad, because it prohibits the Secretary from authorizing the Egg Board to spend funds on any activities targeted specifically at California.[3] The court recognizes that the Egg Board may pursue legitimate campaigns to promote eggs, targeted specifically at this State. Therefore, the temporal scope of the injunction will be limited such that the injunction will remain in place only until Election Day has passed, rather than until final judgment on the merits of the case has been rendered. The Egg Board normally runs nation-wide campaigns. The Secretary has alleged no legitimate harm resulting from a deferment for a few weeks of any other "special projects" specifically or substantially targeting California which the Egg Board might be hatching.

<u>CONCLUSION</u>

For the reasons stated above, the court GRANTS plaintiff's motion for a preliminary injunction.

It is hereby ordered that the Secretary of Agriculture, the American Egg Board, and their officers, agents, employees, and attorneys are enjoined from undertaking, authorizing, facilitating, or allowing any of the following acts, until the court has rendered final judgment on the merits of this action or until 12:01 a.m. Pacific Standard Time, Wednesday, November 5, 2008, whichever occurs first:

(1)  Any broadcast or dissemination of the advertisements described in the Barnes Declaration or any other advertisement promoting "local," "fresh," or "affordable" eggs or reinforcing any other "No on Prop 2" theme, through any media outlet reaching a California audience, including but not limited to television, radio, print media, internet, mail, and leafleting;

(2) Any expenditure or disbursement of funds approved in the American Egg Board's revised 2008 annual budget (including any subsequent revisions prior to November 5, 2008), or of any other federal check-off funds collected to fund the American Egg Board, to support activities specifically or substantially targeted at California, whether undertaken by the American Egg Board or any other person or entity; and

(3) Any expenditure or disbursement of funds approved in the American Egg Board's revised 2008 annual budget (including any subsequent revisions prior to November 5, 2008), or of any other federal check-off funds, to support any activity the purpose of which is, or may be reasonably interpreted to be, to affect voter opinion on or the ultimate disposition of California Proposition 2, in any manner whatsoever, whether undertaken by the American Egg Board or any other person or entity.

IT IS SO ORDERED.

Dated: September 25, 2008

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

14

## **ENDNOTES**

1. The court takes judicial notice of the "No on Prop 2" website and its contents as of September 15, 2008. <u>See</u> Fed. R. Evid. 201.

2. It is worth noting that misuse of Egg Board funds also implicates the interests of the producers who are required under federal law to contribute check-off funds. Farmers from across the country are required to pay assessments so that the Egg Board can pursue its mission of commodity promotion and research, not so that it can spend their money to fight ballot measures in other states. A dollar spent on impermissible political advertisements in California is one less dollar that could be spent actually promoting "the incredible, edible egg" or pursing the Egg Board's legitimate programs in support of the nation's egg industry. Moreover, not every producer who is required to pay assessments to the Egg Board opposes measures like Prop 2. <u>See, e.g.</u>, Motion, Exh. 18 (June 17, 2008, Letter from John Baker, President of Giving Nature Foods, Inc., to Joanne Ivy, President, American Egg Board) at 2 ("Giving Nature Foods does not have a choice whether to give federal check-off funds to the board. . . . The American Egg Board's opposition to the California animal welfare legislation would align the Board against my political and economic interests . . . .").

3. Defendant has cited only one authority, <u>Lewis v. Casey</u>, 518 U.S. 343 (1996), as providing relevant limits to the remedies that the court might order in the instant case—and defendant did so belatedly, first at oral argument. In any event, the facts and holding of that case are inapposite. In <u>Lewis</u>, the Supreme Court severely criticized a district court for imposing injunctive relief that failed to defer to prison authorities' judgment about safety concerns, created a detailed and "wildly intrusive" injunction that enmeshed it in the minutiae of prison operations, and ignored considerations of comity between federal and state governments. <u>See</u> <u>id.</u> at 361-363. None of those concerns are relevant to the instant injunction.